IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


TAMARA KLINE AND GREG KLINE, )
                                )
     Plaintiffs,                )
                                )
VS.                             ) CIVIL ACTION FILE
                                ) NO: 1:23-CV-02035-SDG
JAN DICK,                       )
                                )
     Defendant.                 )


ORAL AND VIDEOTAPED DEPOSITION OF

JAN DICK

JULY 19, 2023


ORAL AND VIDEOTAPED DEPOSITION of
JAN DICK, produced as a witness at the instance of the
Plaintiffs, and duly sworn, was taken in the
above-styled and -numbered cause on the 19th of July,
2023, from 8:50 a.m. to 11:54 a.m., before Therese J.
Casterline, CSR in and for the State of Texas, reported
by machine shorthand, at the offices of Slack Davis
Sanger, LLP, 100 Lexington Street, Suite 70, in the
City of Fort Worth, County of Tarrant, State of Texas,
pursuant to the Federal Rules of Civil Procedure and
the provisions stated on the record.

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4           Mr. John M. Hyatt
             HYATT & HYATT PC
 5           125 Clairemont Avenue
             Suite 440
 6           Decatur, Georgia 30030
             404-378-3635
 7           john@hyatt-law.com
 8
     FOR THE DEFENDANT:
 9
             Mr. Jonathan Adelman
10           WALDON ADELMAN CASTILLA HIESTAND & PROUT
             900 Circle 75 Parkway
11           Suite 1040
             Atlanta, Georgia 30339
12           770-953-1710
             jadelman@wachp.com
13
             Mr. Willie C. Ellis, Jr.
14           THE ELLIS FIRM
             145 Beracah Walk
15           Atlanta, Georgia 30331
             770-212-1432
16           will@call-ellis.com
17
     ALSO PRESENT:
18
             Ms. Erica Taylor, Videographer
19
20
21
22
23
24
25
```

1                        I N D E X

2                                              PAGE

3   Appearances                                  2

4

5   WITNESS:  JAN DICK

6   EXAMINATION BY MR. HYATT                      4

7   EXAMINATION BY MR. ADELMAN                  119

8   EXAMINATION BY MR. HYATT                    121

9

10  CHANGES AND SIGNATURE                        123

11  REPORTER'S CERTIFICATE                       125

12

13                      EXHIBITS

14  NUMBER            DESCRIPTION              PAGE

15  Exhibit 1    Golden State Foods Operations   18
                 Supervisor Job Description

16
    Exhibit 2    AT&T text messages from 1-28-22  38

17               to 2-23-22

18  Exhibit 3    6-9-23 Receipt                   84

19  Exhibit 4    6-24-13 Rockdale County         111
                 Sheriff's Office Incident/Offense

20               Report

21

22

23

24

25

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We are now on the record at 8:50 a.m. on Wednesday, July 19th, 2023.

Would counsel please identify themselves, please state any agreements for the record, after which the court reporter will swear in the witness.

**MR. HYATT:**  John Hyatt here for the plaintiffs.

**MR. ADELMAN:**  Jonathan Adelman for Jan Dick.

**MR. ELLIS:**  Willie Ellis for Jan Dick.

JAN DICK,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HYATT:

   **Q.  Okay.  Mr. Dick, I'm John Hyatt.  We were introduced earlier.  We'll go over a few ground rules, so to speak, before we get started.**

**First, have you ever given a deposition before?**

   A.  No, sir.

   **Q.  All right.  So I -- I know you've spoken with your counsel, giving you the basics, but just a few things that may or may not have been covered.**

1              First, if any of my questions are unclear

2   to you, you need me to rephrase or restate them, let me

3   know, and I'll do so in order to try to get on the same

4   page, okay?

5        A.  Yeah.

6        Q.  If any -- your -- if any of your answers are

7   yes or no, please say yes or no as opposed to uh-huh or

8   huh-uh or nodding your head.

9              We are -- we do have video.  This is

10  helpful for that, but on a written transcript, uh-huh

11  looks a lot like huh-uh, okay?

12       A.  Understood.

13       Q.  And then, finally, if you'll try to wait until

14  I finish my question before you start talking or start

15  your answer.

16              In normal conversation, we -- a lot of

17  times we tend to anticipate where someone's going with

18  a question and kind of jump the gun.  That can cause,

19  again, problems for our court reporter.

20              Also sometimes I might be -- end up

21  zigging where you think I'm going to zag, right?

22       A.  Sure.  Yes, sir.

23       Q.  So we'll just -- just try to wait until I

24  finish my question.  And, of course, I'll try to do the

25  same when you're talking, okay?

1      A.  Okay.

2      **Q.  All right.  Just give us your full name,**

3 **please.**

4      A.  Jan Dick.

5      **Q.  And what's your date of birth, Jan?**

6      A.  It's February 14th, 1995.

7      **Q.  And on February 11, 2022, the date of this**

8 **incident, what was your address?**

9      A.  M███████████████████████

███████████████████████████████████

███████████████████

12      **Q.  Okay.  Was that Gwinnett County, part of**

13 **Loganville?**

14      A.  I believe so, yes, sir.

15      **Q.  Are you married?**

16      A.  Yes, I am.

17      **Q.  And your wife's name?**

18      A.  Is -- first name is Sumiko Ariel Joy Fischer.

19      **Q.  S-U-B-A-K-O?**

20      A.  S-U-M-I-K-O.

21      **Q.  Sumiko, okay.  I'm sorry.**

22          **And the middle name?**

23      A.  Ariel Joy Fischer.  Long name, sorry.

24      **Q.  Okay.  What does she go by?**

25      A.  She goes by Ariel.

1   Q.  Ariel, okay.

2       And when were you and Ariel married?

3   A.  October of 2021.

4   Q.  Any children?

5   A.  We have two.

6   Q.  ████████████████████████████

    ███████████████████████.

8   Q.  When did you move from Georgia to Texas?

9   A.  Just under a year -- I'm sorry.  Just over a

10  year ago.  It was September, the same year of the

11  accident, '21.

12  Q.  Okay.  Well, the -- the crash was February

13  '22.

14  A.  Excuse me.  It was '22, yes.

15  Q.  Okay.  So it was like September of 2022, last

16  year?

17  A.  Yes, sir.

18  Q.  Okay.

19      MR. ADELMAN:  I think that's under a year.

20      THE WITNESS:  That is under a year.

21      MR. ADELMAN:  Yeah.

22  Q.  What's your current address?

23  A.  ████████████████████████████████

    ███████████████████████

25  Q.  And who lives at that address with you now?

1       A.  My wife and two children.

2       Q.  **Any plans to move again that you know of?**

3       A.  No, sir.

4       Q.  **You like it here in Fort Worth?**

5       A.  I love it.  I do.

6       Q.  **Where did you grow up?**

7       A.  I grew up in Conyers, Georgia.

8       Q.  **Where did you go to high school?**

9       A.  Rockdale County High School, also in Conyers.

10      Q.  **Did you start college right out of -- right**

11  **after high school, or did you take a year or so off?**

12      A.  I started right after.

13      Q.  **And you started at Georgia State?**

14      A.  Yes, sir.

15      Q.  **Fall of 2012?**

16      A.  Yes, sir.

17      Q.  **I peeked at your LinkedIn profile.**

18      A.  Okay.

19      Q.  **So that's why -- to save a little time here.**

20      A.  Sure.

21      Q.  **I just want to get stuff confirmed, okay?**

22          **And what did you study at Georgia State?**

23      A.  Business administration.

24      Q.  **And then you transferred to University of**

25  **Georgia?**

1    A.  Yes, sir.

2    Q.  What year did you start there?

3    A.  It was 2014.

4    Q.  Business major?

5    A.  Yes, sir.

6    Q.  And did you graduate?

7    A.  Yes, sir.

8    Q.  In what year?

9    A.  That would have been 2016.

10   Q.  And like a business administration degree?

11   A.  Yes, sir.

12   Q.  Did you have an area of focus in business

13   administration?

14   A.  I did.  It was supply chain management.

15   Q.  Why did you choose that area of study?

16   A.  My initial, I guess, exposure to the business

17   world, that was the one that kind of stood out to me to

18   be the most interesting.

19   Q.  And I assume you also took more general

20   management classes as well?

21   A.  Yes, sir.

22   Q.  Well, do you recall studying concepts like the

23   importance of developing teamwork, camaraderie, good

24   communication among employees in the workplace?

25   A.  Yes, sir.

1    Q.  And now that you're actually working in the

2  business management world, have you found that to be

3  true, the importance of developing that?

4    A.  Yes, sir.

5    Q.  So in your exper- -- in your -- it's been your

6  experience that developing teamwork, camaraderie and

7  good communication among employees in the workplace are

8  important objectives in the world of business

9  management?

10    A.  Yes, sir.

11    Q.  And it will typically benefit a company to

12  develop those traits among its employees?

13    A.  Yes, sir.

14    Q.  Was your first job after graduating from UGA

15  with Pratt Industries?

16    A.  That's right.

17        **MR. HYATT:**  Let me go back.  I -- I forgot

18  to put stipulations on the record.

19        So just we're clear on that, this is --

20  this is the deposition of Jan Dick, obviously, for the

21  purpose of discovery, cross-examination of an opposite

22  party, and any other purpose provided for under the

23  Federal Rules of Civil Procedure.

24        And all objections will be reserved until

25  the time or for the use of a deposition, if that's

1   agreeable.

2           **MR. ADELMAN:**  That's agreeable.

3           And then to the extent that there are any

4   objections which can't be reserved, they'll be on the

5   video record, but they'll all be edited off the video.

6   That's at some point if we use the deposition.

7           **MR. HYATT:**  Fair enough.

8           And you want to wait until the conclusion

9   of the deposition to decide on signature or --

10          **MR. ADELMAN:**  Yeah, let us wait until the

11  conclusion, and we'll talk --

12          **MR. HYATT:**  Okay.

13          **MR. ADELMAN:**  -- we'll talk to him.

14          **MR. HYATT:**  All right.  Sorry about that.

15          THE WITNESS:  Sure.

16          **MR. HYATT:**  We have to do housekeeping

17  sometimes, so --

18      **Q.  And your first job after graduating with UGA**

19  **was with Pratt Industries?**

20      A.   Yes, sir.

21      **Q.  And what does Pratt Industries do?**

22      A.   So they primarily work in -- in packaging, so

23  things like boxes, bubble wrap, packaging, paper for

24  Home Depot and Walmart and -- and several other

25  customers.

1     Q.  All right.  According to your LinkedIn

2 profile, you were there from January 2017 until January

3 of 2021; is that accurate?

4     A.  Yes, sir.

5     Q.  And, again, according to that, looks like

6 during the time you were at Pratt Industries, you

7 started out as an intern?

8     A.  Yes, sir.

9     Q.  Then moved to supply chain process tech?

10    A.  Yes, sir.

11    Q.  Then to materials planning and inventory

12 manager?

13    A.  Yes, sir.

14    Q.  Then to service manager?

15    A.  Yes, sir.

16    Q.  And then to production manager?

17    A.  Yes, sir.

18    Q.  That was -- was that your last position at

19 Pratt?

20    A.  It was.

21    Q.  So you were moving up there?

22    A.  Yes, sir.

23    Q.  Did you like it there?

24    A.  I did.

25    Q.  And why did you leave Pratt and go to Golden

1  State Foods in January 2021?

2      A.  In my -- during my production manager role, I

3  held that -- that position in two different facilities.

4  One was in Conyers, Georgia, and the other in Atlanta,

5  Georgia.

6              When I transitioned into the Atlanta,

7  Georgia facility, that's kind of when I -- when I

8  became unhappy with the position there.

9              Just, you know, that camaraderie you were

10 mentioning earlier, we just didn't have it in the -- in

11 the management leadership team there, so that's when I

12 started looking for another position.

13     Q.  Okay.  Did you discuss any job opportunities

14 at Golden State Foods with your dad?

15     A.  Yes, sir.

16     Q.  How long has your -- your dad been with Golden

17 State Foods, about?

18     A.  I'm not sure off the top of my head.  I --

19 it's over 20 years; I know that.

20     Q.  And he's currently chief operating officer

21 there?

22     A.  Yes, sir.

23     Q.  Do you know how long he's been chief operating

24 officer?

25     A.  I do not, no, sir.

1     Q.  Does he live in California?

2     A.  Yes, sir.

3     Q.  Is -- is -- and that's where Golden State

4  Foods is headquartered, correct?

5     A.  Yes, sir.  The corporate office is in Irvine.

6     Q.  And you started with Golden State Foods at the

7  Conyers facility in January of 2021?

8     A.  Yes, sir.

9     Q.  And that's the facility off of 138 in Conyers?

10     A.  Correct, yes, sir.

11     Q.  It's like Old Covington Road, and that's what

12  it's called?

13     A.  Yes, sir.

14     Q.  All right.  Tell me what does Golden State

15  Foods do at that Conyers facility.

16     A.  Sure.  They're a full make, pack and -- and

17  ship facility for -- for condiments, for -- for small

18  packaging condiments for fast-food restaurants.

19     Q.  Okay.  So that's a small packaging -- are

20  they -- back up.

21     A.  Uh-huh.

22     Q.  Do they manufacture the -- the condiments

23  there?

24     A.  Yes, sir.

25     Q.  Package them?

 1    A.  Yes, sir.

 2    Q.  Ship them?

 3    A.  Yes, sir.

 4    Q.  And that's the -- kind of the sum and

 5  substance of what's done there?

 6    A.  That's it.

 7    Q.  On a really large scale?

 8    A.  On a very large scale, yes, sir.

 9    Q.  I mean, that is a huge facility.

10    A.  It is.

11    Q.  Okay.  Does the facility ever shut down, or is

12  it operating 24/7?

13    A.  It depends on business needs.  My time there,

14  I experienced times where we did shut down on weekends,

15  and we also had weekends where we worked, so it

16  depended on business needs.

17    Q.  Okay.  And you've been there now a year and a

18  half or so?

19    A.  I believe two and a half, '21.

20    Q.  Okay, yeah.

21    A.  Yes, sir.

22    Q.  Two and a half.

23          Just generally speaking, what percentage

24  of that time would you say you were working -- or the

25  facility was going seven days a week as opposed to

1   being shut down on the weekends?

2      A.  Maybe 70 percent, I would say.

3      Q.  **Maybe 70 percent going full seven days a week,**

4   **24 hours a day?**

5      A.  Yes, sir.

6      Q.  **Okay.  And when the facility was -- is -- was**

7   **running -- and we're talking about the Conyers**

8   **facility -- were all aspects running, or it was like**

9   **certain divisions running and open?**

10      A.  Again, it depended on business needs and

11  customer orders, but typically it would be one or two

12  areas.  It wouldn't be the entire facility, typically.

13      Q.  **All right.  When you were there at the Conyers**

14  **facility, do you know the approximate number of**

15  **employees?**

16      A.  I -- I don't know.  I know it was north of

17  300.

18      Q.  **And you're at the facility here near**

19  **Fort Worth now?**

20      A.  Yes, sir.  It's in Burleson, Texas.

21      Q.  **What -- what does this facility do here in the**

22  **Fort Worth area?**

23      A.  It has the -- the exact same scope of -- of

24  work.

25      Q.  **Okay.  And going back to Conyers, looks like**

1    you started as operations supervisor there, correct?

2        A.  Yes, sir.

3        Q.  From -- and you were in that position from

4    January 2021 until April 2022?

5        A.  Yes, sir.

6        Q.  So operations supervisor was your position as

7    of February 11th, 2022?

8        A.  Yes, sir.

9        Q.  Describe for me your job duties as operations

10   supervisor at Golden State Foods in Conyers.

11       A.  Sure.  Yeah, it -- it was, you know, obviously

12   ensuring safety and quality of our -- of our products

13   and -- and employees first, but then meeting specific

14   and certain productivity and production goals.  So

15   we -- we were held to a -- a number, right, that we --

16   that we needed to produce on a daily basis.

17               So my -- my position there was to -- to do

18   the best we could to make sure we got that number.

19       Q.  Okay.  When you say a number, are you talking

20   about the number of -- of product actually shipped --

21   produced and shipped out at a certain time interval?

22       A.  Yes, sir.  We -- we measured production in --

23   in cases.  So it would be a certain number of cases

24   of -- of whichever product we were manufacturing that

25   day.

1    Q.  Okay.  So let me show you the first exhibit.

2            I'm going to show you -- we're going to

3    mark Plaintiffs' Exhibit 1.

4            (Exhibit Number 1 marked.)

5            MR. ADELMAN:  Thank you.

6            THE WITNESS:  Thank you.

7    Q.  Now, this is a job description that was posted

8    on JobzMail -- JobzMall --

9    A.  Okay.

10   Q.  -- online.  And I just printed that out.

11          First of all, I want you to look this

12   over, and I'm just going to ask you if you've ever seen

13   this job description before, perhaps in a different

14   format, but if -- if this -- if this is something

15   you've seen before, and is it an accurate job

16   description.

17   A.  Okay.  I'm sorry.  Can you repeat the

18   question?

19   Q.  Yeah.  It was a lot.

20          So, first of all, have you ever seen this

21   job description for your position as operations

22   supervisor in the Conyers Golden State Foods facility

23   before this?

24   A.  No, sir.

25   Q.  Is this an accurate job description of your

1   **job as operations supervisor at Golden State Foods?**

2      A.  I would say it does not match the -- the

3  expectations that I had when I was holding that

4  position.

5      **Q.  And what -- what's right about it and what's**

6  **wrong about it?**

7      A.  I would say the work assignments,

8  productivity, accuracy, KPIs, areas of improvement are

9  all accurate.

10      Specifically the things I would say are

11  not accurate are areas that are mentioning

12  transportation logistics, drivers.  I didn't manage or

13  supervise anything in that area when I -- in my time

14  there.

15      **Q.  Okay.  All right.  But what you've described**

16  **to me as your -- your job as operations supervisor, it**

17  **looks like it involved a lot of multitasking?**

18      A.  Yes, sir, I would say so.

19      **Q.  Okay.  And were -- were -- was there more than**

20  **one division for -- at -- at that position -- at -- at**

21  **Golden State Foods?**

22      A.  No, sir.

23      **Q.  So how many operations supervisors were there**

24  **at Golden State Foods what -- during the time you were**

25  **there in Conyers?**

1      A.  I -- I'm not sure off the top of my head, sir.

2    I apologize.  I don't know.  It was a large facility.

3      **Q.  Yeah.**

4      A.  I can -- I can speak to how many I worked

5    with.

6      **Q.  Okay.  How many did you work with?**

7      A.  It was myself and three other supervisors for

8    four total.

9      **Q.  And when you say you worked with them, explain**

10   **to me how -- what that means as far as working with**

11   **them.**

12     A.  Sure.  We had -- we had four shift

13   supervisors, so myself and another individual was --

14   was day shift, and then we had two night shift

15   supervisors as well, you know, so they would be a

16   continuation of day shift and -- and -- and vice versa.

17     **Q.  Okay.  And were you a day shift supervisor**

18   **during your entire tenure there?**

19     A.  No, sir.

20     **Q.  Okay.  So tell me when you were day shift and**

21   **when were -- you were night shift.**

22     A.  I can't speak to exact dates of the

23   transitions.

24     **Q.  Yeah.**

25     A.  I spent roughly three months on night shift to

1    support -- when we had a -- a gap there.

2        Q.  Approximately when was that?

3        A.  I apologize.  I'm not sure off the top of my

4    head.  May- -- maybe six months after I started there.

5        Q.  Okay.  When this crash happened on

6    February 11th, 2022, were you a day shift supervisor?

7        A.  Yes, sir.

8        Q.  And when we use -- we're using the word

9    "supervisor."  We're talking about operations

10   supervisor, correct?

11       A.  Yes, sir.

12       Q.  And what was -- what were the hours for the

13   day shift?

14       A.  So typically they were 12-hour days.  Not all

15   the time, again, dependent on -- on business needs, but

16   typically they were from 6:00 a.m. to 6:00 p.m.

17       Q.  And would -- when business needs were higher,

18   would those shifts sometimes run longer than 12 hours?

19       A.  No, sir.

20       Q.  When business needs were lower, would they

21   sometimes run less than 12 hours?

22       A.  Yes, sir.

23       Q.  And how would that range?  Would they

24   sometimes go as short as six or eight hours or --

25       A.  Yes, sir.

1    Q.  Okay.  And when the shift -- when business

2    needs were lower and the shift was going to be shorter,

3    who made the decision, okay, let's shut down the shift,

4    basically?

5    A.  So it would be -- it would be planned.  So as

6    an example, if we were shutting down for the weekend,

7    you know, our Fridays would typically be short, so they

8    were typically scheduled to be that way.

9         But if -- if business needs changed during

10   the week, our -- our manager would -- would make that

11   kind of decision.

12   Q.  When you say your manager, what actual job

13   position would that be who's making that decision?

14   A.  That would have been an operations manager.

15   Q.  And was there just one operations manager for

16   the plant?

17   A.  No, sir.

18   Q.  How many?

19   A.  There were two.

20   Q.  And would they come in on different shifts,

21   sort of like the supervisors?

22   A.  As needed.

23   Q.  Okay.  And almost -- the situations where,

24   say, the plant was shut down earlier on Friday, for

25   example, would there be times where things would change

1    over the weekend and the plant would open up during the

2    weekend, or would -- if they said they were shutting

3    down on Friday early, it was actually shut down and

4    stayed shut down?

5        A.   They -- they -- if they were planning on

6    shutting down, they would stay shut down.

7        Q.   And you -- then you -- it was April of 2022

8    when you moved up to, I guess -- was it assistant --

9    what was the job position you had that you moved up to

10   in April?

11       A.   It was the -- an assistant operations manager

12   role.

13       Q.   Assistant operations manager.

14             And how did your job duties change when

15   you moved to that position?

16       A.   Instead of a daily, you know, shift supervisor

17   over a smaller area, I became an assistant to one of

18   the operations managers and -- and had total

19   responsibility for the same kind of metrics that we

20   talked about earlier for -- for two separate rooms in

21   the facility.

22       Q.   Now, you mentioned the three other operations

23   supervisors that you worked with in Conyers.  What were

24   their names?

25       A.   On day shift, I had Eliseo Mendez,

1    E-L-I-S-E-O, last name M-E-N-D-E-Z.  And forgive me, I

2    can't remember the two night shift supervisors' names.

3    We didn't work together for very long.

4         Q.  Okay.  And what about on night shift?

5         A.  That's what I was saying.  I don't remember

6    the two names.

7         Q.  I'm sorry, okay.

8         A.  I apologize.

9         Q.  Okay.  But if the plant was running, there

10   needed to be an operations supervisor in your area on

11   duty, correct?

12        A.  Yes, sir.

13        Q.  And -- and how was your -- your area cordoned

14   off, so to speak?  In other words, you've got a --

15   you've got productivity quotas, right?

16        A.  Yes, sir.

17        Q.  And I guess another operations supervisor has

18   his or her productivity quotas, correct?

19        A.  Yes, sir.

20        Q.  So how do -- how do they look at Jan Dick's

21   division or area in order to measure those?

22        A.  If I'm -- if I'm understanding the question

23   correctly, to -- just to -- how would leadership in the

24   facility know how well we performed on the day or --

25        Q.  Right.  Because, you know, how -- because --

1    there was -- you've got quotas, and then I assume

2    another operations supervisor has quotas as well.

3         A.  Yes, sir.

4         Q.  And there's several throughout those -- the

5    plant at the same time?

6         A.  Yes, sir.

7         Q.  So how do they know, okay, Jan Dick met his

8    quota?  What -- what are they looking at?  Certain

9    areas of the plant, certain products or -- or what?

10        A.  Yes, sir.  It would be split up by area, so by

11   physical location.

12        Q.  Okay.  And what was -- does your area have a

13   name or a number?

14        A.  It did.  It's a -- it was ketchup.  So the --

15   the facility had two departments.  There was ketchup

16   and sauce.  Each of those had their own rooms.  When I

17   was in that position, I helped supervise -- rooms were

18   called K3 and K4.

19        Q.  And were -- did K3 and K4 do the same thing or

20   were they different type things?

21        A.  Yes, sir, they did the same thing.

22        Q.  So if -- if we went and looked at room K3, for

23   example, what would we see?

24        A.  You would see a few different machines.  So we

25   had one row of eight machines that -- that produce

1    nothing but -- but ketchup packets, so McDonald's

2    ketchup, Wendy's ketchup packets.

3            We have another stand-alone machine that

4    held or produced bulk pouches.  So if you ever worked

5    back of the house of a restaurant, you would know the

6    people in the back of the restaurant would tear open a

7    pouch and -- and pour the contents into a -- a

8    stainless steel container, typically, so it's

9    restaurant use.

10           And then we had another stand-alone

11    machine that also produced even larger pouches for

12    the -- for the in-house -- the pump containers that you

13    can go up with with your disposable cups.

14           So those are the -- the three different

15    types of machines we had.

16    **Q.  Okay.  And you were considered management,**

17    **correct, in -- in that position?**

18           **MR. ADELMAN:**  At what time?  At what time?

19           **MR. HYATT:**  Oh, I'm sorry.

20    **Q.  During -- when you were at Conyers as an**

21    **operations supervisor.**

22    A.  No, sir.

23    **Q.  No?**

24    A.  No, sir.

25    **Q.  So were you paid hourly or salary?**

1    A.  Salary.

2    Q.  Okay.  Were you required to clock in every day

3 that you went in?

4    A.  No, sir.

5    Q.  Were the employees who were working under you,

6 were they required to clock in?

7    A.  Yes, sir.

8    Q.  Because they're paid hourly?

9    A.  Yes, sir.

10    Q.  When you would go into the facility, did you

11 log in to a computer to get access to the Golden State

12 Foods system?

13    A.  No, sir.

14    Q.  So how -- was there any type of computer

15 system that you were -- logged in to when you were at

16 the facility to -- in order to check on production or

17 things of that nature?

18    A.  No, sir.  I -- I had a -- I had a laptop that

19 was -- that was given to me.  But during that role,

20 most of my job was spent on the floor supporting

21 production.  So depending on the day, I wouldn't

22 necessarily log in at any point in time.

23    Q.  Okay.  And then that's part of being a

24 supervisor, you're expected to do the work, help get it

25 done according to standards, correct?

1      A.  Yes, sir.

2      Q.  Okay.  And the laptop that was given to you,

3  that was given to you by Golden State Foods?

4      A.  Yes, sir.

5      Q.  Was it -- did it come with certain software or

6  spreadsheets, things of that nature, on there?

7      A.  Yes, sir.

8      Q.  Without divulging any proprietary stuff, just

9  give me a general description of what was on that

10  laptop when it was given to you.

11      A.  Not much.  Email access, Microsoft Word and

12  Excel.  Those were kind of the main functions that I

13  used them for.  Internet as well.

14      Q.  And, for example, the -- you said you had a

15  spreadsheet on there?

16      A.  Yes, sir.

17      Q.  Yeah.  Was -- was it blank when they gave it

18  to you and then you started filling information in, or

19  did you download reports and information and -- and

20  merge that into the spreadsheet as -- as you got into

21  your job as operations supervisor?

22      A.  I'm sorry, I don't -- I don't understand the

23  question.

24      Q.  Yeah.  So you -- did you use the spreadsheet

25  function?

1      A.   Yes, sir.   I used Microsoft Excel.

2      Q.   **Okay.  And then would you enter the data into**

3   **the Excel in order to perform your job duties?**

4      A.   Yes, sir.

5      Q.   **All right.  And what type of information and**

6   **data would you be entering?**

7      A.   Only our -- at the end of every shift, we

8   would send out our -- our production against our goals

9   for the -- for the shift.  So those -- those were

10  the -- that was the only real function that I used

11  Excel for.

12     Q.   **All right.  And what -- what metrics would be**

13  **on Excel to document what had been done**

14  **productivitywise?**

15     A.   They -- they -- they judge productivity based

16  off of what they call schedule attainment.  So

17  essentially you say you're going to produce 1,000

18  cases, today you produced 1,000, 100 percent

19  attainment.

20     Q.   **Were you -- was it part of your job to**

21  **anticipate and set the attainment goal?**

22     A.   No, sir.

23     Q.   **That was given to you?**

24     A.   Yes, sir.

25     Q.   **By whom?**

1    A.  We have a -- a scheduler in the facility that

2  would -- would send out a production schedule weekly,

3  and on that schedule had our daily targets.

4    Q.  Okay.  The work email system at Golden State

5  Food, explain to me how -- how that worked.  Was it

6  like a private network?

7    A.  I -- I'm not sure if it was a private network

8  or not.  I would -- I'm not sure.

9    Q.  You just -- I assume you had a Golden State

10  Food work email?

11    A.  Yes, sir.

12    Q.  What -- what is that?

13    A.  It's jdick, so first initial, last name,

14  @goldenstatefoods.com.

15    Q.  Spelled out?

16    A.  Yes, sir.

17    Q.  And there wasn't any -- to your knowledge, any

18  encryption or anything; you just used, I guess,

19  Microsoft Out- -- Outlook to send emails to -- to other

20  Golden State Food workers?

21    A.  Yes, sir.

22    Q.  Did you also use your phone or a personal

23  desktop at home to send work emails?

24    A.  Phone, yes.  Desktop, no.

25    Q.  Okay.  And was your phone set to where it

1    would receive emails from Golden State Food email

2    addresses?

3         A.  Yes, sir.

4         Q.  And that laptop that was given to you by

5    Golden State Foods, did you use that strictly for

6    Golden State Foods' work purposes?

7         A.  Yes, sir.

8         Q.  How often would you use the laptop to send and

9    receive work emails over the weekend, for example?

10        A.  Not often.

11        Q.  But you did sometimes?

12        A.  So yes.  But to -- to answer your question in

13   its entirety, the four-shift structure that we had,

14   that was set up to where if we were running production

15   over a weekend, a supervisor would be on shift without

16   a supervisor having to work seven days straight.

17             And so if -- if I was there on a weekend,

18   then, yes, I'd be using the laptop, but it would be in

19   the facility, not at home.

20        Q.  Were there ever any occasions where you'd get

21   an email over the weekend when you weren't scheduled

22   and someone from the plant was notifying you, hey,

23   we're going to need to make a change in the shift or

24   the schedules for product- -- productivity are going to

25   change, or things of that nature, just to give you a

1  heads-up for the following week?

2       A.  Typically not.  Typically not, no, sir.

3       Q.  When you say "typically," would there --

4  sometimes that would happen?

5       A.  I would typically get reached out to by more

6  likely cell phone than I would by email, especially if

7  I wasn't scheduled to work that weekend.

8       Q.  And when you say contacted, reached out to by

9  cell phone, would that be a call or a text or either or

10  both?

11      A.  It could have been either or both.

12      Q.  Okay.  And I assume you have a separate

13  personal email address?

14      A.  Yes, sir.

15      Q.  What -- what is that?

16      A.  It's, again, first initial, last name, so

17  jdick95@gmail.com.

18            MR. ELLIS:  Excuse me.  Mr. Hyatt, when

19  you get a chance, can we take a break?  I need to go to

20  the restroom.

21            MR. HYATT:  Sure.  We can do it right now.

22            THE VIDEOGRAPHER:  We're now off the

23  record at 9:25 a.m.

24            (Recess 9:25-9:29 a.m.)

25            VIDEOGRAPHER:  We are now back on the

1    record at 9:29 a.m.

2        Q.  Jan, just to clean up the record to the extent

3    that it matters, you indicated that you may have given

4    us the wrong date of when you were married.

5            It was October of 2022, correct?

6        A.  Yes, sir.

7        Q.  Okay.  So obviously coworkers at Golden State

8    Foods had your cell number, correct?

9        A.  Yes, sir.

10       Q.  And you would sometimes receive calls and a

11   text on your cell phone about work matters?

12       A.  Yes, sir.

13       Q.  And sometimes those would be on the weekend?

14       A.  Yes, sir.

15       Q.  Did you have more than one cell phone as of

16   February 11, 2022?

17       A.  No, sir.

18       Q.  And the one that you had was one with AT&T,

19   cell number 404-680-3664?

20       A.  Yes, sir.

21       Q.  Did you ever receive a stipend or

22   reimbursement from Golden State Foods for your cell

23   phone use?

24       A.  Yes, sir.

25       Q.  Tell me about that.

1        A.   It's a -- it's a monthly reimbursement

2    program.

3        Q.   All right.  And was that for a set amount per

4    month, or did you turn in reports how -- of how many

5    calls or texts were related to work?

6        A.   Yes and no.  Yes in the sense that it was --

7    it was a set amount.  You would send in your -- your

8    phone bill, just -- just your total number or dollars

9    owed.  And based on your -- your cell phone plan, they

10   would -- they would reimburse you up to a certain

11   amount.

12       Q.   Okay.  So there was just -- there was a --

13   there was a cap of the amount that they would reimburse

14   you for your cell phone use?

15       A.   Yes, sir.

16       Q.   And were you paid the cap every -- every time

17   you sent in a reimbursement when you were at the

18   Conyers facility?

19       A.   Yes, sir.

20       Q.   So you didn't have to go through and

21   cherry-pick each call or text and say, this is related,

22   this is not; not anything like that?

23       A.   Oh, no, sir.  No.

24       Q.   It would be pretty labor-intensive.

25       A.   I would imagine, yes, sir.

1    Q.  Yeah.  So what was the -- what was the set cap

2  percentage of your total bill, or was it just a set cap

3  number?

4    A.  It was -- it was based -- it was again based

5  off of your plan.  Since I had a shared plan with my

6  wife, it -- my -- mine always came to -- I believe it

7  was $72 or something like that, but I believe the cap

8  was $80.

9    Q.  Okay.  And your understanding of that

10  reimbursement was to reimburse you for the estimated

11  percentage of cell phone use that you used that was

12  work-related?

13    A.  No, sir.  From -- from what I understand, the

14  reimbursement purpose was because the company

15  understands that you're going to use your cell phone

16  typically, and sometimes it's going to be for

17  work-related purposes.

18          So it wasn't based off a percentage of

19  use, work to personal.  It was just -- it was just

20  something that they offered to -- to salaried

21  individuals.

22    Q.  All right.  Was there ever a time when you

23  were working at the Conyers Golden State Food facility

24  remotely?

25    A.  No, sir.

1    Q.  And when -- you know, that was a big thing

2  during COVID, right?

3    A.  Uh-huh.

4    Q.  Generally, not -- not at Golden State Foods, I

5  guess?

6    A.  Yeah.  No, sir.  There -- there wasn't remote

7  work.

8    Q.  Right.  Right.

9        But you really -- you needed to be on the

10  floor supervising things?

11    A.  Yes.

12    Q.  And your -- your focus was on supervision and

13  production, as opposed to performing rote tasks,

14  correct?

15    A.  Yes, sir.

16    Q.  The rote tasks were for the people that you

17  were supervising?

18    A.  Yes, sir.

19    Q.  And your job was to see that the work is done,

20  and the work is done according to Golden State Foods'

21  standards?

22    A.  Yes, sir.

23    Q.  Did -- did that sometimes require you to go in

24  earlier than your shift would call for?

25    A.  No, sir.

1          Q.  Or stay later?

2          A.  No, sir, not during that time -- or position,

3     no, sir.

4          Q.  Not during the time you were operations

5     supervisor?

6          A.  Correct.

7          Q.  You mentioned a scheduler who would send out

8     the quotas, so to -- production quotas, correct?

9          A.  Yes, sir.

10         Q.  Who was that?

11         A.  Her name was Linda, last name Aikens,

12    A-I-K-E-N-S.

13         Q.  Did you ever have any direct communication

14    with her about the quota or scheduling numbers, like,

15    these are too -- these are too high or not attainable

16    or anything like that?

17         A.  No, sir, not in that -- not in that position.

18         Q.  Okay.  I guess if you had an issue with that,

19    you would maybe go to your supervisor and discuss that?

20         A.  Yes, sir.

21         Q.  And was that done in -- in person, or was it

22    sometimes done by email or text or cell phone call?

23         A.  I would say more typically in person.  I say

24    that because whenever we'd receive the weekly schedule,

25    we -- we'd review it with our -- with our manager and

1    team.
2        Q.   I assume you were given -- you had sick leave
3    or -- and vacation leave time during the time you were
4    at Conyers and the operations supervisor?
5        A.  Yes, sir.
6        Q.  And if you were out on sick leave, for
7    example, you would have another operations supervisor
8    covering what would be your normal or usual shift at
9    that time?
10       A.  Yes, sir.
11       Q.  Were there ever occasions that you would be
12   contacted when you were on sick leave, whoever's
13   covering for you, with questions or issues that were
14   going on?
15       A.  No, sir.
16       Q.  And I assume that would be the same for
17   vacation leave?
18       A.  Yes, sir.
19           MR. HYATT:  Okay.  Let's look at another
20   exhibit.
21           THE WITNESS:  Thank you.
22           (Exhibit Number 2 marked.)
23           MR. ADELMAN:  Thank you.
24           MR. ELLIS:  Thanks.
25       Q.  Okay.  I'm handing you Plaintiffs' Exhibit 2.

1          MR. ADELMAN:  Is this -- well, did you
2    guys get this?
3               MR. HYATT:  Pardon me?
4               MR. ADELMAN:  Is this what we gave to you?
5               MR. HYATT:  No.  You gave this.
6               MR. ADELMAN:  Okay.  Got it.
7               MR. HYATT:  We got this from you.
8               MR. ADELMAN:  Got it.  Okay.
9               MR. HYATT:  I don't have a response from
10   AT&T yet.
11        Q.  So this is a record from AT&T of all text
12   messages sent and received from your phone from
13   January 28th, 2022, until February 23rd, 2022.
14               And a lot of the numbers are redacted, as
15   you can see on the -- on the fourth page of Exhibit 2,
16   you see there's a list of numbers on February 11th,
17   2022.
18               Do you see that?
19        A.  Yes, sir.
20        Q.  Okay.  And going back to the first page, it
21   looks like there -- you see at the top, it says, Totals
22   for billing period.  There are 178 incoming texts and
23   119 outgoing texts.
24               And some of those texts would have been
25   related to work, correct?

1     A.  Yes, sir.

2     Q.  But there's no way -- even if -- even if these

3 numbers were not redacted or -- if these numbers were

4 not redacted, would you able to go through and figure

5 out which were related and which were not?

6     A.  It's -- it's a possibility.

7     Q.  Okay.  All right.  So did you request that

8 AT&T save or send you this record of text messages?

9     A.  Yes, sir.

10    Q.  When did you do that?

11    A.  I believe it was -- I don't remember the exact

12 date, but it was -- it was -- yeah, I don't recall the

13 exact date.

14           I know it was -- it was shortly after

15 we -- we received the -- the request for them, but the

16 exact date I don't recall, unfortunately.

17    Q.  So was this after the lawsuit was filed that

18 you sent that request?

19    A.  Yes, sir.

20    Q.  And this -- this time period that we have on

21 Plaintiffs' Exhibit 2, which is January 28th to

22 February 23rd, 2022, do you have the actual text

23 messages during that date -- during that date/time

24 period saved on your phone somewhere?

25    A.  I'm not sure, sir.  I'd have to look to -- to

1  verify that, but I don't know.

2      Q.  You haven't purposely deleted any of the texts

3  back during that period in January and February 2022,

4  have you?

5      A.  No, sir.

6      Q.  Did you happen to take a screenshot of any of

7  the text messages that were received or sent on

8  February 11th, 2022?

9      A.  No, sir.

10      Q.  If this wreck had not happened on Friday,

11  February 11th, 2022, when would you have returned to

12  the Golden State Foods facility to work?

13      A.  It would have been the following Monday.

14      Q.  Who was your direct supervisor as of

15  February 11th, 2022?

16      A.  Justin Smith.

17      Q.  And what was his position?

18      A.  He was an operations manager.

19      Q.  And during that time, was -- wasn't there also

20  an assistant operations manager?

21      A.  No, sir.  At the time, there was not.

22      Q.  Not at that time?

23      A.  No, sir.

24      Q.  But when you -- when you were -- in April of

25  2022, you were promoted to assistant operations

1    manager, correct?

2        A.  Yes, sir.

3        Q.  So that was basically a -- a new position at

4    the plant?

5        A.  I don't know if it was a new position.  I know

6    that it wasn't one that was filled at that time.

7        Q.  And in the chain of command at that plant when

8    you were operations supervisor, who -- who answered

9    directly to you?

10       A.  I had an hourly lead that reported to me, and

11   then our -- our direct hourly associates, so machine

12   operators.

13       Q.  Okay.  Who was your hourly lead as of

14   February 11th, 2022?

15       A.  It was Chris, C-H-R-I-S, last name was

16   Yarbrough.  I cannot help with the spelling on that

17   one, unfortunately.

18       Q.  Okay.  But you answered to Justin Smith,

19   operations manager?

20       A.  Yes, sir.

21       Q.  Take me on up the chain of command from there

22   at the Conyers facility, or was there anybody above

23   him?

24       A.  Yes, sir, there was.

25       Q.  Okay.

         1       A.   Above Justin Smith was -- was Jason Slipsager,

         2    and he was the -- his title is vice president of

         3    operations.

         4       Q.   Is that spelled S-L-I-P-S-A-G-E-R?

         5       A.   Yes, sir.

         6       Q.   And he was vice president of operations at

         7    that Conyers facility?

         8       A.   Yes, sir.

         9       Q.   And was he the -- was anyone above him at the

        10    chain of command at the Conyers plant?

        11       A.   No, sir.

        12       Q.   Did you -- now, you were paid a salary when

        13    you were operations supervisor?

        14       A.   Yes, sir.

        15       Q.   Did you ever receive any bonuses or incentive

        16    pay depending on meeting certain production goals,

        17    things like that?

        18       A.   Yes, sir.

        19       Q.   Explain to me how that would work.

        20       A.   So -- you'll have to forgive me on the actual

        21    metrics, but depending on your -- your title and

        22    your -- and your level, and -- and Golden State Foods

        23    is, in general -- you may receive a bonus based off of

        24    facility performance, as well as divisional and -- and

        25    company performance.

1    Q.  Do you know the formula, how that was
2  computed?

3    A.  Unfortunately, no.  No, sir.

4    Q.  Did you -- during the time you were at the
5  Conyers facility, did you receive bonuses for
6  production?

7    A.  Yes, sir.

8    Q.  And to your knowledge, were those computed for
9  facility -- meeting facility goals, generally, or more
10  specifically you meeting goals of your ketchup
11  division?

12    A.  I recall the -- I know the breakdown at that
13  level.  I just don't know -- recall the exact
14  percentages.  But when you're at that level, it's more
15  of a facility performance focus.

16    Q.  Okay.  During the time you were at the Conyers
17  Golden State Foods facility, did you ever receive a
18  stipend or reimbursement from Golden State Foods for
19  using your personal vehicle?

20    A.  Not at that time, no, sir, not when I held
21  that position.

22    Q.  And when did you start receiving a -- a
23  stipend for vehicle use?

24    A.  When I was promoted to the assistant
25  operations manager position.

1    Q.  When you were operations supervisor, would you
2    keep track of your mileage that you would drive that
3    was work-related?
4        A.  No, sir.
5        Q.  Didn't claim that on a tax return or anything
6    like that?
7        A.  No, sir.
8        Q.  During the time you were operations supervisor
9    in Conyers, did you ever leave the plant to call on a
10   customer or supplier?
11       A.  No, sir.
12       Q.  During your time as operations supervisor in
13   Conyers, would you ever leave the plant for lunch?
14       A.  Yes, sir.
15       Q.  How often did you do that?
16       A.  Not often.  I typically brought my own lunch
17   from home.
18       Q.  Would it -- would you be like once a week,
19   once a month that you'd go out for lunch or --
20       A.  I -- I would say once a week is a fair --
21       Q.  There are a lot of eating places around in
22   that area, right?
23       A.  Yes, sir, there are.
24       Q.  And when you would go out for lunch, would you
25   go with -- typically go with other Golden State Foods

1   employees?

2       A.  Yes, sir.

3       Q.  And when you were out to lunch during your

4   shift, if you got a call from the plant about some --

5   some issues going on, would you respond and -- and deal

6   with that over the phone the best you could?

7       A.  The best I could, yes, sir.

8       Q.  I mean, you didn't say, hey, I'm at lunch, I'm

9   off duty, anything like that, right?

10      A.  No, sir.

11      Q.  Okay.  That's part of being a supervisor?

12      A.  Yes, sir.

13      Q.  You deal with it?

14      A.  That's right.

15      Q.  Right.

16          During the time you were operations

17  supervisor in Conyers, were you ever invited to go to

18  lunch away from the plant by your supervisor or someone

19  at Golden State Foods who was above you in the chain of

20  command, so to speak?

21      A.  Not that I recall, no, sir.

22      Q.  But if you had, you would have -- you would

23  have accepted, I assume?

24      A.  Yes, sir.

25      Q.  I mean, that's -- would be helpful for your

1   ambitions in moving up in the company, things like

2   that, right?

3      A.  Yes, sir.

4      Q.  And to help foster good communication and

5   camaraderie and all those objectives that we discussed

6   earlier?

7      A.  Yes, sir.

8      Q.  Okay.  Now, you were injured in the

9   February 11th collision, correct?

10      A.  Yes, sir.

11      Q.  During the time -- well, about how long was it

12   before you were able to return to work?

13      A.  I don't recall the exact timeline.  I believe

14   it was around -- around four weeks.

15      Q.  And during that time, were you receiving calls

16   or texts or emails from Golden State Foods employees

17   that were substantive as far as work and not just, hey,

18   how you doing, are you feeling better, that sort of

19   thing?

20      A.  No, sir.

21      Q.  No?

22         MR. ADELMAN:  It's not like being a

23   lawyer.

24         MR. HYATT:  What's that?

25         MR. ADELMAN:  That's not like being a

1    lawyer, you know.  No one stops bothering you no matter

2    what's going on.

3         A.   Yeah.  I would have check-ins, yeah, but

4    not -- no one was asking me how do I make ketchup when

5    I was out.

6         **Q.  All right.  Let's go to the day of this crash,**

7    **February 11th, 2022.**

8                   **This was a Friday, correct?**

9         A.   Yes, sir.

10        **Q.  And we're going to go over -- go over**

11   **everything that you did that day from the time you got**

12   **up until the wreck.**

13                  **So first of all, what time did you get up**

14   **that day?**

15        A.   I was -- I don't recall the exact time that

16   day.  I can say that I was typically in the gym rather

17   early in the morning.

18                  As I mentioned earlier, 6:00 a.m. was my

19   typical get in to work time, so it's -- it's likely

20   that I was up around 2:00 to 3:00 a.m.

21        **Q.  And that was to go to the gym?**

22        A.   Yes, sir.

23        **Q.  Did -- did you eat breakfast before you went**

24   **to the gym?**

25        A.   Typically I ate after.

1    Q.   And what gym was that?

2    A.   I can't remember the name of it.  It was a --

3  there was a 24-hour gym that was close to my house.

4    Q.   One of those where you have the key card or

5  the code, and you just went in and did your thing, and

6  it wasn't staffed?

7    A.   Yes, sir.

8    Q.   And about how long was your workout?

9    A.   I would say it could have ranged between an

10  hour to two hours.

11    Q.   And then did you return back home?

12    A.   Yes, sir.

13    Q.   Shower, I guess?

14    A.   Yes, sir.

15    Q.   And then you ate some breakfast?

16    A.   Yes, sir.

17    Q.   So around what time would you be eating

18  breakfast, do you think?

19    A.   Again, it would be dependent on the morning,

20  but I would say, you know, around 5:00.

21    Q.   And what was your breakfast?

22    A.   Typically it was -- it was oatmeal, for the

23  most part.

24    Q.   Any protein, bacon, sausage, anything like

25  that?

1    A.   No, sir.  I would have a protein shake.  I

2   did -- meant -- leave that out.

3    Q.   Okay.  Oatmeal and protein shake?

4    A.   Yes, sir.

5    Q.   Is that your typical workday?

6    A.   Yes, sir.

7    Q.   Do you go to the gym every day or just a few

8   days a week?

9    A.   As much as I could, yes, sir.

10    Q.   And your workday started at the 6:00 a.m.

11   shift, correct?

12    A.   Yes, sir.

13    Q.   To the best of your knowledge, did you get

14   there at 6:00, a little before, a little after?

15    A.   To the best of my knowledge, it was probably

16   6:00.

17    Q.   Drove your car?

18    A.   Yes, sir.

19    Q.   The 2012 Infiniti G35?

20    A.   G25, but yes, sir.

21    Q.   G25.  Did you make any stops along the way

22   from your house and to the Conyers plant?

23    A.   Not that I recall.

24    Q.   Eat anything in the car on the way?

25    A.   Not that I recall.

1    Q.  Did you check any work emails or send any work

2  emails before you left that day?

3    A.  Before I left my house?

4    Q.  Yes.

5    A.  Not that I recall, no, sir.

6    Q.  Did you make any calls during your commute on

7  the way to work that morning?

8    A.  Not that I recall.

9    Q.  Or send any texts?

10    A.  Sorry, no, not that I recall.  No, sir.

11    Q.  Other than drive, what did you do on the

12  commute from home to work that morning?  Radio?

13    A.  Yeah.  Typically just listen to music, yes,

14  sir.

15    Q.  Would you sometimes receive calls about work

16  on the way to work in the morning?

17    A.  Typically, no.  That -- that early in the

18  morning, I would say, typically, no.

19    Q.  How long is that drive usually, timewise?

20    A.  About 20 minutes.

21    Q.  Okay.  And at some point that day, you went to

22  the Whistle Post Tavern in Olde Town Conyers, correct?

23    A.  Yes, sir.

24    Q.  Did you go directly from Golden State Foods to

25  the Whistle Post?

1    A.  Yes, sir.

2    Q.  **What time did you leave Golden State Foods for**

3    **the Whistle Post?**

4         MR. ADELMAN:  By the way, I meant to -- I

5    made a note to myself to tell you, I'm not -- before

6    you ask your question, there's a typo in our

7    interrogatory responses.

8         MR. ELLIS:  Do you want to go off record?

9         MR. ADELMAN:  Well, no, we can put it in

10   on the record.

11        There's a typo in the interrogatory

12   responses that is -- that was my fault.

13        And I think he said that he had -- talking

14   about the consumption of alcohol -- and I just want to

15   get the number right -- it's 3(a).  We had written

16   between three to four hours.  That should be two to

17   three hours.

18        MR. HYATT:  Okay.  We'll talk about that.

19   Thank you.

20   Q.  **Okay.  And what time did you leave the plant**

21   **to go to the Whistle Post?**

22   A.  It's hard to recall the exact time, but it was

23   likely around 4:00 or 4:30 p.m.

24   Q.  **Would there be any record of that somewhere in**

25   **the Golden State Foods system?**

1      A.   No, sir, not that I'm aware of.

2      Q.   Because you weren't -- you -- you weren't

3  logging in or anything of that nature when you went --

4  started your shift or ended your shift, correct?

5      A.   No, sir.

6      Q.   And your -- under normal circumstances, your

7  shift would have been from 6:00 a.m. to 6:00 p.m.,

8  correct?

9      A.   Yes, sir.

10      Q.   And why did you leave around 4:00 or 4:30 to

11  go to the Whistle Post?

12      A.   It's hard to recall the exact scenario on that

13  day since it was a while ago, but I would -- I would

14  imagine because it was one of those scenarios that I

15  mentioned before, we may have been closing down early

16  or -- or wrapping up the week early.

17      Q.   Yeah.  We talked about that earlier in -- you

18  said sometimes, depending upon production needs, you

19  would wrap up a little early on -- on Friday and close

20  the plant down or -- basically; is that right?

21      A.   Yes, sir, or certain areas of the facility.

22      Q.   Okay.  And if we were to look at Golden State

23  Foods' records system, what documents would there be to

24  show if and when that type of scenario unfolds?

25      A.   I'm -- I'm not 100 percent certain on -- on

1   their record-keeping, but I'm -- I'm -- I would imagine

2   there would be some kind of log in their system,

3   because we -- there's an electrical transaction for

4   when we produce, so there likely may have been

5   something like that.  I just don't know where that

6   would be kept.

7       **Q.  Because at some point, you've got to tell**

8   **your -- your lead, and your lead's got to tell the**

9   **other, you know, machine operators, hey, we're knocking**

10  **off early --**

11      A.  Yes, sir.

12      **Q.  -- correct?**

13      A.  Yes, sir.

14      **Q.  Which probably -- well, strike that.**

15          **So -- and how do you get the information**

16  **to tell that -- that you're authorized to tell the lead**

17  **you're going to be closing early?**

18      A.  So I would again say that typically it was

19  scheduled that way, you know, so our -- our weekly

20  production schedule would -- would have an indication

21  that we're not running on the weekend.

22          So it -- there wasn't a necessary, I would

23  say, communication or -- or a trigger for that

24  communication.  If we -- if we met our production goals

25  for the week, the day, then people knew when that was

1  happening, right?

2       Q.  Yeah.  And to -- when you say "people," that

3  would include you, correct?

4       A.  Yes, sir.

5       Q.  In fact, you were the first line of

6  communication about meeting or not meeting production

7  goals in your area, correct?

8       A.  Yes, sir.

9       Q.  And so you would have to communicate that to

10 someone above you, correct?

11      A.  Yes, sir.

12      Q.  And that would typically be the operations

13 supervisor?

14      A.  Operations manager.

15      Q.  Operations manager, which was Jason?

16      A.  Justin Smith.

17      Q.  Justin Smith?

18      A.  Yes, sir.

19      Q.  All right.  So when you would do that, would

20 you typically email him, text him, go to his office,

21 what?

22               MR. ADELMAN:  Can we just clarify?

23 Because I'm sitting here listening.  I'm not clear if

24 you're talking about -- I don't understand if there's a

25 communication about meeting goals or about not meeting

```
 1   goals, and I'm not sure what you're asking either.

 2              So my objection is objection to form, but

 3   I think you can fix that real easy to clarify.

 4              MR. HYATT:  All right.

 5              MR. ADELMAN:  And I don't know the answer

 6   to this.  I'm not sure if he's saying that he

 7   communicates -- if it's assumed they're meeting goals

 8   and they shut down, or -- and if they make -- you know

 9   what I mean?  If they communicate that they met goals

10   or they communicate that they haven't met goals and

11   he'd stay open over the weekend.

12        Q.  Do you remember when we -- we spoke earlier,

13   if you don't understand my question, you ask me for

14   clarification?

15        A.  Yes, sir.

16        Q.  Okay.  And you've done that a few times,

17   haven't you?

18        A.  Yes, sir.

19        Q.  I'm going to -- I'm going to make sure we're

20   clear on this.

21              So at some point in some instances, you

22   would communicate to someone above you, probably

23   Jason --

24        A.  Justin.

25        Q.  Justin -- I'm sorry -- that you're -- you've
```

1    already met your production goals, correct?

2        A.  Yes, sir.

3        Q.  All right.  And that would sometimes be a

4    trigger for, okay, we're going to be able to knock off

5    early on Friday?

6        A.  I would say yes, sir.  I would also add that,

7    typically, especially when we were planning on shutting

8    down for the weekend, one of the first things that we

9    typically did was -- was understand how much more

10   production we still had left to make before we were

11   finished.

12            So there wasn't always necessarily a line

13   of communication saying -- or indicating that we're

14   behind or we're ahead or we're on target.

15            It was -- my -- my operations manager at

16   the time was very -- he was very informed, very

17   knowledgeable about the process, so we -- we all

18   understood walking in that day after checking how much

19   more product we had left to make, if we were going to

20   be on time or not.

21       Q.  And would there be any -- any record of that

22   kind of communication that we'd be able to see from

23   that day?

24       A.  It -- it's hard to say.  Typically, we would

25   have conversations more than we would communicate

1   because I was day shift and so was he, and he also had

2   a good floor presence, I would say, so there wasn't

3   always a text or an email or -- or a documented

4   conversation about that.

5       Q.  Okay.

6       A.  I'm not saying it's not a possibility, though.

7       Q.  And -- but before -- were you authorized to

8   tell your lead to stop the production on the floor, or

9   did you have to get approval from your supervisor?

10      A.  I would -- I would -- I would ask, you know,

11  what -- in what kind of scenario that would happen

12  because if there was a -- there was a quality concern,

13  then, yes, I would -- I would have that authority.

14          But in a situation like what you're

15  suggesting where if we're on schedule to just shut down

16  for a weekend, that -- that there -- there wouldn't be

17  that line of communication or authority needed

18  because -- because, again, we would understand at the

19  beginning of the shift where we stood and how much more

20  production we had left to make.

21      Q.  Okay.  But as we sit here today, you don't

22  know if that's why you left for the Whistle Post Tavern

23  at 4:00 or 4:30 that afternoon?

24      A.  That's correct.

25      Q.  Was there anything particularly eventful

1  during your shift that day that you recall at the

2  plant?

3      A.  Not that I recall, no, sir.

4      Q.  Did you eat lunch that day?

5      A.  I -- I don't recall, but I -- I typically did,

6  so I would say -- I would say pretty confidently yes.

7      Q.  And what was your typical lunch?

8      A.  Again, depended on the day.  Sometimes it

9  would be as simple as a sandwich.  Sometimes it would

10  be leftovers from dinner the night before.  I don't

11  recall what exactly I ate that day.

12      Q.  Do you -- are you certain that you didn't go

13  out somewhere to eat lunch that day?

14      A.  No, sir, I'm not certain.

15      Q.  So that's a possibility too?

16      A.  I would say that's a possibility, yes, sir.

17      Q.  Did you have a company credit card?

18      A.  Not at the time, no, sir.

19      Q.  When did -- when did you first -- when were

20  you first given a company credit card?

21      A.  Shortly after I was promoted to the assistant

22  operations manager position.

23      Q.  So as far as -- to summarize what you had to

24  eat that day, we know you had oatmeal and a protein

25  shake around 5 a.m.?

1      A.  Likely, yes, sir.

2      Q.  **And you may have had some form of lunch, a**

3 **sandwich or possibly leftovers or possibly a lunch out**

4 **somewhere near the plant?**

5      A.  Yes, sir.

6      Q.  **How much do you weigh?**

7      A.  Right now I weigh about 230 pounds.

8      Q.  **On February 11th, 2022, how much did you**

9 **weigh?**

10     A.  It was probably closer to 210.

11     Q.  **Did someone with Golden State Foods invite or**

12 **request that you meet at the Whistle Post that day?**

13     A.  I don't recall how the -- how that was

14 initiated, so I don't recall if -- if it was my

15 suggestion or someone else's.

16     Q.  **Had you been to the Whistle Post before?**

17     A.  Yes, sir.

18     Q.  **About how frequently had you -- would you go**

19 **there?**

20     A.  It wasn't on any frequency.  I'd probably been

21 there maybe a half a dozen times before.

22     Q.  **At the time, did you know any of the staff**

23 **there by name?**

24     A.  No, sir.

25     Q.  **Do you know any of the owners of the Whistle**

1    Post?

2         A.  No, sir.

3         Q.  So was that a -- a -- usual or unusual for you

4    to gather with Golden State Foods' employees at the

5    Whistle Post after work?

6         A.  At -- hard for me to answer the question.

7    What I will say is, you know, in the -- the other times

8    that I've gone, I would go with peers, you know, so --

9    so typically it would be with -- with Golden State

10   Foods' employees, yes.  But it would typically be a

11   different group of people, I guess you could say.

12        Q.  It would be correct to say that -- I assume,

13   that attending a gathering at a tavern was not part of

14   your customary duties as operations supervisor at

15   Golden State Foods?

16        A.  No, sir.

17        Q.  Okay.  Trick -- that was a messy question.

18   Okay.

19             Was attending a gathering at a tavern part

20   of your customary duties as operations supervisor at

21   Golden State Foods?

22        A.  And -- and customary -- mary -- meaning --

23   customary meaning?  Sorry.

24        Q.  Was that -- was going to a tavern part of your

25   customary duties as an operations supervisor at Golden

1    State Foods?

2         A.  No, sir.

3         Q.  Now, you provided us a list of persons who

4    were with you at the Whistle Post that afternoon.

5         A.  Yes, sir.

6         Q.  The first one listed, I think, was a -- or one

7    of them was Justin Smith?

8         A.  Yes, sir.

9         Q.  And that was your supervisor?

10        A.  Yes, sir.

11        Q.  And he was operations supervisor at the plant?

12        A.  Operations manager.

13        Q.  Operations manager.

14        A.  Yes, sir.

15        Q.  You were operations supervisor.  Okay.

16             So he's -- he was above you in the Golden

17   State Food corporate hierarchy?

18        A.  Yes, sir.

19        Q.  And then there was also Justin -- you had --

20   he was identified as Justin Slipsager.  Isn't his

21   actual name Jason?

22        A.  Yes, sir, it's Jason Slipsager.

23        Q.  And he's also a Golden State Food employee?

24        A.  Yes, sir.

25        Q.  And what was his position at the time?

1      A.  He was the vice president of operations.

2      **Q.  So he's the head of the plant there?**

3      A.  Yes, sir.

4      **Q.  So also above you in the corporate hierarchy?**

5      A.  Yes, sir.

6      **Q.  And then there was a -- a Mike Wilson?**

7      A.  Yes, sir.

8      **Q.  Also a Golden State Foods employee?**

9      A.  Yes, sir.

10      **Q.  What was his position?**

11      A.  I don't know the exact title.  I -- I can tell

12  you that he's a leader in our supply chain network for

13  the division.

14      **Q.  A leader -- he was a leader in the supply**

15  **chain?**

16      A.  Divisional network.

17      **Q.  Were -- did you deal with him in day-to-day**

18  **operations at the plant?**

19      A.  Not much, no, sir.

20      **Q.  So was he considered management?**

21      A.  Yes, sir.

22      **Q.  All right.  So he was also above you in the**

23  **corporate hierarchy, so to speak?**

24      A.  Yes, sir.

25      **Q.  And then there was Kate Dolan?**

1      A.  Yes, sir.

2      Q.  D-O-L-A-N?

3      A.  Yes, sir.

4      Q.  And what was her position at the time?

5      A.  She is an executive chef for Golden State

6  Foods.

7      Q.  And did she work at the Conyers plant?

8      A.  Yes, sir.

9      Q.  And where does she stand in the Golden State

10  Foods corporate hierarchy, as far as you know?

11     A.  I'm frankly not 100 percent sure, because she

12  kind of worked in a different -- totally different area

13  than I did, so I'm not really sure on the titles and

14  levels in -- in her -- in her area.

15     Q.  Okay.  And there was a Marta, M-A-R-T-A,

16  Londono, L-O-N-D-O-N-O?

17     A.  Yes, sir.

18     Q.  And was she a Golden State Food employee?

19     A.  Yes, sir.

20     Q.  What was her position at the time?

21     A.  She was also an operations manager.

22     Q.  So she was also above you in the Golden State

23  Food corporate hierarchy?

24     A.  Yes, sir.

25     Q.  And then there was a David Boateng,

1    B-O-A-T-E-N-G?

2        A.  Yes, sir.

3        Q.  Also a Golden State Foods employee?

4        A.  Yes, sir.

5        Q.  What was his position?

6        A.  Operations manager.

7        Q.  So he was also above you in the Golden State

8    Foods corporate hierarchy?

9        A.  Yes, sir.

10       Q.  Then there was a Dawn, D-A-W-N, Warner,

11   W-A-R-N-E-R?

12       A.  Yes, sir.

13       Q.  A Golden State Foods employee?

14       A.  Yes, sir.

15       Q.  What was her position at the time?

16       A.  Director of supply chain for the Conyers

17   facility.

18       Q.  Was she also considered management?

19       A.  Yes, sir.

20       Q.  So she was above you in the corporate

21   hierarchy at Golden State Foods?

22       A.  Yes, sir.

23       Q.  Was anyone other than those seven employees

24   that I just went over that you recall being with you at

25   the Whistle Post Tavern that day?

1    A.  Not that I recall.

2    Q.  **So there -- there had to have been some kind**

3    **of message or coordination for a meeting at the Whistle**

4    **Post that -- that afternoon, right?**

5    A.  Yes, sir, there -- there should have been some

6    kind of communication.  I just don't recall what or how

7    that was.

8    Q.  **You don't have any idea?**

9    A.  No, sir.  It could have been in passing, a --

10   a conversation, just someone inviting someone else,

11   but -- but, no, I don't remember the exact

12   communication.

13   Q.  **Because we've got people -- these people are,**

14   **you know, spread out all -- all around the plant,**

15   **correct?**

16   A.  Yes, sir.

17   Q.  **I mean, you're -- other than Justin, you're**

18   **not really rubbing elbows with these other folks during**

19   **your shift day to day, typically, are you?**

20   A.  Yes, sir.  I would say David and -- and Marta

21   as well, we -- we all officed in the same area, so the

22   operations -- operations members all officed in one

23   area that was separate from the front or, you know,

24   executive officers, what I would call it.

25   Q.  **And had you ever had a -- a group convene at**

1 the Whistle Post or any other bar on a Friday afternoon

2 in a situation like this before?

3     A.   I would say yes, just it wasn't with those

4 individuals.

5     Q.   I'm sorry?

6     A.   I would say yes, but it just wasn't with those

7 individuals.

8     Q.   All right.  How often would you get together

9 with other employees at -- at a bar in the afternoon?

10     A.   Not often.  Yeah, not often at all.

11     Q.   Once a month, once every three months?

12     A.   One -- once a month would be closer to the

13 pin, yes, sir.

14     Q.   There's each -- all seven of these Golden

15 State Food employees that you were with, each of those

16 were above you in the corporate hierarchy, correct?

17     A.   Yes, sir.

18     Q.   Is there a possibility that someone -- one of

19 those seven persons invited you or requested you to

20 come to -- and meet them at the Whistle Post that

21 afternoon?

22          MR. ADELMAN:  Objection to form.

23     Q.   You can answer.

24          MR. ADELMAN:  Because it's compound.

25     Q.   You can answer.

1     A.  It's a possibility, yes, sir.

2     **Q.  Do you think you started the -- the invitation**

3 **around?  I mean, you would know -- you would remember**

4 **that, wouldn't you?**

5     A.  Again, it's a possibility, but no, sir, I

6 don't -- I don't recall an invitation that -- it was --

7 it was over a year ago.  I'm -- I apologize, I just

8 don't.

9     **Q.  It was over a year ago, but this is a**

10 **significant event in your life, right?**

11     A.  Yes, sir.

12     **Q.  Right.  And you can't recall at all who**

13 **instigated or invited or coordinated this meeting?**

14     A.  No, sir.

15           **MR. ADELMAN:**  Objection to form.

16           You can answer that.

17     A.  No, sir.

18     **Q.  In any case, at some point you realized that**

19 **there was going to be a -- a meeting at the Whistle**

20 **Post Tavern with fellow Golden State Food workers that**

21 **afternoon?**

22           **MR. ADELMAN:**  Objection to form.

23     **Q.  Right?**

24           **You can answer.**

25     A.  Yes, sir.

1    Q.  And you knew that all those persons were not

2    just fellow employees, but they were also above you in

3    the corporate hierarchy?

4        A.  Yes, sir.

5        Q.  And so you knew that it could benefit you to

6    attend that meeting or that gathering as you move up in

7    the company?

8        A.  Yes, sir.

9        Q.  That's part of developing the camaraderie and

10   teamwork and -- that we talked about earlier?  That's

11   important in business management, correct?

12       A.  Yes, sir.

13       Q.  And that's -- that's a good general concept as

14   far as business management, but Golden State Foods

15   places particular emphasis on that, teamwork and

16   camaraderie and collaboration, correct?

17       A.  Yes, sir.

18       Q.  And you wanted to be perceived as a team

19   player?

20       A.  Yes, sir.

21       Q.  Not a guy who's off doing his own thing?

22       A.  Yes, sir.

23       Q.  And that's what these types of gatherings tend

24   to do when there are coworkers there talking and -- and

25   unwinding, so to speak, correct?

1    A.  Yes, sir.

2    Q.  So going in, this meeting at the Whistle Post

3 appeared to be -- or looked like a positive for you,

4 careerwise?

5    A.  Yes, sir.

6    Q.  And a positive for Golden State Foods

7 generally, businesswise speaking?

8    A.  I don't know about -- about that.  My -- my

9 perception of it was just people meeting after work.

10    Q.  But you would agree that that gathering at the

11 Whistle Post would have been incidental to your

12 employment at Golden State Foods?

13              MR. ADELMAN:  Objection, form.

14    A.  I don't know if it would be incidental, no,

15 sir.  It -- I was -- I was invited, and I -- or -- or

16 invited and wanted to go.  That was it.

17    Q.  All right.  But going to the Whistle Post

18 wasn't obviously a major part of your job, but you went

19 to the Whistle Post because of your job, correct?

20    A.  Yes, sir.

21    Q.  So your counsel indicated there was something

22 incorrect in the interrogatory responses, which said

23 that you were there at the Whistle Post for

24 approximately three to four hours, and that's -- should

25 be two to three hours; is that correct?

```
 1        A.  Yes, sir.
 2        Q.  All right.  So did you make or receive any
 3   cell phone calls while you were at the Whistle Post
 4   that afternoon?
 5        A.  Not that I recall.
 6        Q.  Okay.  Let's go back to Plaintiffs' Exhibit 2.
 7   And look on page 4 where we've got this -- these list
 8   of text messages on February 11th, 2022, that are not
 9   redacted.
10             Are you with me?
11        A.  Yes, sir.
12        Q.  Okay.  So it looks like we've got a text
13   message at 11:39 a.m., outgoing to the number
14   850-901-8888.
15             Do you see that?
16        A.  Yes, sir.
17        Q.  Do you know whose number that is?
18        A.  No, sir, I don't.
19        Q.  Do you recall making -- sending a text message
20   at a -- around that time that morning?
21        A.  I -- I don't recall.
22        Q.  And then there's another one -- another
23   outgoing text message at 11:39 a.m. to the number
24   ███████████.
25             Are you with me?
```

1      A.  Yes, sir.

2      Q.  Whose number is that?

3      A.  I'm not sure.

4      Q.  You don't have any idea?

5      A.  No, sir.

6      Q.  And then there's a third text message outgoing

7  at 11:39 to the number 404-798-5027.

8              Are you with me?

9      A.  Yes, sir.

10     Q.  Whose number is that?

11     A.  I'm not sure.

12     Q.  No idea?

13     A.  No, sir.

14     Q.  Do you know why you would be sending several

15  text messages at 11:39 to different -- to these

16  different numbers?

17     A.  I'm not sure, no, sir.

18     Q.  Okay.  And then there's another text message

19  at 11:39 outgoing that you sent to the number

20  404-820-5207.

21              Are you with me on that?

22     A.  Yes, sir.

23     Q.  Whose number is that?

24     A.  I'm not sure.

25     Q.  And then another text message at 11:39

1    outgoing from your phone to the number 4█████████

2            Are you with me on that?

3      A.  Yes, sir.

4      **Q.  Whose number is that?**

5      A.  I don't know.

6      **Q.  No idea?**

7      A.  No, sir.

8      **Q.  And then there's a sixth text message that**

9    **went out on your phone at 11:39 to the number**

10   █████████████

11           Are you with me there?

12      A.  Yes, sir.

13      **Q.  Do you know whose number that was?**

14      A.  No, sir.

15      **Q.  Do you believe that this was a group text that**

16    **went out at 11:39?**

17      A.  It -- it's a possibility.

18      **Q.  That would have been hard to have sent seven**

19    **text messages individually within a minute, wouldn't**

20    **it?**

21      A.  I agree, yes, sir.

22      **Q.  A good teenager could probably do that.**

23      A.  Yeah.  Not me.

24      **Q.  All right.  So do you have any recollection of**

25    **sending out a group text that morning?**

1    A.   That morning, no, sir.

2    Q.   **Did you often send group text messages during**

3    **your workday at Golden State Foods?**

4    A.   I would say yes, sir.

5    Q.   **And what were some of the instances when you**

6    **would do that?**

7    A.   Typically, you know, that was a line of

8    communication that we would have with either other

9    supervisors or -- or hourly associates.  If there was a

10   change in plan for the day or something that just

11   needed to be communicated out, a text message is --

12   that could have been a form of communication that we

13   would use.

14   Q.   **Okay.  You don't recall sending out a group**

15   **text to coworkers at -- that morning?**

16   A.   Unfortunately, no.  No, sir.

17   Q.   **Is there a chance that -- that -- that your**

18   **actual text from December -- from February 11th, 2022,**

19   **would still be on your cell phone?**

20   A.   There's a possibility, yes, sir.

21   Q.   **Then at 11:51, we see an incoming text from**

22   **the number 404-593-3731.**

23                **Do you see that?**

24   A.   Yes, sir.

25   Q.   **And there's actually two incoming texts both**

```
1   at 11:51.  Do you recognize that number and know who

2   that would have been from?

3        A.  No, sir.

4        Q.  And -- and actually it looks like you sent --

5   you actually sent a number -- a text back out, so there

6   are two incoming and one outgoing text to that number.

7        A.  Yes, sir.

8        Q.  You don't have any idea who that was from or

9   to?

10       A.  No, sir.

11       Q.  So then moving on down, we see a number -- a

12  group of texts starting at 14:37, which would have been

13  6:37 p.m., correct?

14       A.  Yes, sir.

15       Q.  Are all --

16       A.  Or 2:37.

17       Q.  I'm sorry?

18       A.  2:37.

19       Q.  Well, it says 14:37 on here military time,

20  right?

21       A.  Yes, sir.

22       Q.  Okay.

23       A.  That's 2:37, right.

24       Q.  Oh, yeah.  So do you know -- do you recognize

25  that number, 84- -- 814-441-3983?
```

1      A.  No, sir.

2      Q.  No?  All right.

3            So none of these numbers make any -- any

4  sense to you as far as who they were from or who they

5  were to?

6      A.  No, sir.  Sorry, I don't -- I don't have a

7  memory of people's phone numbers, unfortunately.

8      Q.  All right.

9            MR. ELLIS:  Excuse me.  Whenever you

10  finish a line of questioning, can we take a break?

11  We've been going another hour.

12            MR. HYATT:  Yeah.  This is a good time for

13  a break, yeah, because I want to discuss something off

14  the record.  So let's take a break.

15            MR. ELLIS:  Okay.

16            THE VIDEOGRAPHER:  We're now off the

17  record at 10:26 a.m.

18            (Recess 10:26-10:47 a.m.)

19            THE VIDEOGRAPHER:  We are now back on the

20  record at 10:47 a.m.

21      Q.  Okay.  Jan, you were -- during the break you

22  were able to look on your phone and get the names of

23  most of the folks who match up to these numbers that we

24  have on the February 11th text, correct?

25      A.  Yes, sir.

1    Q.  And the first one that ends in 8888, you were

2  not able to find that number, correct?

3    A.  Correct.

4    Q.  Then the next one that ends in 1906 is Nyesha

5  Bennett --

6    A.  Yes, sir.

7    Q.  -- correct?

8        And is she a Golden State Food employee?

9    A.  She was.  I'm not sure if she's still there or

10  not.

11    Q.  What -- do you -- does that jog your memory of

12  what you could have been texting with her about?

13    A.  Yes, sir.  She was our night shift supervisor

14  in the same area that I -- I supervised, so it was --

15  it was likely about the room or change of plans or --

16  or something along those lines, something about that

17  day in -- on work -- at work.

18    Q.  Okay.  And then the next one that ends in

19  5027 and -- well, it's 404-798-5027, that was an

20  outgoing text message to Chris Yarbrough, correct?

21    A.  Yes, sir.

22    Q.  And he's your lead -- or he was your lead,

23  right?

24    A.  Yes, sir.

25    Q.  Right.  Do you recall anything about the

1  substance of that message?

2      A.  No.  It was likely the same topic.

3      Q.  Okay.  And then the next one, 404-820-5207,

4  was Eliseo Mendez?

5      A.  Yes, sir.

6      Q.  And what was Eliseo's position?

7      A.  He was also a day shift supervisor.

8      Q.  Do you recall anything about the substance of

9  that?

10     A.  I would -- I would imagine it's the same, yes,

11  sir.

12     Q.  And then the next one, 402-510-8705 was an

13  outgoing text to Justin Smith, correct?

14     A.  Yes, sir.

15     Q.  Who was your supervisor?

16     A.  Yes, sir.

17     Q.  You -- does that jog your memory about what

18  that could have been about?

19     A.  No, sir.  It was probably the same.

20     Q.  Something productionwise, that sort of thing?

21     A.  I would think so, yes, sir.

22     Q.  And then the next one, 404-536-5773, Rodriguez

23  Cofield?

24     A.  Yes, sir.

25     Q.  Who was that?

1        A.   He was our night shift lead, so Chris
2    Yarbrough's counterpart on nights.
3        Q.   **All right.  Do you recall anything about the**
4    **substance of that?**
5        A.   It was likely the same, sir.
6        Q.   **The next one -- actually, the next three --**
7    **404-593-3731 is Eddie Bryant, B-R-Y-A-N-T?**
8        A.   Yes, sir.
9        Q.   **Who was Eddie Bryant?**
10       A.   He was our -- I forgot his actual title, but
11   he was in charge of security for the facility.
12       Q.   **Do you know why you would have been contacting**
13   **him?**
14       A.   Yes, sir.  I looked at the text messages on
15   that day, and he was extending congratulations to one
16   of our hourly associates for giving them a Golden
17   Spirit Award, which is -- it's an award that you give
18   for outstanding character or performance.
19       Q.   **Okay.  So you looked at the actual text**
20   **message on that day?**
21       A.   Yes, sir.
22       Q.   **Did you look at the text message from -- that**
23   **you sent to Justin Smith?**
24       A.   I tried, sir.  I couldn't -- I couldn't
25   find what I imagine to be a group text with those

1  individuals.

2       Q.  Okay.  Yeah, because there was -- yeah.  Those

3  first -- one, two, three, four, five, six -- seven

4  would have been a group text.

5            You don't -- that doesn't tell -- now that

6  you have their names, you don't know who you -- why you

7  would have sent a group text to that group of folks?

8       A.  No, sir.  I mean, again, it was likely

9  work-related.

10      Q.  Yeah.  And then we have the one that ends --

11 the several texts that end 3 -- end in 3983 to a Dan

12 Koah, K-O-A-H?

13      A.  Yes, sir.

14      Q.  And who is that?

15      A.  He's our continuous improvement director in

16 Conyers, Georgia.

17      Q.  And what was the substance of that text?

18      A.  He was letting me know about a -- an issue

19 found on a specific piece of equipment.

20      Q.  Okay.  But other than that -- what we think

21 was a group text that went out at 11:39, you still have

22 the -- the actual text messages that we've gone over

23 still on your phone?

24      A.  Yes, sir.

25      Q.  Okay.  And you'll preserve those for us?

1    A.  Yes, sir.

2    Q.  Okay.  All right.  So you don't believe that

3  you issued the invitation to these seven Golden State

4  Food employees to meet at the Whistle Post Tavern the

5  afternoon of February 11th, do you?

6    A.  I don't recall who initiated the -- the

7  invitation.

8    Q.  But it's not likely that you would have issued

9  an invitation to seven folks above you in the -- in the

10  chain of command at Golden State Foods to go meet at a

11  bar, is it?

12    A.  Had I done that before, no?  But I can't say

13  it would be unlikely.

14    Q.  Would it be more likely that one of them would

15  have issued the invitation?

16    A.  I -- I wouldn't call it more or less likely.

17  I'm sorry.  I -- I wouldn't.

18    Q.  So when you -- do you remember about what time

19  you got to the Whistle Post?

20    A.  If -- if I recall correctly, if I left around

21  4:00 to 4:30, it would have been shortly after.  The

22  drive in between the facility and the Whistle Post was

23  maybe five to 10 minutes.

24    Q.  Okay.  And were you -- were other Golden State

25  Food worker -- employees there before you, or did -- or

1    were you the first there?

2        A.  I don't recall.

3        Q.  Once everyone was there, was each person

4    paying for their drinks as they ordered, or was the

5    group running a tab?

6        A.  I -- I didn't recall until I saw the -- the

7    one itemized receipt that was produced.

8        Q.  Okay.  You've seen -- you've seen that

9    recently?

10       A.  Yes, sir.

11          MR. HYATT:  Jon -- Jonathan, do you have

12    that?

13          MR. ADELMAN:  I do.

14          MR. HYATT:  Can I see that?

15          MR. ADELMAN:  You need to make a copy of

16    this, but -- and, by the way, it shows a date of

17    June 9th, 2023.  That's obviously not the date.  That's

18    when it was printed.

19          MR. HYATT:  Printed?  Okay.

20          MR. ADELMAN:  And that's the itemized

21    receipt according to -- who was it -- Mike?

22          THE WITNESS:  Mike Wilson.

23          MR. ADELMAN:  Mike Wilson.

24        Q.  Okay.  Is it your understanding that Mike

25    Wilson paid the tab?

1    A.  It is my understanding, yes, sir.

2    **Q.  All right.  And is it your understanding it**

3    **was paid by a Golden State Food credit card?**

4    A.  Yes, sir.

5    **Q.  All right.**

6         MR. ADELMAN:  And just let me just -- just

7    in an abundance of caution, I'm just going to assert an

8    attorney-client-privilege objection to that.  I know he

9    already answered, but I think the understanding, to the

10   extent that there is one, comes from attorneys.

11        MR. HYATT:  Okay.

12   **Q.  So did you play any role in obtaining this**

13   **receipt?**

14   A.  No, sir.

15   **Q.  All right.  So --**

16        MR. HYATT:  Maybe we should get copies of

17   this.

18        MR. ADELMAN:  Yeah, we can.

19        MR. HYATT:  Yeah.

20        MR. ADELMAN:  I mean, I've got it.  You

21   can mark that -- or do you want to just mark it as an

22   exhibit?

23        MR. HYATT:  Yeah, I want to mark it as an

24   exhibit.

25        MR. ADELMAN:  Yeah, go ahead.  I mean, we

```
 1   have --
 2                   MR. HYATT:  Okay.  Look --
 3                   MR. ADELMAN:  -- other copies, yeah --
 4                   MR. HYATT:  -- to save some time, I'm
 5   going to take a photo of it --
 6                   MR. ADELMAN:  Yeah.
 7                   MR. HYATT:  -- and mark it as an exhibit.
 8                   MR. ADELMAN:  I can email it to you if you
 9   want.
10                   MR. HYATT:  Yeah, even better.
11                   So this will be 3.
12                   THE WITNESS:  Yes, sir.
13                   (Exhibit Number 3 marked.)
14                   MR. HYATT:  Or I'll just take a photo.
15   It'll be quicker.
16       Q.  Okay.  I'm showing you what's been marked
17   Plaintiffs' Exhibit 3.
18                   Did -- do you recall any discussions about
19   who was going to pay the tab?
20       A.  No, sir.
21       Q.  But you know you didn't pay any of the tab
22   yourself?
23       A.  Yes, sir, that's correct.
24       Q.  And, I mean, normally when someone's leaving a
25   bar, they're making some inquiry about who's paying or
```

1  do I owe something or anything of that nature.

2          Is that typically your experience?

3      A.  Yes, sir.

4      Q.  Did you make any kind of inquiry about, hey,

5  who's -- do I need to chip in or who's paying this or

6  anything of that nature?

7      A.  No, sir.  I -- I assumed that I would have

8  just been paying for myself.

9      Q.  But you didn't?

10     A.  That's correct.

11     Q.  Okay.  So did -- do -- how did you find out

12 that you weren't paying and someone else was paying?

13     A.  It wasn't until after the fact.

14     Q.  Until after what fact?

15     A.  Well, until the tab was paid.  My -- Mike

16 Wilson offered to pay the tab.

17     Q.  Okay.  Mike -- do you remember Mike saying, I

18 got this, or something like that?

19     A.  I wouldn't say I remember him saying that, but

20 that -- that had to have been the case, yes, sir.

21     Q.  All right.  So you -- what you -- in your

22 interrogatory responses, I believe you testified that

23 during the time you were at the Whistle Post, which

24 is -- we believe is from two to three hours, correct?

25     A.  Yes, sir.

1      Q.  -- you had no more than two draft beers,

2  correct?

3      A.  Yes, sir.

4      Q.  And one mixed cocktail?

5      A.  Yes, sir.

6      Q.  All right.  So when we're looking at

7  Plaintiffs' Exhibit -- is it 3?

8      A.  Yes, sir.

9      Q.  We see, as far as the drafts -- beers, we see

10  eight draft Guinnesses and eight draft Michelob Ultras,

11  correct?

12      A.  Yes, sir.

13      Q.  So what -- did you have a Guinness or did you

14  have a Michelob Ultra?

15      A.  I believe them to be the Michelob Ultras.

16      Q.  Okay.  And you believe you had no more than

17  two?

18      A.  It was two or three.  I know the -- the

19  responses we said, you know, two beers and possibly a

20  mixed cocktail.

21              Once we reviewed this -- the itemized

22  receipt and -- you'll see that there's an Irish Car

23  Bomb shooter on there, which is not something that I

24  would order or drink, so -- so it is a possibility that

25  it was two to three beers.

1      Q.  Okay.  This receipt says two Irish Car Bomb

2  "hooters," but I assume it should Irish Car Bomb

3  shooters?

4      A.  I -- I assumed -- I assumed the same.

5             MR. ADELMAN:  That might be a bad

6  printout, yeah.  I sent you an email copy of that.

7             MR. HYATT:  Okay.

8      Q.  All right.  So have you ever had an Irish Car

9  Bomb shooter?

10      A.  I believe I have, yes.

11      Q.  All right.  And are you 100 percent certain

12  that you did not have an Irish Car Bomb shooter that

13  afternoon?

14      A.  I -- I don't believe I did, no, sir.

15      Q.  It seems like that's something one would

16  remember, whether they had one of those, right?

17      A.  Hard -- hard to say.  I don't recall having

18  one of those, no, sir.

19      Q.  Okay.  And you've been to the Whistle Post a

20  few times before this, correct?

21      A.  Yes, sir.

22      Q.  And you know they serve two size of draft

23  beers, correct?

24      A.  I didn't know that, no, sir.

25      Q.  Well, they -- they serve a -- they serve a --

1    a pint, 16 ounce, and they also serve a larger, it's 22
2    ounces.

3        A.  Okay.

4        Q.  Do you -- did you have the six -- a pint or
5    did you have one that appeared to be larger than a
6    pint?

7        A.  I believe they were pints.

8        Q.  Why did you originally think that you had a --
9    some form of mixed cocktail when you answered the
10   interrogatories?

11       A.  I thought that might have been a possibility,
12   but I wasn't 100 percent sure, which is why there was
13   kind of a two or three suggestion in there.

14            But again, once we saw there weren't any
15   mixed cocktails ordered, then I thought that didn't
16   happen.

17       Q.  All right.  And we see there are some
18   appetizers:  two fried pickles, fried jalapenos, fried
19   mushrooms, mozzarella sticks, jumbo pretzel, potato
20   skins and Sidewinder nachos on here.

21            Did you eat any of that food?

22       A.  Yes, sir.

23       Q.  What did you eat that you remember?

24       A.  Some of all of it.  Probably not the pretzel I
25   would say is the one thing maybe not.

1     Q.  Okay.

2     A.  I'm not typically a pretzel eater.

3     Q.  Do you -- and you have a Golden State Food

4 corporate credit card now, correct?

5     A.  I do now, yes, sir.

6     Q.  To your knowledge, is the credit card -- well,

7 let me ask you this:  What -- what bank and issuer of

8 that credit card -- who's the bank that issued that

9 credit card?

10    A.  Under their American Express.

11    Q.  Okay.  So it's American Express.

12             Is it your understanding that's always

13 been -- that was the case back in February of 2022?

14    A.  I believe so, yes, sir.

15    Q.  And it's your understanding that Mike Wilson

16 paid this tab, Plaintiff's Exhibit 3, on the Golden

17 State Food American Express corporate card?

18    A.  Yes, sir.

19    Q.  And when you became assistant director of

20 operations in April of 2022 -- that was correct?

21    A.  Assistant manager, but yes, sir.

22    Q.  Assistant manager.  I can't get those

23 straight.

24             Assistant manager of operations in April

25 of 2022, you were given a credit card at that point,

1  correct?

2       A.  Yes, sir.

3       Q.  A corporate credit card?

4       A.  Yes, sir.

5       Q.  American Express?

6       A.  Yes, sir.

7       Q.  And I assume you were given instructions and

8  something to sign about what is proper and what is not

9  proper use of the corporate credit card?

10      A.  Yes, sir.

11      Q.  And from your understanding of what you were

12  given -- you were told when you were given that

13  corporate card, was this spending of the $174.20 plus

14  the tip a -- a valid and proper use of the corporate

15  card, according to the regulations you were given?

16      A.  Yes, sir.

17      Q.  Because it's in -- it was a company

18  get-together, correct?

19      A.  I wouldn't call it a company get-together, no,

20  sir.

21      Q.  Yeah.  Well, why would you consider that a --

22  a proper use of the company credit card?

23      A.  Just -- I know that that's been done in the

24  past, I would say.  You know, I've -- I've taken out my

25  associates and team members and peers and -- and used

1  the company credit card in the past.

2      Q.  And that's -- that was another example of what

3  we talked about a lot about helping build corporate

4  camaraderie and communication and teamwork and that

5  sort of thing, correct?

6      A.  Well -- and it's not specific to, you know,

7  the corporate or company.  We've taken job applicants.

8  We've taken customers.  We've taken other people out,

9  and then used the same form of payment before too.

10     Q.  Those are legitimate business uses and

11 expenses, correct?

12     A.  Yes, sir.

13     Q.  And you expect that Golden State Foods

14 considered this a legitimate business expense, the --

15 the Whistle Post tab here?

16     A.  Yes, sir.

17             MR. ADELMAN:  Objection to form -- sorry.

18 Objection to form.

19             You can answer.

20             I think he did.

21             THE WITNESS:  Yeah.

22     Q.  And are you 100 percent confident that the

23 beers -- the two or three draft beers that you had were

24 the Michelob Ultras and not the Guinness?

25     A.  No, sir, I'm not 100 percent confident.  I

1    just know that if I were presented with those two

2    options, I would go with the Michelob Ultra.

3        **Q. The shots that we see on here, who drank**

4    **those?**

5        A. I don't recall.

6        **Q. Do you remember anyone drinking shots?**

7        A. Not that I recall, no, sir.

8        **Q. And I think we talked about you don't**

9    **recall -- or know anyone by name at the Whistle -- that**

10   **works at the Whistle Post?**

11       A. No, sir.

12       **Q. This has server identified as Terrell H --**

13   **Terrell might be the last name -- I don't know.**

14            **Does that ring a bell at all for you?**

15       A. No, sir.

16       **Q. Do you -- were -- were y'all sitting at a**

17   **table or milling around the bar when you were there at**

18   **the Whistle Post?**

19       A. I recall sitting at a table.

20       **Q. So this server was -- was coming and taking**

21   **drink orders as opposed to you guys going up to the**

22   **bar?**

23       A. Both were occurring. I do remember going to

24   the bar, like walking that direction from the table,

25   but obviously we also had a server as well to take, you

1   know, food orders and other orders as well.

2       Q.  All right.  Did you have any discussions with

3   any of the Whistle Post staff, other than making food

4   or drink orders?

5       A.  Not that I recall, no, sir.

6       Q.  Did you have any discussions with anyone at

7   the Whistle Post staff about whether you would be

8   driving home?

9       A.  No, sir, not that I recall.

10      Q.  Do you know if any of the Whistle Post staff

11  knew that you would be driving when you left there?

12      A.  Not that I know of.

13      Q.  Was there any discussion among the Golden

14  State Food people there at the Whistle Post about

15  whether anyone should get a cab or an Uber instead of

16  driving home?

17      A.  Not that I recall.

18      Q.  Do you know if any of the Golden State Food

19  people there got a cab or an Uber instead of driving

20  home?

21      A.  No, sir, I don't know.

22      Q.  Did you consider doing that?

23      A.  No, sir.

24      Q.  Why not?

25      A.  I didn't feel I needed to.

```
1        Q.  Did you feel you were intoxicated at all?
2        A.  No, sir.
3        Q.  Did you feel you were less saved -- safe to
4   drive at all because of the amount you had to drink?
5        A.  No, sir.
6        Q.  Did you feel a buzz at all?
7        A.  No, sir.
8        Q.  And when I say "you feel a buzz," you know --
9   you know what that is, correct?
10       A.  Yes, sir.
11       Q.  All right.  So you didn't feel anything, any
12  different?
13       A.  No, sir.
14       Q.  When you left the Whistle Post, were others of
15  the Golden State Food party still there?
16       A.  I believe so.  I think people were leaving
17  kind of at their own discretion, so I don't recall who
18  all was there still and who wasn't.
19       Q.  And what did you say to everyone when you were
20  leaving?
21       A.  Sorry.  What did I say to them?
22       Q.  Yeah.  Did you say anything in particular,
23  like I'm -- I've got to get home or dinner's waiting or
24  duty calls, or anything like that?
25       A.  I don't -- I don't recall anything specific,
```

1  no, sir.

2      **Q.  Did anyone walk with you to your car?**

3      A.  No, sir, not that I recall.

4      **Q.  All right.  But you didn't give any indication**

5  **to any of the Golden State Foods folks that you were**

6  **going to be calling a cab or an Uber or anything of**

7  **that nature?**

8      A.  No, sir.

9      **Q.  Because you felt you were totally fine to**

10 **drive?**

11     A.  Yes, sir.

12     **Q.  So what time did you leave the Whistle Post?**

13     A.  I believe it was around 7 o'clock.

14     **Q.  Did you make any stops between the Whistle**

15 **Post and the scene of the crash?**

16     A.  No, sir.

17     **Q.  Did you receive any cell phone -- did you**

18 **receive or make any cell phone calls while you were at**

19 **the Whistle Post?**

20     A.  While I was there, not that I recall, no, sir.

21     **Q.  Did you let your wife know that -- where you**

22 **were going to -- what you were going to be doing and**

23 **where you were going to be going?**

24     A.  I likely would have, yes, sir, but I don't

25 recall an exact conversation of that happening.

1    Q.  All right.  Would you have -- well, we know
2  you didn't notify her by text because we would -- that
3  day because we would have seen a text --
4    A.  Yes, sir.
5    Q.  -- with her number on it?
6    A.  Yes, sir.
7    Q.  And her number's ████████, correct?
8    A.  Yes, sir.
9    Q.  When you communicated with your wife when you
10  were at work, was it usually by text or by call?
11    A.  It could have been either/or.  It would -- I
12  would say more so by call typically because in that
13  facility specifically there was very little cell phone
14  service, so text messages were -- were pretty
15  difficult, you know, but with -- I know iPhones you had
16  the -- like WiFi calling option, so typically it was by
17  phone call.
18    Q.  Okay.  When you left for work early that
19  morning, did you know that you were going to be going
20  to the Whistle Post at the end of the workday?
21    A.  No, sir.
22    Q.  So under normal circumstances, you would have
23  been home earlier than 7 o'clock, correct?
24    A.  Yes, sir.
25    Q.  So you feel sure that you notified your wife

1  at some point what you were going to be doing, where
2  you were going to be going?
3      A.  Yes, sir.
4      Q.  And we pretty much eliminated everything but a
5  cell phone call, right?
6      A.  Yes, sir.
7      Q.  Okay.  So when we get the cell phone call
8  list, we're likely to see a call to or from your wife
9  sometime during that day?
10     A.  I'm sure, yes, sir.
11     Q.  Do you recall her being happy or unhappy about
12  you going to the tavern while she's at home with the
13  kids?
14     A.  No, I -- I don't.  No.  And I think I'd
15  remember if she was upset.
16     Q.  And I think you said you did not make any
17  stops between the Whistle Post and the scene of the
18  crash?
19     A.  I don't believe so, no, sir.
20     Q.  Were you on your cell phone at the time of the
21  crash?
22     A.  I don't believe so, no, sir.
23     Q.  Are you certain that you were not?
24     A.  I'm not 100 percent certain, no, sir.
25     Q.  Do you recall any -- being on the phone at any

1   time between the time you left the Whistle Post and the

2   time of the crash?

3       A.  Not that I recall, no, sir.

4       Q.  And this crash occurred on Miller Bottom Road

5   near its intersection with Haynes Ridge Road, correct?

6       A.  Yes, sir.

7       Q.  And you acknowledge that you drove your car

8   across a double yellow centerline and into Ms. Kline's

9   lane of travel?

10      A.  Yes, sir.

11      Q.  And you acknowledge that the crash occurred in

12  Ms. Kline's lane of travel, not yours?

13      A.  Yes, sir.

14      Q.  And you acknowledge that driving your car

15  across the double yellow centerline was the cause of

16  the crash?

17      A.  Yes, sir.

18      Q.  And you acknowledge you were at fault for the

19  crash?

20      A.  Yes, sir.

21      Q.  Tell me why you drove your car across the

22  double yellow centerline into Ms. Kline's lane of

23  travel.

24      A.  I -- I -- I really don't know.  I can

25  speculate on a bunch of different scenarios that could

1  have caused that to happen, but -- I wish -- I wish I

2  did know.  I've been kind of trying to understand that

3  for a little over a year now, but I don't know.

4      **Q.  What's the last thing you remember before the**

5  **crash?**

6      A.  I remember -- I remember leaving the Whistle

7  Post and driving, but I don't remember the entirety of

8  the drive in between the two, right in between leaving

9  and the actual incident.

10         I -- I believe I hit my head in that whole

11  accident because that -- that night, especially after,

12  obviously, was -- it was hard to recall.

13      **Q.  Do you remember the route that you took?**

14      A.  Yes, sir.

15      **Q.  It's pretty much a straight shot, right?**

16      A.  Yes, sir.

17      **Q.  You go through -- go down Main Street, go down**

18  **past your old high school?**

19      A.  Yes, sir.

20      **Q.  To 138?**

21      A.  And then left onto Miller Bottom, yes, sir.

22      **Q.  Yeah.  So what's the last thing you remember,**

23  **I mean, where you were on the route?  Do you remember**

24  **being on 138?**

25      A.  I -- I do, yes, sir.  And, again, it's -- it's

1   hazy, but yes, sir.

2                 (Telephone interruption.)

3               **MR. ADELMAN:** Do you need to take a break?

4               **MR. ELLIS:** No. Apologies.

5               **MR. ADELMAN:** I'm just jealous you have

6   two phones.

7       **Q. Do you remember being on Miller Bottom Road?**

8       A. No, sir.

9       **Q. So when is the -- when -- what's the last**

10   **clear memory that you have of that afternoon?**

11       A. The most familiar thing -- the clearest thing

12   I think was the -- I forgot the name of the road, the

13   one that goes past Rockdale County High School.

14   There's an intersection to turn left onto 138. That I

15   recall. Getting onto 138 is kind of when it starts

16   fading, I guess I would say.

17       **Q. And I know you were injured in the collision.**

18       A. Yes, sir.

19       **Q. What were your injuries?**

20       A. In my right knee, I had a completely severn --

21   or severed -- excuse me -- PCL. I broke -- I can't

22   remember the exact number, but almost all of my ribs

23   on -- I think it was my left side, and a few on my

24   right. I think it was seven or eight ribs total.

25               I had and still have a -- I have a

1  fracture on my left iliac wing.  I remember that

2  specifically because I couldn't pronounce it the first

3  time I heard it, but that hipbone.  And then, you know,

4  just obviously severe bruising.

5      **Q.  Were you diagnosed with a concussion?**

6      A.  No, sir.

7      **Q.  And you're -- as we sit here today, you're not**

8  **certain of the number of beers you had at the Whistle**

9  **Post, correct?**

10     A.  No, sir.

11     **Q.  Have you watched any of the officer body cam**

12 **video after the crash?**

13     A.  I've watched bits and pieces of it, yes, sir.

14 It was hard to watch.

15     **Q.  Do you recall seeing early in one of the video**

16 **clips where a man wearing a stocking cap goes up to the**

17 **deputy and reports to him that you were intoxicated?**

18     A.  No, sir.  I might not have seen that part of

19 it.

20     **Q.  If he did and if that's on the video, do you**

21 **dispute that?**

22     A.  Yes, sir.

23     **Q.  Okay.  I mean, you dispute that you were**

24 **intoxicated?**

25     A.  Yes, sir.

1    Q.  Do you remember seeing the -- the lady in the

2    black-and-white striped shirt who was helping you after

3    the crash?

4    A.  No, sir.

5    Q.  You don't remember seeing her on the video?

6    A.  No, sir.

7    Q.  Do you remember a lady spending some time with

8    you kind of before the paramedics got there?

9    A.  Yes, sir.

10   Q.  Do you remember her having a black-and-white

11   striped shirt on?

12   A.  I don't remember the -- sorry -- her clothing.

13   Q.  Okay.  It turns out she's a nurse.  Do you

14   remember saying that she's a -- she was a nurse and

15   helping you go sit down and all that sort of thing?

16   A.  No, sir.

17   Q.  Did you see one of the video clips where

18   the -- one of the deputies was going through your

19   backpack that was in your car?

20   A.  No, sir.

21   Q.  There is a clip where they're going through

22   the -- your backpack and they -- they pull out and show

23   that there was a laptop, a Dell laptop, I think it was.

24   A.  Yes, sir.

25   Q.  Is that the laptop that Golden State Foods

1  gave you when you went to work there?

2      A.  Yes, sir.

3      Q.  All right.  And that's the one you used for

4  work?

5      A.  Yes, sir.

6      Q.  And that was in the car with you at the time

7  of the crash?

8      A.  Yes, sir.

9      Q.  And then at one point they -- they pulled out

10  two prescription pill bottles.  One looked like it was

11  for tizanidine, a muscle relaxer.

12              Does that sound familiar?

13      A.  Yes, sir.

14      Q.  Did you have a prescription for tizanidine at

15  that time?

16      A.  I believe I did.  I can't remember the name of

17  the actual muscle relaxer, but I did have one for a

18  muscle relaxer, yes, sir.

19      Q.  Who prescribed that?

20      A.  It would have been a surgeon of mine.  I can't

21  remember his exact name off the top of my head, but he

22  was a chiropractic surgeon.

23      Q.  Chiropractic surgeon?

24      A.  Yes.

25      Q.  Maybe an orthopedic surgeon?

1    A.   I'm sorry, orthopedic, yes.  Thank you.
2    Sorry.
3         **MR. ADELMAN:**  Yeah.
4    A.   I got them -- I got them crossed.
5    **Q.   Okay.  Is the orthopedist out there in the**
6    **Conyers area?**
7    A.   No, sir.  I had two, so I apologize for not
8    remembering the exact location, but they were both in
9    the Atlanta area.
10   **Q.   Okay.  Were they with a group, an orthopedic**
11   **group?**
12   A.   Yes, sir.
13   **Q.   Do you remember the name of the group?**
14   A.   I remember one of them was Resurgens.  The
15   other one I don't recall.
16   **Q.   And which Resurgens office would you go to?**
17   A.   They had several.  I think -- I think it was
18   Lithia Springs, I think.
19   **Q.   And what were you being treated for at that --**
20   **by that Resurgens doctor?**
21   A.   So with both -- both surgeons, I had -- what
22   do they call it -- the diskectomy.  So I had a ruptured
23   disk in -- I think it was my L4-L5, so lower back.  So
24   pain medication.  That was it.
25   **Q.   When did you have that surgery?**

1    A.  It was years ago, years.  Multiple years.  I
2  don't remember the exact date.
3    **Q.  Were you college age at that time?**
4    A.  No.  I was -- I remember being -- I was
5  working.  I believe one time was when I was -- I think
6  both of them was when I was at Pratt.
7    **Q.  Okay.  Was it a work injury?**
8    A.  Oh, no, sir.
9    **Q.  No workers' comp claim or anything like that?**
10    A.  No, sir.
11    **Q.  How did you injure it?**
12    A.  Believe it or not, I was playing intramural
13  soccer and -- in Atlanta.  And it was noncontact, just
14  sprinting.  And I took a funny step, and I -- I thought
15  I pulled something in my back and went to a
16  chiropractor, and they eventually told me I needed to
17  go see an orthopedic surgeon to get an understanding of
18  what's going on.
19    **Q.  Had pain going down your legs and that stuff?**
20    A.  Big time, my right leg, yes, sir.
21    **Q.  Where did you have your surgery?**
22    A.  Both times it was in Atlanta.  I think Emory.
23  One time -- the Resurgens one was in Resurgens.  They
24  had a hospital in the Loganville or Snellville area.
25  The other one I believe was at Emory Hospital.

1       Q.  So you had two?

2       A.  Yes, sir.

3       Q.  Were they both diskectomies, or did you also

4  have a fusion at some point?

5       A.  They were both diskectomies.

6       Q.  Okay.  How -- how is your back doing now?

7       A.  Not great, unfortunately.

8       Q.  Are you still taking tizanidine?

9       A.  Oh, no, sir.

10      Q.  No?  And that was like sometimes you'd get

11  spasms, that sort of thing?

12      A.  Yes, sir.

13      Q.  Did you take any of the tizanidine that -- the

14  day of the crash?

15      A.  No, sir.

16      Q.  Are you certain of that?

17      A.  Yes, sir.  At that time, I hadn't taken it in

18  months.  The spasms that you mentioned had -- had

19  resided [sic].  It was just nerve pain, you know, which

20  my surgeons explained to me could be still lingering

21  and could stay there for a while after the surgery was

22  completed.

23      Q.  If you hadn't taken it in months, why were you

24  carrying it in your backpack back and forth to work?

25      A.  I -- I probably just left it in there because

1    I -- I had it in there when I was working at Golden

2    State Foods, and -- and maybe I had taken it in the

3    past as needed, but I do know for a fact at that time I

4    hadn't taken it in months.

5        Q.  When you did take it, did it affect your

6    cognition at all, make you drowsy at all?

7        A.  No, sir.

8        Q.  Did you have any interaction with Ms. Kline at

9    the scene?

10       A.  Not that I recall.

11       Q.  And you -- you probably know that Ms. Kline's

12   mother-in-law was in the truck with her, correct?

13       A.  Yes, sir.

14       Q.  Did you have any interaction with her at the

15   scene?

16       A.  Not that I recall, no, sir.

17       Q.  Do you recall having any interact- -- any

18   interaction with any of Ms. Kline's family at the

19   scene?

20       A.  Not that I recall, no, sir.

21       Q.  And you were taken to Grady after the crash?

22       A.  Yes, sir.

23       Q.  Were you taken by ground ambulance or in a

24   helicopter?

25       A.  From what I understand, I was taken by

1  helicopter.

2      Q.  Did you have any surgeries there?

3      A.  No, sir.

4      Q.  Do you recall how long you were hospitalized?

5      A.  I believe it was three days.

6      Q.  I assume you've spoken with your dad about

7  this lawsuit?

8      A.  Yes, sir.

9      Q.  Tell me about that.

10      A.  Just made sure he understood that -- that

11  there was a lawsuit that -- stemming from this

12  accident, and that's -- update him as -- as more

13  findings and more information comes up, but that's

14  about it.

15      Q.  At some point, did you have some discussion

16  with him about the fact that Golden State Foods

17  corporate credit card was paid -- paid the tab for the

18  Whistle Post --

19      A.  Yes, sir.

20      Q.  -- drinks?

21          And what was his reaction to that?

22      A.  He didn't have much of one, just acknowledged,

23  and that -- that was it.

24      Q.  He didn't have any reaction other than to say,

25  oh, okay, that -- that sort of thing?

1    A.  No.  I mean, he didn't share with me any kind
2  of plans on anything to do with that information, or
3  what he was going to do with that information, I should
4  say, but -- that was all that I got was an
5  acknowledgment.
6     Q.  Have you -- have you spoken with anyone at
7  Golden State Foods about this deposition today, other
8  than the fact that you're -- you've got to sit for a
9  deposition?
10    A.  No, sir.
11    Q.  That Infiniti G35 that you were driving was
12  titled in both your name and your father's name,
13  correct?
14    A.  Yes, sir.
15    Q.  And why is that?
16    A.  I'm not sure why it was titled that way.
17  Yeah, I'm not sure.
18    Q.  How long had you been driving that car?
19    A.  I think three years, maybe three or four
20  years.
21    Q.  So your father had been -- all that time, your
22  father was in California, correct?
23    A.  I -- I don't know the exact timeline of when
24  he moved to California, but I think you're right, yes,
25  sir.

1    Q.  All right.  In any case, at the time of this

2    wreck, he -- he wasn't dictating when you could and

3    could not use the car or putting any limitations on

4    that or anything like that?

5    A.  No, sir.

6    Q.  What other vehicles did you and your wife own

7    as of February 11th, 2022?

8    A.  We have -- we have a Toyota Highlander.

9    Just -- excuse me, I don't -- I don't remember if we

10   bought that before or after the accident.

11            I do remember she also had a -- a Jeep

12   Liberty.  But, again, when -- when the Jeep went is

13   when the Toyota Highlander came, and I just -- I don't

14   remember the -- the time of it relative to the

15   accident, if it was before or after.

16   Q.  Okay.  Did the Liberty follow the Highlander

17   or vice versa?

18   A.  Vice versa.  The Highlander came after the

19   Liberty.

20   Q.  Okay.  And were both of those vehicles insured

21   by State Farm?

22   A.  Yes, sir.  Mine -- mine for a fact was.  I

23   can't remember who hers was through because at that

24   time we weren't married yet, so we wouldn't have been

25   under the same policy.  So she had her own insurance.

1    I just don't know who the insurance company was.

2        **Q. But you were living together, correct?**

3        A.  Yes, sir.

4        **Q.  And you -- you know you did not have an**

5    **umbrella policy with any company above your State Farm**

6    **policy on this vehicle?**

7        A.  That's correct.

8        **Q.  Do you remember which -- what insurance**

9    **company the Highlander or the Liberty were with?**

10       A.  I -- I don't, no, sir.  I know the Highlander,

11   it -- we currently still own that vehicle, and it's

12   through State Farm.

13       **Q.  I'm sorry?**

14       A.  The Highlander, we still have it, it's still a

15   vehicle of ours, and that's through State Farm.

16       **Q.  To your knowledge, was it ever insured by**

17   **another company?**

18       A.  No, sir, not to my knowledge.

19       **Q.  Okay.**

20               **MR. HYATT:**  Okay.  So this will be 4.

21               (Exhibit Number 4 marked.)

22               THE WITNESS:  Thank you.

23               **MR. ADELMAN:**  It's the prior -- is this

24   the prior one?

25               **MR. HYATT:**  Right, yeah.

1    Q.  Handing you Plaintiff's Exhibit 4, which is an

2    Incident/Offense Report from Rockdale County Sheriff's

3    office from June of 2013 involving a prior DUI arrest.

4            Do you recall this situation?

5    A.  Yes, sir.

6    Q.  So look on page 3, which is a narrative

7    incident report by Officer Epperson.

8            I'll ask you to read through that and let

9    me know if there's anything in there that you dispute

10   as being correct.

11   A.  Okay.

12   Q.  Do you see anything in that incident report

13   that you feel is not correct?

14   A.  No, sir.

15   Q.  Do you see where it's reported here that you

16   told the officer that you had drunk a couple of beers

17   earlier?

18   A.  Yes, sir.

19   Q.  And that wasn't true, was it?

20   A.  No, sir.

21   Q.  All right.  Because you see where you

22   registered a blood alcohol of 0.192, correct?

23   A.  Yes, sir.

24   Q.  And do you know how much that is over the

25   legal presumption of intoxication?

1      A.  No, sir.

2      Q.  **It's well over it, though, correct?**

3      A.  I do know that, yes, sir.

4      Q.  **You know that.**

5          **And why did you say to the officer that**

6   **you'd had just a couple of beers?**

7      A.  Well, I -- I don't know.  I know that, you

8   know, I was a teenager at the time and likely afraid,

9   right, of -- of the situation and not really knowing

10  what was coming next.  But I don't know exactly why I

11  would have said that.

12     Q.  **Well, there's more -- it's more than being a**

13  **product of being a teenager; you were being arrested**

14  **for DUI, correct?**

15     A.  Yes, sir.

16     Q.  **So certainly concerned over what was coming**

17  **next?**

18     A.  Yes, sir.

19     Q.  **Do you know why the DUI case against you was**

20  **transferred out of Rockdale County?**

21     A.  I don't know why it was transferred out of

22  Rockdale County, no, sir.

23     Q.  **You were driving Judge Nancy Bills' car that**

24  **evening, correct?**

25     A.  Yes, sir.

1    Q.  And she was a Rockdale -- state court Rockdale

2  County judge, correct?

3    A.  Yes, sir.

4    Q.  Do you know Judge Bills?

5    A.  Yes, sir.

6    Q.  All right.  And you were -- according to this,

7  you -- report, you were friends with her daughter?

8    A.  Yes, sir.

9    Q.  Were y'all platonic friends or were y'all

10  dating?

11    A.  We were dating.

12    Q.  So did you ever speak with Judge Bills about

13  this incident?

14    A.  Oh, yes, sir.

15    Q.  Tell me about that.

16    A.  It -- 10 years ago, so I don't remember the

17  exact conversations, but obviously incredibly

18  apologetic.  And, you know, she -- I -- I remember

19  having a conversation about what would be coming next.

20         I didn't know that it was transferred out

21  of the county, but I do recall her telling me she would

22  have to redact herself from the situation, obviously,

23  because of our -- our relationship.

24    Q.  And after -- according to your interrogatory

25  responses and what we've seen, after it was transferred

1    out of Rockdale, the DUI case against you was dropped,

2    correct?

3        A.  Yes, sir.

4        Q.  Do you know why?

5        A.  I don't.  I know my -- my attorney at the time

6    had suggested that I perform certain tasks before, you

7    know, the court date to -- to help show that I'm

8    remorseful of the situation, so I believe that had a

9    role to play in that outcome.

10       Q.  And what did you do?

11       A.  I took a defensive -- a defensive driving

12   course, a DUI class, and there was another thing -- I

13   apologize for not -- there was -- there was community

14   service involved as well that I'd completed before the

15   court date, and I believe that's all of it.

16       Q.  Where did you do the -- the defensive

17   driving/DUI class?

18       A.  It was in Atlanta.

19       Q.  Do you remember anything other than that?

20       A.  Other than where it was?

21       Q.  Yeah.

22       A.  No, not much, sir.

23       Q.  You -- like what part of town it was in or

24   anything like that?

25       A.  I do -- I do remember it being -- I believe it

1   was close to Howell Mill Road.  I remember driving on

2   it going to and from the class.

3       **Q.  And the community service, tell me about that.**

4       A.  It was an online community service, so it

5   was -- it was -- it was more of an academic community

6   service where you took several academic classes, and

7   they -- they considered it as community service.

8       **Q.  What -- when you say "academic," that's a**

9   **pretty broad definition.**

10      A.  Yeah, yeah.  Sorry.  It's quite -- quite

11  literally like -- like math and science classes.  I

12  mean, it -- it was essentially sitting in class is what

13  it was.

14      **Q.  And that was considered community service?**

15      A.  Yes, sir.

16      **Q.  Your -- did your attorney set that up?**

17      A.  I don't recall who set that up.  He may have

18  suggested it, but I don't -- I don't recall who set

19  that up.

20      **Q.  And David LaMalva was your attorney, correct?**

21      A.  Yes, sir.

22          **MR. HYATT:**  That's L-A-M-A-L-V-A.

23      **Q.  Did Mr. LaMalva guide you to that online**

24  **community service?**

25          **MR. ADELMAN:**  We may be getting into

```
 1   privileged stuff, so --
 2                   MR. HYATT:  Well, I -- I'll -- I'll ask --
 3   reask it.
 4        Q.  How did you learn about the online community
 5   service?
 6                   MR. ADELMAN:  To the extent that it's your
 7   attorney, I'm going to object as being privileged.
 8                   THE WITNESS:  Oh.
 9                   MR. ADELMAN:  I'll instruct you not to
10   answer --
11                   THE WITNESS:  Okay.
12                   MR. ADELMAN:  -- if that's where it's
13   coming from.
14                   THE WITNESS:  I don't believe it was.
15                   MR. ADELMAN:  Okay.  Answer it.
16        A.  So I believe I just researched, you know,
17   forms of community service in Atlanta --
18        Q.  Okay.
19        A.  -- and found several.  I believe that was just
20   one of them.
21        Q.  Have you been pulled over in your vehicle by
22   law enforcement for any reason since this DUI arrest in
23   June of 2013?
24        A.  I may have had a speeding ticket or two since
25   that time, but that -- that's all that I recall.  No.
```

1    Q.  At one point in the officer body cam video

2  after the collision, the lady -- the nurse, Ms. Norman,

3  was -- is holding up what appeared to be a work ID with

4  your photo on that.

5            Do you remember seeing that in the video?

6    A.  No, sir.

7    Q.  Did you wear -- did you have a work ID that

8  you would wear at the plant?

9    A.  Yes, sir.

10    Q.  Like it had a little clip on it, and you clip

11  it to your shirt?

12    A.  Yes, sir -- belt buckle, but, yes, sir.

13    Q.  I'm sorry?

14    A.  You clip it to your belt loop.

15    Q.  Okay.  And did you have that -- were you still

16  wearing that work ID when you went to the Whistle Post?

17    A.  I -- I may have.  I don't recall.  I

18  typically -- if I -- if I go somewhere after work or

19  even for lunch, I'll take it off, but it's a

20  possibility that I was wearing it.

21    Q.  Okay.  Going back to that 2013 DUI charge that

22  was dropped, did you -- do you recall what amount fine

23  you had to pay?

24    A.  Oh, no, sir.

25    Q.  It wasn't for the DUI; it was for a lesser

1    charge, correct?

2        A.  Yes, sir.  I was -- believe it was the -- the

3    failure to maintain charge.

4        **Q.  Are -- are you still in touch with Mary**

5    **Bill -- Mary Bills?**

6        A.  No, sir.

7        **Q.  Okay.  Have you seen Judge Bills lately?**

8        A.  No, sir.

9                **MR. HYATT:**  All right.  Let me check my

10   notes.  I think we're about done.

11               Okay.  Signature?

12               **MR. ELLIS:**  Can we take a break?

13               **MR. ADELMAN:**  Yeah, let's talk.

14               THE VIDEOGRAPHER:  We're now off the

15   record at 11:39 a.m.

16               (Recess 11:39-11:52 a.m.)

17               THE VIDEOGRAPHER:  We are now back on the

18   record at 11:52 a.m.

19                         EXAMINATION

20   BY MR. ADELMAN:

21       **Q.  Jan, I just want to clarify a couple of**

22   **things.**

23               **I think you talked about, in response to**

24   **Mr. Hyatt's questions, about you had at most two to**

25   **three drinks or beers or whatever it was at the Whistle**

1  Post.

2              Do you recall that?

3      A.  Yes.

4      Q.  And then he asked you a question about whether

5  you're certain about the number of -- of drinks you

6  had.  And I think your answer was that you weren't

7  certain about the number.

8              Do you remember that?

9      A.  Yes, I do.

10     Q.  When you say you're not certain, what do you

11 mean?

12     A.  I wasn't -- you know, that's also why we put

13 in the -- or I put in the suggestion that it was two to

14 three beers.  I couldn't remember if it was two or

15 three, right, but I'm -- I'm certain it wasn't more

16 than that.  I just -- I just don't know if it was one,

17 two or three.

18     Q.  Okay.  And then there was some mention about

19 the gathering at Whistle Post as being a meeting.

20             Was it -- was it a business meeting that

21 was happening there?

22     A.  No.

23     Q.  Okay.  Was it a -- what was it?

24     A.  It -- I wouldn't even call it a gathering.  It

25 was just -- I don't know if Happy Hour is the right

1  phrase to use, but people going to get food and a beer

2  or two after work.

3      Q.  Okay.  And was it mandatory to attend that?

4      A.  No.

5      Q.  And then, finally, you have --

6          MR. ADELMAN:  Well, actually, that's all I

7  have.

8          THE WITNESS:  Okay.

9          MR. ADELMAN:  That's all I have.

10                     EXAMINATION

11  BY MR. HYATT:

12      Q.  You -- as far as that gathering at the Whistle

13  Post, you said it wasn't mandatory, but you don't

14  know -- can't recall the circumstances of the -- who

15  organized it or who invited you or any of that,

16  correct?

17      A.  Yes, sir, that's correct.

18          MR. HYATT:  Okay.  All right.  That's all

19  I have.

20          MR. ADELMAN:  He's going to -- he's going

21  to reserve.

22          MR. HYATT:  Okay.

23          MR. ADELMAN:  Right?

24          Yeah, we're going to reserve.

25          THE VIDEOGRAPHER:  Okay.  We're now off

1    the record at 11:54 a.m.

2                    (Deposition concluded at 11:54 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         CHANGES AND SIGNATURE

2  **WITNESS NAME:**  JAN DICK           DATE:  7-19-23

3  PAGE  LINE                 CHANGE           REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

1    I, JAN DICK, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted above.

4    _____

5    JAN DICK

6

7  THE STATE OF _____)

8  COUNTY OF _____)

9

10    Before me, _____, on this

11  day personally appeared JAN DICK, known to me (or

12  proved to me under oath or through _____)

13  (description of identity card or other document) to be

14  the person whose name is subscribed to the foregoing

15  instrument and acknowledged to me that they executed

16  the same for the purposes and consideration therein

17  expressed.

18    Given under my hand and seal of office this

19  _____ day of _____, 2023.

20

21    _____

22    NOTARY PUBLIC IN AND FOR

23    THE STATE OF _____

24  My commission expires: _____

25

```
1              IN THE UNITED STATES DISTRICT COURT
2                 NORTHERN DISTRICT OF GEORGIA
3                       ATLANTA DIVISION
4
5   TAMARA KLINE AND GREG KLINE, )
                                 )
6         Plaintiffs,            )
                                 )
7   VS.                          ) CIVIL ACTION FILE
                                 ) NO: 1:23-CV-02035-SDG
8   JAN DICK,                    )
                                 )
9         Defendant.             )
10
11
12                 REPORTER'S CERTIFICATION
13        ORAL AND VIDEOTAPED DEPOSITION OF JAN DICK
14                      JULY 19, 2023
15
16        I, Therese J. Casterline, Registered Merit
17  Reporter, Certified Realtime Reporter, Certified
18  Shorthand Reporter for the State of Texas, do hereby
19  certify to the following:
20            That the witness, JAN DICK, was duly sworn
21  by the officer and that the transcript of the oral
22  deposition is a true record of the testimony given by
23  the witness;
24            I further certify that pursuant to FRCP Rule
25  30(e)(1) that the signature of the deponent:
```

1    XX was requested by the deponent or a
2    party before the completion of the deposition and is to
3    be returned within 30 days from the date of receipt of
4    the transcript.  If returned, the attached Changes and
5    Signature Page contains any changes and the reasons
6    therefor;
7    __ was not requested by the deponent
8    or a party before the completion of the deposition.
9    I further certify that I am neither counsel
10   for, related to, nor employed by any of the parties or
11   attorneys to the action in which this proceeding was
12   taken.  Further, I am not a relative or employee of any
13   attorney of record in this cause, nor am I financially
14   or otherwise interested in the outcome of the action.
15   Subscribed and sworn to on this the
16   25th day of July, 2023.
17
18   _____
     Therese J. Casterline, Texas CSR
19   5001, Expiration Date:  4/30/24
     WORLDWIDE COURT REPORTERS
20   12621 Featherwood Drive
     Suite 290
21   Houston, Texas 77034
     Firm Registration Number 223
22   1-800-745-1101
23
24
25

**A**

**A-I-K-E-N-S**
37:12
**a.m** 1:19,19 4:3
21:16 32:23,24
33:1 48:18,20
50:10 53:7
59:25 71:13,23
76:17,18,20
119:15,16,18
122:1,2
**able** 40:4 47:12
57:4,22 76:22
77:2
**above-styled**
1:18
**abundance** 83:7
**academic** 116:5
116:6,8
**accepted** 46:23
**access** 27:11
28:11
**accident** 7:11
99:11 108:12
110:10,15
**accuracy** 19:8
**accurate** 12:3
18:15,25 19:9
19:11
**acknowledge**
98:7,11,14,18
**acknowledged**
108:22 124:15
**acknowledgm...**
109:5
**action** 1:7 125:7
126:11,14
**actual** 22:12
40:22 43:20
62:21 74:18
79:10,19 80:22
99:9 103:17
**add** 57:6
**address** 6:8,9
7:22,25 32:13
**addresses** 31:2

**Adelman** 2:9,10
3:7 4:10,10
7:19,21 11:2
11:10,13 18:5
26:18 38:23
39:1,4,6,8
47:22,25 52:4
52:9 55:22
56:5 67:22,24
68:15,22 70:13
82:13,15,20,23
83:6,18,20,25
84:3,6,8 87:5
91:17 100:3,5
104:3 111:23
116:25 117:6,9
117:12,15
119:13,20
121:6,9,20,23
**administration**
8:23 9:10,13
**affect** 107:5
**affix** 124:2
**afraid** 113:8
**afternoon** 58:23
62:4 66:4 67:1
67:9,21 68:21
71:4 81:5
87:13 100:10
**age** 105:3
**ago** 7:10 53:13
68:7,9 105:1
114:16
**agree** 70:10
73:21
**agreeable** 11:1,2
**agreements** 4:6
**ahead** 57:14
83:25
**Aikens** 37:11
**alcohol** 52:14
112:22
**ambitions** 47:1
**ambulance**
107:23
**American** 89:10
89:11,17 90:5

**amount** 34:3,7
34:11,13 94:4
118:22
**answer** 5:15
31:12 56:5
61:6 67:23,25
68:16,24 91:19
117:10,15
120:6
**answered** 42:8
42:18 83:9
88:9
**answers** 5:6
**anticipate** 5:17
29:21
**anybody** 42:22
**apol-** 6:9
**apologetic**
114:18
**Apologies** 100:4
**apologize** 20:2
21:3 24:8 68:7
104:7 115:13
**Appearances**
3:3
**appeared** 70:3
88:5 118:3
124:11
**appetizers** 88:18
**applicants** 91:7
**approval** 58:9
**approximate**
16:14
**approximately**
21:2 70:24
**April** 17:4 23:7
23:10 41:24
89:20,24
**area** 9:12,15
16:22 19:13
23:17 24:10,13
24:21 25:10,12
45:22 55:7
64:12,14 66:21
66:23 77:14
104:6,9 105:24
**areas** 16:12 19:8

19:11 25:9
53:21
**Ariel** 6:18,23,25
7:1,2
**Ariel's** 7:6
**arrest** 112:3
117:22
**arrested** 113:13
**asked** 120:4
**asking** 48:4 56:1
**aspects** 16:8
**assert** 83:7
**assignments**
19:7
**assistant** 23:8,11
23:13,17 41:20
41:25 44:24
59:21 89:19,21
89:22,24
**associates** 42:11
74:9 79:16
90:25
**assume** 9:19
25:1 30:9
32:12 38:2,16
46:23 61:12
87:2 90:7
108:6
**assumed** 56:7
85:7 87:4,4
**AT&T** 3:16
33:18 39:10,11
40:8
**ate** 48:25 49:15
59:11
**Atlanta** 1:3 2:11
2:15 13:4,6
104:9 105:13
105:22 115:18
117:17 125:3
**attached** 126:4
**attainable** 37:15
**attainment**
29:16,19,21
**attend** 69:6
121:3
**attending** 61:13

61:19
**attorney** 115:5
116:16,20
117:7 126:13
**attorney-clien...**
83:8
**attorneys** 83:10
126:11
**authority** 58:13
58:17
**authorized**
54:16 58:7
**Avenue** 2:5
**award** 79:17,17
**aware** 53:1

**B**

**B-O-A-T-E-N...**
65:1
**B-R-Y-A-N-T**
79:7
**back** 10:17
14:20 16:25
26:5,6 32:25
39:20 41:3
49:11 71:6
75:5 76:19
89:13 104:23
105:15 106:6
106:24 118:21
119:17
**backpack**
102:19,22
106:24
**bacon** 49:24
**bad** 87:5
**bank** 89:7,8
**bar** 67:1,9 81:11
84:25 92:17,22
92:24
**Barley** 6:10,10
**based** 29:15
34:9 35:4,4,18
43:23
**basically** 22:4
42:3 53:20
**basics** 4:24

**basis** 17:16
**beer** 121:1
**beers** 86:1,9,19
  86:25 87:23
  91:23,23 101:8
  112:16 113:6
  119:25 120:14
**beginning** 58:19
**believe** 6:14
  15:19 35:6,7
  40:11 47:13
  73:15 81:2
  85:22,24 86:15
  86:16 87:10,14
  88:7 89:14
  94:16 95:13
  97:19,22 99:10
  103:16 105:5
  105:12,25
  108:5 115:8,15
  115:25 117:14
  117:16,19
  119:2
**bell** 92:14
**belt** 118:12,14
**benefit** 10:11
  69:5
**Bennett** 77:5
**Beracah** 2:14
**best** 17:18 46:6
  46:7 50:13,15
**better** 47:18
  84:10
**big** 36:1 105:20
**bill** 34:8 35:2
  119:5
**billing** 39:22
**Bills** 114:4,12
  119:5,7
**Bills'** 113:23
**birth** 6:5
**bits** 101:13
**black-and-wh...**
  102:2,10
**blank** 28:17
**blood** 112:22
**Boateng** 64:25

**body** 101:11
  118:1
**Bomb** 86:23
  87:1,2,9,12
**bonus** 43:23
**bonuses** 43:15
  44:5
**bothering** 48:1
**bottles** 103:10
**Bottom** 98:4
  99:21 100:7
**bought** 110:10
**boxes** 11:23
**break** 32:19
  76:10,13,14,21
  100:3 119:12
**breakdown**
  44:12
**breakfast** 48:23
  49:15,18,21
**broad** 116:9
**broke** 100:21
**brought** 45:16
**bruising** 101:4
**Bryant** 79:7,9
**bubble** 11:23
**buckle** 118:12
**build** 91:3
**bulk** 26:4
**bunch** 98:25
**Burleson** 16:20
**business** 8:23
  9:4,10,12,16
  10:2,8 15:13
  15:16 16:10
  21:15,17,20
  22:1,9 69:11
  69:14 91:10,14
  120:20
**businesswise**
  70:7
**buzz** 94:6,8

---
**C**

**C** 2:1,13 4:1
**C-H-R-I-S**
  42:15

**cab** 93:15,19
  95:6
**California** 14:1
  109:22,24
**call** 29:16 32:9
  34:21 36:24
  37:22 45:9
  46:4 66:24
  81:16 90:19
  96:10,12,17
  97:5,7,8
  104:22 120:24
**called** 14:12
  25:18
**calling** 95:6
  96:16
**calls** 33:10 34:5
  47:15 51:6,15
  71:3 94:24
  95:18
**cam** 101:1
  118:1
**camaraderie**
  9:23 10:6 13:9
  47:5 69:9,16
  91:4
**cap** 34:13,16
  35:1,2,7
  101:16
**car** 50:17,24
  86:22 87:1,2,8
  87:12 95:2
  98:7,14,21
  102:19 103:6
  109:18 110:3
  113:23
**card** 49:4 59:17
  59:20 83:3
  89:4,6,8,9,17
  89:25 90:3,9
  90:13,15,22
  91:1 108:17
  124:13
**careerwise** 70:4
**carrying** 106:24
**case** 68:18 85:20
  89:13 110:1

  113:19 115:1
**cases** 17:23,23
  29:18
**Casterline** 1:20
  125:16 126:18
**CASTILLA**
  2:10
**cause** 1:18 5:18
  98:15 126:13
**caused** 99:1
**caution** 83:7
**cell** 7:6 32:6,9
  33:8,11,15,19
  33:22 34:9,14
  35:11,15 37:22
  71:3 74:19
  95:17,18 96:13
  97:5,7,20
**centerline** 98:8
  98:15,22
**certain** 16:9
  17:14,21,23
  25:8,9 28:5
  34:10 43:16
  53:21,25 59:12
  59:14 87:11
  97:23,24 101:8
  106:16 115:6
  120:5,7,10,15
**certainly** 113:16
**CERTIFICA...**
  3:11
**CERTIFICA...**
  125:12
**Certified** 125:17
  125:17
**certify** 125:19
  125:24 126:9
**chain** 9:14 12:9
  42:7,21 43:10
  46:19 63:12,15
  65:16 81:10
**chance** 32:19
  74:17
**change** 22:25
  23:14 31:23,25
  74:10 77:15

  123:3
**changed** 22:9
**changes** 3:10
  123:1 126:4,5
**character** 79:18
**charge** 79:11
  118:21 119:1,3
**check** 27:16
  51:1 119:9
**check-ins** 48:3
**checking** 57:18
**chef** 64:5
**cherry-pick**
  34:21
**chief** 13:20,23
**children** 7:4 8:1
**chip** 85:5
**chiropractic**
  103:22,23
**chiropractor**
  105:16
**choose** 9:15
**Chris** 42:15
  77:20 79:1
**Circle** 2:10
**circumstances**
  53:6 96:22
  121:14
**City** 1:23
**Civil** 1:7,24
  10:23 125:7
**claim** 45:5 105:9
**Clairemont** 2:5
**clarification**
  56:14
**clarify** 55:22
  56:3 119:21
**class** 115:12,17
  116:2,12
**classes** 9:20
  116:6,11
**clean** 33:2
**clear** 10:19
  55:23 56:20
  100:10
**clearest** 100:11
**clip** 102:21

118:10,10,14
clips 101:16
102:17
clock 27:2,6
close 49:3 53:19
116:1
closer 60:10
67:12
closing 53:15
54:17
clothing 102:12
cocktail 86:4,20
88:9
cocktails 88:15
code 49:5
Cofield 78:23
cognition 107:6
collaboration
69:16
college 8:10
105:3
collision 47:9
100:17 118:2
come 22:20 28:5
67:20
comes 83:10
108:13
coming 92:20
113:10,16
114:19 117:13
command 42:7
42:21 43:10
46:20 81:10
commission
124:24
communicate
55:9 56:9,10
56:22 57:25
communicated
74:11 96:9
communicates
56:7
communication
9:24 10:7
37:13 47:4
54:23,24 55:6
55:25 57:13,22

58:17 66:6,12
74:8,12 91:4
community
115:13 116:3,4
116:5,7,14,24
117:4,17
commute 51:6
51:12
comp 105:9
company 10:11
35:14 43:25
47:1 59:17,20
69:7 90:17,19
90:22 91:1,7
111:1,5,9,17
completed
106:22 115:14
completely
100:20
completion
126:2,8
compound
67:24
computed 44:2
44:8
computer 27:11
27:14
concept 69:13
concepts 9:22
concern 58:12
concerned
113:16
concluded 122:2
conclusion 11:8
11:11
concussion
101:5
condiments
14:17,18,22
confident 91:22
91:25
confidently 59:6
confirmed 8:21
congratulations
79:15
consider 90:21
93:22

consideration
124:16
considered
26:16 63:20
65:18 91:14
116:7,14
consumption
52:14
contacted 32:8
38:12
contacting 79:12
container 26:8
containers 26:12
contains 126:5
contents 26:7
continuation
20:16
continuous
80:15
convene 66:25
conversation
5:16 58:4
66:10 95:25
114:19
conversations
57:25 114:17
Conyers 8:7,9
13:4 14:7,9,15
16:7,13,25
17:10 18:22
19:25 23:23
26:20 34:18
35:23 38:4
42:22 43:7,10
44:5,16 45:9
45:13 46:17
50:22 51:22
64:7 65:16
80:16 104:6
coordinated
68:13
coordination
66:3
copies 83:16
84:3
copy 82:15 87:6
cordoned 24:13

corporate 14:5
62:17 63:4,23
64:10,23 65:8
65:20 67:16
69:3 89:4,17
90:3,9,13,14
91:3,7 108:17
correct 14:4,10
17:1 21:10
24:11,18 26:17
27:25 33:5,8
36:14 37:6,8
39:25 42:1
47:9 48:8
50:11 51:22
53:4,8 54:12
55:3,7,10 57:1
58:24 61:12
66:15 67:16
69:11,16,25
70:19,25 75:13
76:24 77:2,3,7
77:20 78:13
84:23 85:10,24
86:2,11 87:20
87:23 89:4,20
90:1,18 91:5
91:11 94:9
96:7,23 98:5
101:9 107:12
109:13,22
111:2,7 112:10
112:13,22
113:2,14,24
114:2 115:2
116:20 119:1
121:16,17
124:3
correctly 24:23
81:20
counsel 4:5,24
70:21 126:9
counterpart
79:2
county 1:23 3:19
6:12 8:9
100:13 112:2

113:20,22
114:2,21 124:8
couple 112:16
113:6 119:21
course 5:24
115:12
court 1:1 4:7
5:19 114:1
115:7,15 125:1
126:19
covered 4:25
covering 38:8,13
COVID 36:2
Covington 14:11
coworkers 33:7
69:24 74:15
crash 7:12 21:5
48:6 95:15
97:18,21 98:2
98:4,11,16,19
99:5 101:12
102:3 103:7
106:14 107:21
credit 59:17,20
83:3 89:4,6,8,9
89:25 90:3,9
90:22 91:1
108:17
cross-examina...
10:21
crossed 104:4
CSR 1:20
126:18
cups 26:13
current 7:22
currently 13:20
111:11
customary
61:14,20,22,23
61:25
customer 16:11
45:10
customers 11:25
91:8

D

D 3:1 4:1

**D-A-W-N** 65:10
**D-O-L-A-N** 64:2
**dad** 13:14,16
108:6
**daily** 17:16
23:16 30:3
**Dan** 80:11
**data** 29:2,6
**date** 6:5,7 33:4
40:12,13,16,23
82:16,17 105:2
115:7,15 123:2
126:3,19
**date/time** 40:23
**dates** 20:22
**dating** 114:10
114:11
**daughter** 114:7
**David** 64:25
66:20 116:20
**Davis** 1:21
**Dawn** 65:10
**day** 16:4 17:25
20:14,16,17,20
21:6,13 23:25
24:24 27:2,21
48:6,11,14,16
50:7 51:2,21
53:13 54:25
57:18,23 58:1
59:1,4,8,11,13
59:24 60:12
65:25 66:19,19
74:10 77:17
78:7 79:15,20
96:3 97:9
106:14 124:11
124:19 126:16
**day-to-day**
63:17
**days** 15:25 16:3
21:14 31:16
50:8 108:5
126:3
**deal** 46:5,13
63:17
**Decatur** 2:6

**December** 74:18
**decide** 11:9
**decision** 22:3,11
22:13
**Defendant** 1:9
2:8 125:9
**defensive** 115:11
115:11,16
**definition** 116:9
**degree** 9:10
**deleted** 41:2
**Dell** 102:23
**departments**
25:15
**depended** 15:16
16:10 59:8
**dependent** 21:15
49:19
**depending**
27:21 43:16,21
53:18
**depends** 15:13
**deponent** 125:25
126:1,7
**deposition** 1:11
1:15 4:20
10:20,25 11:6
11:9 109:7,9
122:2 124:2
125:13,22
126:2,8
**Depot** 11:24
**deputies** 102:18
**deputy** 101:17
**Describe** 17:9
**described** 19:15
**description** 3:14
3:15 18:7,13
18:16,21,25
28:9 124:13
**desktop** 30:23
30:24
**develop** 10:12
**developing** 9:23
10:3,6 69:9
**diagnosed** 101:5
**Dick** 1:8,12,16

3:5 4:11,12,13
4:17 6:4 10:20
25:7 123:2
124:1,5,11
125:8,13,20
**Dick's** 24:20
**dictating** 110:2
**different** 13:3
18:13 22:20
25:20,24 26:14
61:11 64:12,12
72:15,16 94:12
98:25
**difficult** 96:15
**dinner** 59:10
**dinner's** 94:23
**direct** 37:13
41:14 42:11
**direction** 92:24
**directly** 42:9
51:24
**director** 65:16
80:15 89:19
**discovery** 10:21
**discretion** 94:17
**discuss** 13:13
37:19 76:13
**discussed** 47:5
**discussion** 93:13
108:15
**discussions**
84:18 93:2,6
**disk** 104:23
**diskectomies**
106:3,5
**diskectomy**
104:22
**disposable**
26:13
**dispute** 101:21
101:23 112:9
**DISTRICT** 1:1
1:2 125:1,2
**division** 1:3
19:20 24:21
44:11 63:13
125:3

**divisional** 43:24
63:16
**divisions** 16:9
**divulging** 28:8
**doctor** 104:20
**document** 29:13
124:13
**documented**
58:3
**documents**
53:23
**doing** 47:18
69:21 93:22
95:22 97:1
106:6
**Dolan** 63:25
**dollars** 34:8
**double** 98:8,15
98:22
**download** 28:19
**dozen** 60:21
**draft** 86:1,10,10
87:22 91:23
**drafts** 86:9
**drank** 92:3
**drink** 86:24
92:21 93:4
94:4
**drinking** 92:6
**drinks** 82:4
108:20 119:25
120:5
**drive** 45:2 51:11
51:19 81:22
94:4 95:10
99:8 126:20
**drivers** 19:12
**driving** 93:8,11
93:16,19 98:14
99:7 109:11,18
113:23 115:11
116:1
**driving/DUI**
115:17
**dropped** 115:1
118:22
**drove** 50:17

98:7,21
**drowsy** 107:6
**drunk** 112:16
**DUI** 112:3
113:14,19
115:1,12
117:22 118:21
118:25
**duly** 1:17 4:14
125:20
**duties** 17:9
23:14 29:3
61:14,20,25
**duty** 24:11 46:9
94:24

**E**

**E** 2:1,1 3:1 4:1,1
**E-L-I-S-E-O**
24:1
**earlier** 4:18
13:10 22:24
23:20 36:24
47:6 48:18
53:17 56:12
69:10 96:23
112:17
**early** 23:3 48:17
51:17 53:15,16
53:19 54:10,17
57:5 96:18
101:15
**easy** 56:3
**eat** 48:23 50:24
59:4,13,24
88:21,23
**eater** 89:2
**eating** 45:21
49:17
**Eddie** 79:7,9
**edited** 11:5
**eight** 21:24
25:25 86:10,10
100:24
**either** 32:9,11
56:1 74:8
**either/or** 96:11

**elbows** 66:18
**electrical** 54:3
**eliminated** 97:4
**Eliseo** 23:25
  78:4
**Eliseo's** 78:6
**Ellis** 2:13,14
  4:12,12 32:18
  38:24 52:8
  76:9,15 100:4
  119:12
**else's** 60:15
**email** 28:11 30:4
  30:10 31:1,21
  32:6,13 37:22
  55:20 58:3
  84:8 87:6
**emails** 30:19,23
  31:1,9 47:16
  51:1,2
**Emory** 105:22
  105:25
**emphasis** 69:15
**employed**
  126:10
**employee** 62:23
  63:8 64:18
  65:3,13 77:8
  126:12
**employees** 9:24
  10:7,12 16:15
  17:13 27:5
  46:1 47:16
  61:4,10 65:23
  67:9,15 69:2
  81:4,25
**employment**
  70:12
**encryption**
  30:18
**ended** 53:4
**ends** 77:1,4,18
  80:10
**enforcement**
  117:22
**ensuring** 17:12
**enter** 29:2

**entering** 29:6
**entire** 16:12
  20:18
**entirety** 31:13
  99:7
**Epperson** 112:7
**equipment**
  80:19
**Erica** 2:18
**especially** 32:6
  57:7 99:11
**essentially** 29:17
  116:12
**estimated** 35:10
**evening** 113:24
**event** 68:10
**eventful** 58:25
**eventually**
  105:16
**exact** 16:23
  20:22 40:11,13
  40:16 44:13
  47:13 48:15
  52:22 53:12
  63:11 66:11
  95:25 100:22
  103:21 104:8
  105:2 109:23
  114:17
**exactly** 59:11
  113:10
**EXAMINATI...**
  3:6,7,8 4:15
  119:19 121:10
**example** 22:6,25
  25:23 28:14
  31:9 38:7 91:2
**Excel** 28:12 29:1
  29:3,11,13
**excuse** 7:14
  32:18 76:9
  100:21 110:9
**executed** 124:15
**executive** 64:5
  66:24
**exhibit** 3:15,16
  3:18,19 18:1,3

  18:4 38:20,22
  38:25 39:15
  40:21 71:6
  83:22,24 84:7
  84:13,17 86:7
  89:16 111:21
  112:1
**EXHIBITS** 3:13
**expect** 91:13
**expectations**
  19:3
**expected** 27:24
**expense** 91:14
**expenses** 91:11
**exper-** 10:5
**experience** 10:6
  85:2
**experienced**
  15:14
**Expiration**
  126:19
**expires** 124:24
**explain** 20:9
  30:5 43:19
**explained**
  106:20
**exposure** 9:16
**Express** 89:10
  89:11,17 90:5
**expressed**
  124:17
**extending** 79:15
**extent** 11:3 33:2
  83:10 117:6

—————————
**F**
**facilities** 13:3
**facility** 13:7
  14:7,9,15,17
  15:9,11,25
  16:6,8,12,14
  16:18,21 18:22
  20:2 23:21
  24:24 25:15
  27:10,16 30:1
  31:19 34:18
  35:23 41:12

  42:22 43:7,24
  44:5,9,9,15,17
  53:21 65:17
  79:11 81:22
  96:13
**fact** 55:5 85:13
  85:14 107:3
  108:16 109:8
  110:22
**fading** 100:16
**failure** 119:3
**fair** 11:7 45:20
**Fall** 8:15
**familiar** 100:11
  103:12
**family** 107:18
**far** 20:10 47:17
  59:23 64:10
  69:14 76:4
  86:9 121:12
**Farm** 110:21
  111:5,12,15
**fast-food** 14:18
**father** 109:21,22
**father's** 109:12
**fault** 52:12
  98:18
**Featherwood**
  126:20
**February** 6:6,7
  7:12 17:7 21:6
  33:16 39:13,16
  40:22 41:3,8
  41:11,15 42:14
  47:9 48:7 60:8
  71:8 74:18
  76:24 81:5
  89:13 110:7
**Federal** 1:24
  10:23
**feel** 93:25 94:1,3
  94:6,8,11
  96:25 112:13
**feeling** 47:18
**fellow** 68:20
  69:2
**felt** 95:9

**figure** 40:4
**FILE** 1:7 125:7
**filed** 40:17
**filled** 42:6
**filling** 28:18
**finally** 5:13
  121:5
**financially**
  126:13
**find** 77:2 79:25
  85:11
**findings** 108:13
**fine** 95:9 118:22
**finish** 5:14,24
  76:10
**finished** 57:11
**Firm** 2:14
  126:21
**first** 4:14,20 5:1
  6:18 10:14
  11:18 17:13
  18:1,11,20
  30:13 32:16
  39:20 48:13
  55:5 57:8
  59:19,20 62:6
  77:1 80:3 82:1
  101:2
**Fischer** 6:18,23
**five** 80:3 81:23
**fix** 56:3
**floor** 27:20
  36:10 58:2,8
**focus** 9:12 36:12
  44:15
**folks** 66:18
  76:23 80:7
  81:9 95:5
**follow** 110:16
**following** 32:1
  41:13 125:19
**follows** 4:14
**food** 30:5,10,20
  31:1 35:23
  62:17,23 64:18
  64:23 67:15
  68:20 77:8

81:4,25 83:3
88:21 89:3,17
93:1,3,14,18
94:15 121:1
**Foods** 3:15 13:1
13:14,17 14:4
14:6,15 17:10
18:22 19:1,21
19:24 27:12
28:3 31:5 33:8
33:22 36:4
41:12 43:22
44:17,18 45:25
46:19 47:16
51:24 52:2,25
60:11 61:15,21
62:1 63:8 64:6
64:10 65:3,8
65:13,21 69:14
70:6,12 74:3
81:10 91:13
95:5 102:25
107:2 108:16
109:7
**Foods'** 31:6
36:20 53:23
61:4,10
**foregoing** 124:1
124:14
**forgive** 24:1
43:20
**forgot** 10:17
79:10 100:12
**form** 56:2 60:2
67:22 68:15,22
70:13 74:12
88:9 91:9,17
91:18
**format** 18:14
**forms** 117:17
**formula** 44:1
**Fort** 1:23 7:24
8:4 16:19,22
**forth** 106:24
**foster** 47:4
**found** 10:2
80:19 117:19

**four** 20:8,12
47:14 52:16
70:24 80:3
109:19
**four-shift** 31:13
**fourth** 39:15
**fracture** 101:1
**frankly** 64:11
**FRCP** 125:24
**frequency** 60:20
**frequently** 60:18
**Friday** 22:24
23:3 41:10
48:8 53:19
57:5 67:1
**Fridays** 22:7
**fried** 88:18,18
88:18
**friends** 114:7,9
**front** 66:23
**full** 6:2 14:16
16:3
**function** 28:25
29:10
**functions** 28:12
**funny** 105:14
**further** 125:24
126:9,12
**fusion** 106:4

### G

**G** 4:1
**G25** 50:20,21
**G35** 50:19
109:11
**gap** 21:1
**gather** 61:4
**gathering** 61:13
61:19 69:6
70:10 120:19
120:24 121:12
**gatherings**
69:23
**general** 9:19
28:9 43:23
69:13
**generally** 15:23

36:4 44:9 70:7
**Georgia** 1:2 2:6
2:11,15 6:11
7:8 8:7,13,22
8:25 13:4,5,7
80:16 125:2
**get-together**
90:18,19
**getting** 100:15
116:25
**give** 6:2 28:9
31:25 79:17
95:4
**given** 4:20 27:19
28:2,3,10
29:23 31:4
33:3 38:2
59:20 89:25
90:7,12,12,15
124:18 125:22
**giving** 4:24
79:16
**go** 4:18 6:24 8:8
10:17 12:25
21:24 26:13
27:10 32:19
34:20 36:23
37:19 40:4
45:19,24,25,25
46:17 48:6,10
48:10,21 50:7
51:24 52:8,21
53:11 55:20
59:12 60:18
61:8 70:16
71:6 81:10
83:25 92:2
99:17,17,17
102:15 104:16
105:17 118:18
**goal** 29:21
**goals** 17:14 29:8
43:16 44:9,10
54:24 55:7,25
56:1,7,9,10
57:1
**goes** 6:25 100:13

101:16
**going** 5:17,21
15:25 16:3,25
18:2,2,12 22:2
29:17 31:23,24
35:15,16 38:14
39:20 46:5
48:2,10 54:17
56:19,19 57:4
57:19 61:24
68:19 70:2,17
76:11 83:7
84:5,19 92:21
92:23 95:6,22
95:22,23,23
96:19,19 97:1
97:2,2,12
102:18,21
105:18,19
109:3 116:2
117:7 118:21
121:1,20,20,24
**Golden** 3:15
12:25 13:14,16
14:3,6,14
17:10 18:22
19:1,21,24
27:11 28:3
30:4,9,20 31:1
31:5,6 33:7,22
35:23 36:4,20
41:12 43:22
44:17,18 45:25
46:19 47:16
51:24 52:2,25
53:22 60:11
61:4,9,15,21
61:25 62:16,23
63:8 64:5,9,18
64:22 65:3,7
65:13,21 67:14
68:20 69:14
70:6,12 74:3
77:8 79:16
81:3,10,24
83:3 89:3,16
91:13 93:13,18

94:15 95:5
102:25 107:1
108:16 109:7
**goldenstatefo...**
30:14
**good** 4:2 9:23
10:7 47:4 58:2
69:13 73:22
76:12
**graduate** 9:6
**graduating**
10:14 11:18
**Grady** 107:21
**great** 106:7
**GREG** 1:5
125:5
**grew** 8:7
**ground** 4:18
107:23
**group** 61:11
66:25 73:15,25
74:2,14 75:12
79:25 80:4,7,7
80:21 82:5
104:10,11,13
**grow** 8:6
**guess** 9:16 23:8
24:17 30:18
36:5 37:18
49:13 61:11
100:16
**guide** 116:23
**Guinness** 86:13
91:24
**Guinnesses**
86:10
**gun** 5:18
**guy** 69:21
**guys** 39:2 92:21
**Gwinnett** 6:12
**gym** 48:16,21,24
49:1,3 50:7

### H

**H** 92:12
**half** 15:18,19,22
60:21

**hand** 124:18
**handing** 38:25
  112:1
**happen** 32:4
  41:6 58:11
  88:16 99:1
**happened** 21:5
  41:10
**happening** 55:1
  95:25 120:21
**happy** 97:11
  120:25
**hard** 52:22
  53:12 57:24
  61:6 73:18
  87:17,17 99:12
  101:14
**Haynes** 98:5
**hazy** 100:1
**head** 5:8 13:18
  20:1 21:4 63:2
  99:10 103:21
**headquartered**
  14:4
**heads-up** 32:1
**heard** 101:3
**held** 13:3 17:15
  26:4 44:20
**helicopter**
  107:24 108:1
**help** 27:24 42:16
  47:4 115:7
**helped** 25:17
**helpful** 5:10
  46:25
**helping** 91:3
  102:2,15
**hey** 31:22 46:8
  47:17 54:9
  85:4
**hierarchy** 62:17
  63:4,23 64:10
  64:23 65:8,21
  67:16 69:3
**HIESTAND**
  2:10
**high** 8:8,9,11

37:15 99:18
  100:13
**higher** 21:17
**Highlander**
  110:8,13,16,18
  111:9,10,14
**hipbone** 101:3
**hit** 99:10
**holding** 19:3
  118:3
**home** 11:24
  30:23 31:19
  45:17 49:11
  51:12 93:8,16
  93:20 94:23
  96:23 97:12
**hooters** 87:2
**hospital** 105:24
  105:25
**hospitalized**
  108:4
**hour** 49:10
  76:11 120:25
**hourly** 26:25
  27:8 42:10,11
  42:13 74:9
  79:16
**hours** 16:4
  21:12,18,21,24
  49:10 52:16,17
  70:24,25 85:24
**house** 26:5 49:3
  50:22 51:3
**housekeeping**
  11:16
**Houston** 126:21
**Howell** 116:1
**huge** 15:9
**huh-uh** 5:8,11
**Hyatt** 2:4,4,4
  3:6,8 4:8,8,16
  4:17 10:17
  11:7,12,14,16
  26:19 32:18,21
  38:19 39:3,5,7
  39:9 47:24
  52:18 56:4

76:12 82:11,14
  82:19 83:11,16
  83:19,23 84:2
  84:4,7,10,14
  87:7 111:20,25
  116:22 117:2
  119:9 121:11
  121:18,22
**Hyatt's** 119:24

      **I**
**ID** 118:3,7,16
**idea** 66:8 72:4
  72:12 73:6
  75:8
**identified** 62:20
  92:12
**identify** 4:5
**identity** 124:13
**iliac** 101:1
**imagine** 34:25
  53:14 54:1
  78:10 79:25
**importance** 9:23
  10:3
**important** 10:8
  69:11
**improvement**
  19:8 80:15
**in-house** 26:12
**incentive** 43:15
**incident** 6:8
  99:9 112:7,12
  114:13
**Incident/Offe...**
  3:19 112:2
**incidental** 70:11
  70:14
**include** 55:3
**incoming** 39:22
  74:21,25 75:6
**incorrect** 70:22
**incredibly**
  114:17
**indicated** 33:3
  70:21
**indicating** 57:13

**indication** 54:20
  95:4
**individual** 20:13
**individually**
  73:19
**individuals**
  35:21 67:4,7
  80:1
**Industries** 10:15
  11:19,21 12:6
**Infiniti** 50:19
  109:11
**information**
  28:18,19 29:5
  54:15 108:13
  109:2,3
**informed** 57:16
**initial** 9:16
  30:13 32:16
**initiated** 60:14
  81:6
**injure** 105:11
**injured** 47:8
  100:17
**injuries** 100:19
**injury** 105:7
**inquiry** 84:25
  85:4
**instance** 1:16
**instances** 56:21
  74:5
**instigated** 68:13
**instruct** 117:9
**instructions**
  90:7
**instrument**
  124:15
**insurance**
  110:25 111:1,8
**insured** 110:20
  111:16
**interact-** 107:17
**interaction**
  107:8,14,18
**interested**
  126:14
**interesting** 9:18

**intern** 12:7
**Internet** 28:13
**interrogatories**
  88:10
**interrogatory**
  52:7,11 70:22
  85:22 114:24
**interruption**
  100:2
**intersection**
  98:5 100:14
**interval** 17:21
**intoxicated** 94:1
  101:17,24
**intoxication**
  112:25
**intramural**
  105:12
**introduced** 4:18
**inventory** 12:11
**invitation** 68:2,6
  81:3,7,9,15
**invite** 60:11
**invited** 46:17
  67:19 68:13
  70:15,16
  121:15
**inviting** 66:10
**involved** 19:17
  115:14
**involving** 112:3
**iPhones** 96:15
**Irish** 86:22 87:1
  87:2,8,12
**Irvine** 14:5
**issue** 37:18
  80:18
**issued** 81:3,8,15
  89:8
**issuer** 89:7
**issues** 38:13
  46:5
**It'll** 84:15
**itemized** 82:7,20
  86:21

      **J**

**J** 1:19 125:16
126:18
**jadelman@wa...**
2:12
**jalapenos** 88:18
**Jan** 1:8,12,16
3:5 4:10,12,13
6:4,5 10:20
24:20 25:7
33:2 76:21
119:21 123:2
124:1,5,11
125:8,13,20
**January** 12:2,2
13:1 14:7 17:4
39:13 40:21
41:3
**Jason** 43:1
55:15 56:23
62:21,22
**jdick** 30:13
**jdick95@gma...**
32:17
**jealous** 100:5
**Jeep** 110:11,12
**job** 3:15 10:14
11:18 13:13
17:9 18:7,13
18:15,21,25
19:1,16 22:12
23:9,14 27:20
28:21 29:3,20
36:19 70:18,19
91:7
**JobzMail** 18:8
**JobzMall** 18:8
**jog** 77:11 78:17
**John** 2:4 4:8,17
**john@hyatt-l...**
2:7
**Jon** 82:11
**Jonathan** 2:9
4:10 82:11
**Joy** 6:18,23
**Jr** 2:13
**judge** 29:15
113:23 114:2,4

114:12 119:7
**July** 1:13,18 4:3
125:14 126:16
**jumbo** 88:19
**jump** 5:18
**June** 82:17
112:3 117:23
**Justin** 41:16
42:18 43:1
55:16,17 56:24
56:25 62:7,19
62:20 66:17
78:13 79:23

**K**

**K-O-A-H** 80:12
**K3** 25:18,19,22
**K4** 25:18,19
**Kate** 63:25
**keep** 45:2
**kept** 54:6
**ketchup** 25:14
25:15 26:1,2,2
44:10 48:4
**key** 49:4
**kids** 97:13
**kind** 5:18 9:17
13:7 15:4
22:11 23:19
28:12 54:2
57:22 58:11
64:12 66:2,6
85:4 88:13
94:17 99:2
100:15 102:8
109:1
**Kline** 1:5,5
107:8 125:5,5
**Kline's** 98:8,12
98:22 107:11
107:12
**knee** 100:20
**knew** 54:25 69:1
69:5 93:11
**knock** 57:4
**knocking** 54:9
**know** 4:23 5:3

8:2 13:9,19,23
16:14,16,16
17:11 20:2,15
22:7 23:16
24:24,25 25:7
26:5 36:1
40:14 41:1
42:5,5 44:1,12
44:13 48:1
49:20 54:5,9
54:19 56:5,8
58:10,22 59:24
60:22,25 61:7
61:8 63:11
64:10 66:14,23
68:3 70:8,14
71:17 72:14
73:5,13 74:7
75:1,24 79:12
80:6,18 83:8
84:21 86:18,19
87:22,24 90:23
90:24 91:6
92:1,9,13 93:1
93:10,12,18,21
94:8,9 95:21
96:1,15,15,19
98:24 99:2,3
100:17 101:3
106:19 107:3
107:11 109:23
111:1,4,10
112:9,24 113:3
113:4,7,7,8,10
113:19,21
114:4,18,20
115:4,5,7
117:16 120:12
120:16,25
121:14
**knowing** 113:9
**knowledge**
30:17 44:8
50:13,15 89:6
111:16,18
**knowledgeable**
57:17

**known** 124:11
**Koah** 80:12
**KPIs** 19:8

**L**

**L-A-M-A-L-V...**
116:22
**L-O-N-D-O-N...**
64:16
**L4-L5** 104:23
**labor-intensive**
34:24
**lady** 102:1,7
118:2
**LaMalva** 116:20
116:23
**lane** 98:9,12,22
**laptop** 27:18
28:2,10 31:4,8
31:18 102:23
102:23,25
**large** 15:7,8 20:2
**larger** 26:11
88:1,5
**lately** 119:7
**law** 117:22
**lawsuit** 40:17
108:7,11
**lawyer** 47:23
48:1
**lead** 42:10,13
54:8,16 58:8
77:22,22 79:1
**lead's** 54:8
**leader** 63:12,14
63:14
**leadership** 13:11
24:23
**learn** 117:4
**leave** 12:25 38:2
38:3,6,12,17
45:9,13 50:2
52:2,20 53:10
95:12
**leaving** 84:24
94:16,20 99:6
99:8

**left** 51:2,3 57:10
57:19 58:20,22
81:20 93:11
94:14 96:18
98:1 99:21
100:14,23
101:1 106:25
**leftovers** 59:10
60:3
**leg** 105:20
**legal** 112:25
**legitimate** 91:10
91:14
**legs** 105:19
**lesser** 118:25
**let's** 22:3 38:19
48:6 71:6
76:14 119:13
**letting** 80:18
**level** 43:22
44:13,14
**levels** 64:14
**Lexington** 1:22
**Liberty** 110:12
110:16,19
111:9
**life** 68:10
**limitations**
110:3
**Linda** 37:11
**line** 55:5 57:12
58:17 74:7
76:10 123:3
**lines** 77:16
**lingering** 106:20
**LinkedIn** 8:17
12:1
**list** 39:16 62:3
71:7 97:8
**listed** 62:6
**listen** 51:13
**listening** 55:23
**literally** 116:11
**Lithia** 104:18
**little** 8:19 50:14
50:14 53:19
96:13 99:3

118:10
live 14:1
lives 7:25
living 111:2
LLP 1:22
location 25:11
104:8
log 27:11,22
54:2
Loganville 6:11
6:13 105:24
logged 27:15
logging 53:3
logistics 19:12
Londono 64:16
long 6:23 13:16
13:23 24:3
47:11 49:8
51:19 108:4
109:18
longer 21:18
look 18:11 24:20
38:19 40:25
53:22 71:7
76:22 79:22
84:2 112:6
looked 25:22
70:3 79:14,19
103:10
looking 13:12
25:8 86:6
looks 5:11 12:5
16:25 19:17
39:21 71:12
75:4
loop 118:14
lot 5:11,16 18:19
19:17 39:14
45:21 91:3
love 8:5
lower 21:20 22:2
104:23
lunch 45:13,16
45:19,24 46:3
46:8,18 59:4,7
59:13 60:2,3
118:19

**M**

M 2:4
M-A-R-T-A
64:15
M-E-N-D-E-Z
24:1
machine 1:21
26:3,11 42:11
54:9
machines 25:24
25:25 26:15
main 28:12
99:17
maintain 119:3
major 9:4 70:18
making 22:13
71:19 84:25
93:3
man 101:16
manage 19:12
management
9:14,20 10:2,9
13:11 26:16
63:20 65:18
69:11,14
manager 12:12
12:14,16 13:2
22:10,12,14,15
23:11,13 37:25
41:18,20 42:1
42:19 44:25
55:14,15 57:15
59:22 62:12,13
64:21 65:6
89:21,22,24
managers 23:18
mandatory
121:3,13
manufacture
14:22
manufacturing
17:24
mark 18:3 83:21
83:21,23 84:7
marked 18:4
38:22 84:13,16

111:21
married 6:15
7:2 33:4
110:24
Marta 64:15
66:20
mary 61:22
119:4,5
match 19:2
76:23
materials 12:11
math 116:11
matter 48:1
matters 33:3,11
May- 21:4
McDonald's
26:1
mean 15:9 46:8
46:25 56:9
66:17 68:3
80:8 83:20,25
84:24 99:23
101:23 109:1
116:12 120:11
meaning 61:22
61:23
means 20:10
meant 50:2 52:4
measure 24:21
measured 17:22
medication
104:24
meet 60:12
67:20 81:4,10
meeting 17:13
43:16 44:9,10
55:6,6,25,25
56:7 66:3
68:13,19 69:6
70:2,9 120:19
120:20
members 66:22
90:25
memory 76:7
77:11 78:17
100:10
Mendez 23:25

78:4
mention 120:18
mentioned
23:22 37:7
48:18 53:15
106:18
mentioning
13:10 19:11
merge 28:20
Merit 125:16
message 66:3
71:13,19,23
72:6,18,25
73:8 74:11
77:20 78:1
79:20,22
messages 3:16
39:12 40:8,23
41:7 71:8
72:15 73:19
74:2 79:14
80:22 96:14
messy 61:17
met 25:7 54:24
56:9,10 57:1
metrics 23:19
29:12 43:21
Michelob 86:10
86:14,15 91:24
92:2
Microsoft 28:11
29:1 30:19
middle 6:22
Mike 63:6 82:21
82:22,23,24
85:15,17,17
89:15
mileage 45:2
military 75:19
Mill 116:1
Miller 98:4
99:21 100:7
milling 92:17
mine 35:6
103:20 110:22
110:22
minute 73:19

minutes 51:20
81:23
mixed 86:4,20
88:9,15
Monday 41:13
month 34:4
45:19 67:11,12
monthly 34:1
months 20:25
21:4 67:11
106:18,23
107:4
morning 4:2
48:17 49:19
51:7,12,16,18
71:20 73:25
74:1,15 96:19
mother-in-law
107:12
move 7:8 8:2
69:6
moved 12:9 23:8
23:9,15 109:24
moving 12:21
47:1 75:11
mozzarella
88:19
Multiple 105:1
multitasking
19:17
muscle 103:11
103:17,18
mushrooms
88:19
music 51:13

**N**

N 2:1 3:1 4:1
nachos 88:20
name 6:2,17,18
6:22,23 24:1
25:13 30:13
32:16 37:11,11
42:15 49:2
60:23 62:21
92:9,13 100:12
103:16,21

104:13 109:12
109:12 123:2
124:14
**names** 23:24
24:2,6 76:22
80:6
**Nancy** 113:23
**narrative** 112:6
**nature** 27:17
28:6 31:25
53:3 85:1,6
95:7
**near** 16:18 60:4
98:5
**necessarily**
27:22 57:12
**necessary** 54:22
**need** 5:2 31:23
32:19 82:15
85:5 100:3
**needed** 17:16
22:22 24:10
36:9 58:17
74:11 93:25
105:16 107:3
**needs** 15:13,16
16:10 21:15,17
21:20 22:2,9
53:18
**neither** 126:9
**nerve** 106:19
**network** 30:6,7
63:12,16
**new** 42:3,5
**night** 20:14,21
20:25 24:2,4
59:10 77:13
79:1 99:11
**nights** 79:2
**nodding** 5:8
**noncontact**
105:13
**normal** 5:16
38:8 53:6
96:22
**normally** 84:24
**Norman** 118:2

**north** 16:16
**NORTHERN**
1:2 125:2
**NOTARY**
124:22
**note** 52:5
**noted** 124:3
**notes** 119:10
**notified** 96:25
**notify** 96:2
**notifying** 31:22
**number** 3:14 7:6
16:14 17:15,18
17:19,20,23
18:4 25:13
33:8,19 34:8
35:3 38:22
52:15 71:13,17
71:23 72:2,7
72:10,19,23
73:1,4,9,13
74:22 75:1,5,6
75:11,25 77:2
84:13 96:5
100:22 101:8
111:21 120:5,7
126:21
**number's** 96:7
**numbered** 1:18
**numbers** 37:14
39:14,16 40:3
40:3 72:16
76:3,7,23
**nurse** 102:13,14
118:2
**Nyesha** 77:4

**O**

**O** 4:1
**o'clock** 95:13
96:23
**oath** 124:12
**oatmeal** 49:22
50:3 59:24
**object** 117:7
**objection** 56:2,2
67:22 68:15,22

70:13 83:8
91:17,18
**objections** 10:24
11:4
**objectives** 10:8
47:5
**obtaining** 83:12
**obviously** 16:20
17:11 33:7
70:18 82:17
92:25 99:12
101:4 114:17
114:22
**occasions** 31:20
38:11
**occurred** 98:4
98:11
**occurring** 92:23
**October** 7:3
33:5
**offered** 35:20
85:16
**office** 3:19 14:5
55:20 104:16
112:3 124:18
**officed** 66:21,22
**officer** 13:20,24
101:11 112:7
112:16 113:5
118:1 125:21
**officers** 66:24
**offices** 1:21
**oh** 26:19 34:23
75:24 105:8
106:9 108:25
114:14 117:8
118:24
**okay** 4:17 5:4,11
5:25 6:1,12,21
6:24 7:1,12,15
7:18 8:18,21
11:12 13:13
14:19 15:11,17
15:20 16:6,25
17:19 18:1,9
18:17 19:15,19
20:6,17,20

21:5 22:1,3,23
24:4,7,9 25:7
25:12 26:16
27:2,23 28:2
29:2 30:4,25
32:12 33:7
34:12 35:9
37:18 38:19,25
39:6,8,20 40:7
42:13,18,25
44:16 46:11
47:8 50:3
51:21 52:18,20
53:22 56:16
57:4 58:5,21
61:17,18 62:15
64:15 71:6,12
72:18 74:14
75:22 76:15,21
77:18 78:3
79:19 80:2,20
80:25 81:2,24
82:8,19,24
83:11 84:2,16
85:11,17 86:16
87:1,7,19 88:3
89:1,11 96:18
97:7 101:23
102:13 104:5
104:10 105:7
106:6 108:25
110:16,20
111:19,20
112:11 117:11
117:15,18
118:15,21
119:7,11
120:18,23
121:3,8,18,22
121:25
**old** 14:11 99:18
**Olde** 51:22
**once** 45:18,19,20
67:11,11,12
82:3 86:21
88:14
**online** 18:10

116:4,23 117:4
**open** 16:9 23:1
26:6 56:11
**operating** 13:20
13:23 15:12
**operations** 3:15
17:1,6,9 18:21
19:1,16,23
21:9 22:14,15
23:11,13,18,22
24:10,17 25:2
26:21 28:21
37:4 38:4,7
41:18,20,25
42:8,19 43:3,6
43:13 44:25
45:1,8,12
46:16 55:12,14
55:15 57:15
59:22 61:14,20
61:25 62:11,12
62:13,15 63:1
63:18 64:21
65:6 66:22,22
89:20,24
**operators** 42:12
54:9
**opportunities**
13:13
**opposed** 5:7
15:25 36:13
92:21
**opposite** 10:21
**option** 96:16
**options** 92:2
**oral** 1:11,15
125:13,21
**order** 5:3 24:21
27:16 29:3
86:24
**ordered** 82:4
88:15
**orders** 16:11
92:21 93:1,1,4
**organized**
121:15
**originally** 88:8

**orthopedic** 103:25 104:1 104:10 105:17
**orthopedist** 104:5
**ounce** 88:1
**ounces** 88:2
**Out-** 30:19
**outcome** 115:9 126:14
**outgoing** 39:23 71:13,23 72:6 72:19 73:1 75:6 77:20 78:13
**Outlook** 30:19
**outstanding** 79:18
**owe** 85:1
**owed** 34:9
**owners** 60:25

**P**

**P** 2:1,1 4:1
**p.m** 21:16 52:23 53:7 75:13
**pack** 14:16
**Package** 14:25
**packaging** 11:22 11:23 14:18,19
**packets** 26:1,2
**page** 3:2,14 5:4 39:15,20 71:7 112:6 123:3 126:5
**paid** 26:25 27:8 34:16 43:12 82:25 83:3 85:15 89:16 108:17,17
**pain** 104:24 105:19 106:19
**paper** 11:23
**paramedics** 102:8
**Pardon** 39:3
**Parkway** 2:10

**part** 6:12 27:23 29:20 46:11 49:23 61:13,19 61:24 69:9 70:18 101:18 115:23
**particular** 69:15 94:22
**particularly** 58:25
**parties** 126:10
**party** 10:22 94:15 126:2,8
**passing** 66:9
**pay** 43:16 84:19 84:21 85:16 118:23
**paying** 82:4 84:25 85:5,8 85:12,12
**payment** 91:9
**PC** 2:4
**PCL** 100:21
**peeked** 8:17
**peers** 61:8 90:25
**people** 26:6 36:16 54:25 55:2 61:11 66:13,13 70:9 91:8 93:14,19 94:16 121:1
**people's** 76:7
**perceived** 69:18
**percent** 16:2,3 29:18 53:25 64:11 87:11 88:12 91:22,25 97:24
**percentage** 15:23 35:2,11 35:18
**percentages** 44:14
**perception** 70:9
**perform** 29:3 115:6
**performance**

43:24,25 44:15 79:18
**performed** 24:24
**performing** 36:13
**period** 39:22 40:20,24 41:3
**person** 37:21,23 82:3 124:14
**personal** 30:22 32:13 35:19 44:19
**personally** 124:11
**persons** 62:3 67:19 69:1
**phone** 7:6 30:22 30:24,25 32:6 32:9 33:11,15 33:23 34:8,9 34:14 35:11,15 37:22 39:12 40:24 46:6 71:3 73:1,9 74:19 76:7,22 80:23 95:17,18 96:13,17 97:5 97:7,20,25
**phones** 100:6
**photo** 84:5,14 118:4
**phrase** 121:1
**physical** 25:11
**pickles** 88:18
**piece** 80:19
**pieces** 101:13
**pill** 103:10
**pin** 67:13
**pint** 88:1,4,6
**pints** 88:7
**places** 45:21 69:15
**Plaintiff's** 89:16 112:1
**plaintiffs** 1:6,17 2:3 4:9 125:6

**Plaintiffs'** 18:3 38:25 40:21 71:6 84:17 86:7
**plan** 34:9 35:5,5 74:10
**planned** 22:5
**planning** 12:11 23:5 57:7
**plans** 8:2 77:15 109:2
**plant** 22:16,24 23:1 24:9 25:5 25:9 31:22 42:4,7 43:10 45:9,13 46:4 46:18 50:22 52:20 53:20 59:2 60:4 62:11 63:2,18 64:7 66:14 118:8
**platonic** 114:9
**play** 83:12 115:9
**player** 69:19
**playing** 105:12
**please** 4:5,6 5:7 6:3
**plus** 90:13
**point** 11:6 27:22 51:21 54:7 56:21 68:18 89:25 97:1 103:9 106:4 108:15 118:1
**policy** 110:25 111:5,6
**position** 12:18 13:3,8,12 17:3 17:6,17 18:21 19:4,20 22:13 23:9,15 25:17 26:17 37:2,17 41:17 42:3,5 44:21,25 59:22 62:25 63:10 64:4,20 65:5

65:15 78:6
**positive** 70:3,6
**possibility** 40:6 58:6 59:15,16 67:18 68:1,5 73:17 74:20 86:24 88:11 118:20
**possibly** 60:3,3 86:19
**Post** 51:22,25 52:3,21 53:11 58:22 60:12,16 61:1,5 62:4 65:25 66:4 67:1,20 68:20 70:2,11,17,19 70:23 71:3 81:4,19,22 85:23 87:19 91:15 92:10,18 93:3,7,10,14 94:14 95:12,15 95:19 96:20 97:17 98:1 99:7 101:9 108:18 118:16 120:1,19 121:13
**posted** 18:7
**potato** 88:19
**pouch** 26:7
**pouches** 26:4,11
**pounds** 60:7
**pour** 26:7
**Pratt** 10:15 11:19,21 12:6 12:19,25 105:6
**prescribed** 103:19
**prescription** 103:10,14
**presence** 58:2
**PRESENT** 2:17
**presented** 92:1
**preserve** 80:25
**president** 43:2,6

63:1
**presumption**
112:25
**pretty** 34:24
59:6 96:14
97:4 99:15
116:9
**pretzel** 88:19,24
89:2
**primarily** 11:22
**printed** 18:10
82:18,19
**printout** 87:6
**prior** 111:23,24
112:3
**private** 30:6,7
**privileged** 117:1
117:7
**probably** 50:15
54:14 56:22
60:10,20 73:22
78:19 88:24
106:25 107:11
**problems** 5:19
**Procedure** 1:24
10:23
**proceeding**
126:11
**process** 12:9
57:17
**produce** 17:16
25:25 29:17
54:4
**produced** 1:16
17:21 26:4,11
29:18 82:7
**product** 17:20
17:24 57:19
113:13
**product-** 31:24
**production**
12:16 13:2
17:14,22 27:16
27:21 29:8
30:2 31:14
36:13 37:8
43:16 44:6

53:18 54:20,24
55:6 57:1,10
58:8,20
**productionwise**
78:20
**productivity**
17:14 19:8
24:15,18 29:15
31:24
**productivityw...**
29:14
**products** 17:12
25:9
**profile** 8:17 12:2
**program** 34:2
**promoted** 41:25
44:24 59:21
**pronounce**
101:2
**proper** 90:8,9,14
90:22
**proprietary**
28:8
**protein** 49:24
50:1,3 59:24
**PROUT** 2:10
**proved** 124:12
**provided** 10:22
62:3
**provisions** 1:25
**PUBLIC** 124:22
**pull** 102:22
**pulled** 103:9
105:15 117:21
**pump** 26:12
**purpose** 10:21
10:22 35:14
**purposely** 41:2
**purposes** 31:6
35:17 124:16
**pursuant** 1:24
125:24
**put** 10:18 52:9
120:12,13
**putting** 110:3

_____
**Q**

**quality** 17:12
58:12
**question** 5:14,18
5:24 18:18
24:22 28:23
31:12 52:6
56:13 61:6,17
120:4
**questioning**
76:10
**questions** 5:1
38:13 119:24
**quicker** 84:15
**quite** 116:10,10
**quota** 25:8
37:14
**quotas** 24:15,18
25:1,2 37:8,8

_____
**R**

**R** 2:1 4:1
**R-A-I-N-I-E-R**
7:23
**Radio** 51:12
**Rainier** 7:23
**range** 21:23
**ranged** 49:9
**reached** 32:5,8
**reaction** 108:21
108:24
**read** 112:8
124:1
**real** 29:10 56:3
**realized** 68:18
**really** 15:7 36:9
64:13 66:18
98:24 113:9
**Realtime** 125:17
**reask** 117:3
**reason** 117:22
123:3
**reasons** 126:5
**recall** 9:22 40:12
40:16 44:12,13
46:21 47:13
48:15 50:23,25
51:5,8,10

52:22 53:12
59:1,3,5,11
60:13,14 65:24
66:1,6 68:6,12
71:5,19,21
74:14 77:25
78:8 79:3 81:6
81:20 82:2,6
84:18 87:17
92:5,7,9,19
93:5,9,17
94:17,25 95:3
95:20,25 97:11
97:25 98:3
99:12 100:15
101:15 104:15
107:10,16,17
107:20 108:4
112:4 114:21
116:17,18
117:25 118:17
118:22 120:2
121:14
**receipt** 3:18
82:7,21 83:13
86:22 87:1
126:3
**receive** 31:1,9
33:10,21 37:24
43:15,23 44:5
44:17 51:15
71:2 95:17,18
**received** 39:12
40:15 41:7
**receiving** 44:22
47:15
**Recess** 32:24
76:18 119:16
**recognize** 75:1
75:24
**recollection**
73:24
**record** 1:25 4:3
4:6 10:18 11:5
32:23 33:1,2
39:11 40:8
52:8,10,24

57:21 76:14,17
76:20 119:15
119:18 122:1
125:22 126:13
**record-keeping**
54:1
**records** 53:23
**redact** 114:22
**redacted** 39:14
40:3,4 71:9
**registered**
112:22 125:16
**Registration**
126:21
**regulations**
90:15
**reimburse** 34:10
34:13 35:10
**reimbursement**
33:22 34:1,17
35:10,14 44:18
**related** 34:5,21
39:25 40:5
126:10
**relationship**
114:23
**relative** 110:14
126:12
**relaxer** 103:11
103:17,18
**remember** 24:2
24:5 40:11
49:2 56:12
66:11 68:3
81:18 85:17,19
87:16 88:23
92:6,23 97:15
99:4,6,6,7,13
99:22,23 100:7
100:22 101:1
102:1,5,7,10
102:12,14
103:16,21
104:13,14
105:2,4 110:9
110:11,14,23
111:8 114:16

114:18 115:19
115:25 116:1
118:5 120:8,14
**remembering**
104:8
**remorseful**
115:8
**remote** 36:6
**remotely** 35:24
**repeat** 18:17
**rephrase** 5:2
**report** 3:20
112:2,7,12
114:7
**reported** 1:20
42:10 112:15
**reporter** 4:7
5:19 125:17,17
125:18
**REPORTER'S**
3:11 125:12
**REPORTERS**
126:19
**reports** 28:19
34:4 101:17
**request** 40:7,15
40:18 60:12
**requested** 67:19
126:1,7
**require** 36:23
**required** 27:2,6
**researched**
117:16
**reserve** 121:21
121:24
**reserved** 10:24
11:4
**resided** 106:19
**respond** 46:5
**response** 39:9
119:23
**responses** 52:7
52:12 70:22
85:22 86:19
114:25
**responsibility**
23:19

**restate** 5:2
**restaurant** 26:5
26:6,9
**restaurants**
14:18
**restroom** 32:20
**Resurgens**
104:14,16,20
105:23,23
**return** 45:5
47:12 49:11
**returned** 41:11
126:3,4
**review** 37:25
**reviewed** 86:21
**ribs** 100:22,24
**Ridge** 98:5
**right** 4:23 5:21
6:2 8:10,10,12
10:16 11:14
12:1 14:14
16:13 17:15
19:5,15 24:15
24:25 29:5,12
32:21 34:3
35:22 36:2,8,8
40:7 45:22
46:9,14,15
47:2 48:6
52:15 53:20
55:1,19 56:4
57:3 60:7
63:22 66:4
67:8 68:10,12
68:23 70:17
71:2 73:24
75:20,23 76:2
76:8 77:23,25
79:3 81:2 83:2
83:5,15 85:21
86:6 87:8,11
87:16 88:17
93:2 94:11
95:4 96:1 97:5
99:8,15 100:20
100:24 103:3
105:20 109:24

110:1 111:25
112:21 113:9
114:6 119:9
120:15,25
121:18,23
**ring** 92:14
**road** 7:23 14:11
98:4,5 100:7
100:12 116:1
**Rockdale** 3:19
8:9 100:13
112:2 113:20
113:22 114:1,1
115:1
**Rodriguez** 78:22
**role** 13:2 23:12
27:19 83:12
115:9
**room** 25:22
77:15
**rooms** 23:20
25:16,17
**rote** 36:13,16
**roughly** 20:25
**route** 99:13,23
**row** 25:25
**rubbing** 66:18
**Rule** 125:24
**rules** 1:24 4:18
10:23
**run** 21:18,21
**running** 16:7,8
16:9 24:9
31:14 54:21
82:5
**ruptured** 104:22

**S**

**S** 2:1 4:1
**S-L-I-P-S-A-...**
43:4
**S-U-B-A-K-O**
6:19
**S-U-M-I-K-O**
6:20
**safe** 94:3
**safety** 17:12

**salaried** 35:20
**salary** 26:25
27:1 43:12
**sandwich** 59:9
60:3
**Sanger** 1:22
**sauce** 25:16
**sausage** 49:24
**save** 8:19 40:8
84:4
**saved** 40:24 94:3
**saw** 82:6 88:14
**saying** 24:5 56:6
57:13 58:6
85:17,19
102:14
**says** 39:21 75:19
87:1
**scale** 15:7,8
**scenario** 53:12
53:24 58:11
**scenarios** 53:14
98:25
**scene** 95:15
97:17 107:9,15
107:19
**schedule** 29:16
30:2,3 37:24
54:20 58:15
**scheduled** 22:8
31:21 32:7
54:19
**scheduler** 30:1
37:7
**schedules** 31:24
**scheduling**
37:14
**school** 8:8,9,11
99:18 100:13
**science** 116:11
**scope** 16:23
**screenshot** 41:6
**seal** 124:18
**security** 79:11
**see** 25:23,24
36:19 39:15,16
39:18,21 57:22

71:15 74:21,23
75:11 82:14
86:9,9,22
88:17 92:3
97:8 102:17
105:17 112:12
112:15,21
**seeing** 101:15
102:1,5 118:5
**seen** 18:12,15,20
82:8,8 96:3
101:18 114:25
119:7
**send** 29:8 30:2
30:19,23 31:8
34:7 37:7 40:8
51:1,9 74:2
**sending** 71:19
72:14 73:25
74:14
**sense** 34:6 76:4
**sent** 34:17 39:12
40:18 41:7
72:19 73:18
75:4,5 79:23
80:7 87:6
**separate** 23:20
32:12 66:23
**September** 7:10
7:15
**serve** 87:22,25
87:25 88:1
**server** 92:12,20
92:25
**service** 12:14
96:14 115:14
116:3,4,6,7,14
116:24 117:5
117:17
**set** 29:21 30:25
31:14 34:3,7
35:1,2 116:16
116:17,18
**seven** 15:25 16:3
31:16 65:23
67:14,19 73:18
80:3 81:3,9

100:24
**severe** 101:4
**severed** 100:21
**severn** 100:20
**shake** 50:1,3
59:25
**share** 109:1
**shared** 35:5
**Sheriff's** 3:19
112:2
**shift** 20:12,14,14
20:16,17,20,21
20:25 21:6,13
22:1,2,3 23:16
23:25 24:2,4
29:7,9 31:15
31:23 36:24
38:8 46:4
50:11 53:4,4,7
58:1,19 59:11
66:19 77:13
78:7 79:1
**shifts** 21:18
22:20
**ship** 14:17 15:2
**shipped** 17:20
17:21
**shirt** 102:2,11
118:11
**shooter** 86:23
87:9,12
**shooters** 87:3
**short** 21:24 22:7
**shorter** 22:2
**shorthand** 1:21
125:18
**shortly** 40:14
59:21 81:21
**shot** 99:15
**shots** 92:3,6
**show** 18:1,2
53:24 102:22
115:7
**Shower** 49:13
**showing** 84:16
**shows** 82:16
**shut** 15:11,14

16:1 22:3,24
23:3,4,6 56:8
58:15
**shutting** 22:6
23:2,6 57:7
**sic** 106:19
**sick** 38:2,6,12
**side** 100:23
**Sidewinder**
88:20
**sign** 90:8
**signature** 3:10
11:9 119:11
123:1 124:2
125:25 126:5
**significant**
68:10
**simple** 59:9
**sir** 4:22 5:22
6:14 7:17 8:3
8:14,16 9:1,5,7
9:11,21,25
10:4,10,13
11:20 12:4,8
12:10,13,15,17
12:22 13:15,22
13:25 14:2,5,8
14:10,13,24
15:1,3,8,21
16:5,20 17:2,5
17:8,22 18:24
19:18,22 20:1
20:19 21:7,11
21:19,22,25
22:17 24:12,16
24:19 25:3,6
25:10,21 26:22
26:24 27:4,7,9
27:13,18 28:1
28:4,7,16 29:1
29:4,22,24
30:11,16,21
31:3,7 32:2,14
33:6,9,12,14
33:17,20,24
34:15,19,23,25
35:13,25 36:6

36:15,18,22,25
37:2,3,9,17,20
38:5,10,15,18
39:19 40:1,9
40:19,25 41:5
41:9,21,23
42:2,20,24
43:5,8,11,14
43:18 44:3,7
44:20 45:4,7
45:11,14,23
46:2,7,10,12
46:21,24 47:3
47:7,10,20
48:9,22 49:7
49:12,14,16
50:1,4,6,9,12
50:18,20 51:5
51:10,14,23
52:1 53:1,5,9
53:21 54:11,13
55:4,8,11,18
56:15,18 57:2
57:6 59:3,14
59:16,18 60:1
60:5,17,24
61:2,16 62:2,5
62:8,10,14,18
62:22,24 63:3
63:5,7,9,19,21
63:24 64:1,3,8
64:17,19,24
65:2,4,9,11,14
65:19,22 66:5
66:9,16,20
67:13,17 68:1
68:5,11,14,17
68:25 69:4,8
69:12,17,20,22
70:1,5,15,20
71:1,11,16,18
72:1,5,9,13,17
72:22 73:3,7
73:12,14,21
74:1,4,16,20
74:24 75:3,7
75:10,14,21

76:1,6,25 77:6
77:13,21,24
78:5,11,14,16
78:19,21,24
79:5,8,14,21
79:24 80:8,13
80:24 81:1
82:10 83:1,4
83:14 84:12,20
84:23 85:3,7
85:20,25 86:3
86:5,8,12
87:14,18,21,24
88:22 89:5,14
89:18,21 90:2
90:4,6,10,16
90:20 91:12,16
91:25 92:7,11
92:15 93:5,9
93:21,23 94:2
94:5,7,10,13
95:1,3,8,11,16
95:20,24 96:4
96:6,8,21,24
97:3,6,10,19
97:22,24 98:3
98:6,10,13,17
98:20 99:14,16
99:19,21,25
100:1,8,18
101:6,10,13,18
101:22,25
102:4,6,9,16
102:20,24
103:2,5,8,13
103:18 104:7
104:12 105:8
105:10,20
106:2,9,12,15
106:17 107:7
107:13,16,20
107:22 108:3,8
108:19 109:10
109:14,25
110:5,22 111:3
111:10,18
112:5,14,18,20

112:23 113:1,3
113:15,18,22
113:25 114:3,5
114:8,14 115:3
115:22 116:15
116:21 118:6,9
118:12,12,24
119:2,6,8
121:17
**sit** 58:21 101:7
102:15 109:8
**sitting** 55:23
92:16,19
116:12
**situation** 58:14
67:2 112:4
113:9 114:22
115:8
**situations** 22:23
**six** 21:4,24 80:3
88:4
**sixth** 73:8
**size** 87:22
**skins** 88:20
**Slack** 1:21
**Slipsager** 43:1
62:20,22
**small** 14:17,19
**smaller** 23:17
**Smith** 41:16
42:18 43:1
55:16,17 62:7
78:13 79:23
**Snellville** 105:24
**soccer** 105:13
**software** 28:5
**someone's** 5:17
84:24
**sorry** 6:21,23
7:9 11:14
18:17 24:7
26:19 28:22
51:10 56:25
61:23 67:5
75:17 76:6
81:17 91:17
94:21 102:12

104:1,2 111:13
116:10 118:13
**sort** 22:21 47:18
78:20 91:5
102:15 106:11
108:25
**sound** 103:12
**spasms** 106:11
106:18
**speak** 4:19 20:4
20:22 24:14
46:20 63:23
69:25 114:12
**speaking** 15:23
70:7
**specific** 17:13
80:19 91:6
94:25
**specifically**
19:10 44:10
96:13 101:2
**speculate** 98:25
**speeding** 117:24
**spelled** 7:23
30:15 43:4
**spelling** 42:16
**spending** 90:13
102:7
**spent** 20:25
27:20
**Spirit** 79:17
**split** 25:10
**spoke** 56:12
**spoken** 4:23
108:6 109:6
**spread** 66:14
**spreadsheet**
28:15,20,24
**spreadsheets**
28:6
**Springs** 104:18
**sprinting** 105:14
**staff** 60:22 93:3
93:7,10
**staffed** 49:6
**stainless** 26:8
**stand** 64:9

**stand-alone** 26:3
26:10
**standards** 27:25
36:21
**start** 5:14,14
8:10 9:2 44:22
**started** 4:19
8:12,13 12:7
13:12 14:6
17:1 21:4
28:18 50:10
53:4 68:2
**starting** 75:12
**starts** 100:15
**state** 1:20,23
3:15 4:6 8:13
8:22 13:1,14
13:17 14:3,6
14:14 17:10
18:22 19:1,21
19:24 27:11
28:3 30:4,9,20
31:1,5,6 33:7
33:22 35:23
36:4,20 41:12
43:22 44:17,18
45:25 46:19
47:16 51:24
52:2,25 53:22
60:11 61:4,9
61:15,21 62:1
62:17,23 63:8
64:5,9,18,22
65:3,7,13,21
67:15 68:20
69:14 70:6,12
74:3 77:8 81:3
81:10,24 83:3
89:3,17 91:13
93:14,18 94:15
95:5 102:25
107:2 108:16
109:7 110:21
111:5,12,15
114:1 124:7,23
125:18
**stated** 1:25

**STATES** 1:1
125:1
**stay** 23:6 37:1
56:11 106:21
**stayed** 23:4
**steel** 26:8
**stemming**
108:11
**step** 105:14
**sticks** 88:19
**stipend** 33:21
44:18,23
**stipulations**
10:18
**stocking** 101:16
**stood** 9:17 58:19
**stop** 58:8
**stops** 48:1 50:21
95:14 97:17
**straight** 31:16
89:23 99:15
**Street** 1:22
99:17
**strictly** 31:5
**strike** 54:14
**striped** 102:2,11
**structure** 31:13
**study** 8:22 9:15
**studying** 9:22
**stuff** 8:21 28:8
105:19 117:1
**subscribed**
124:14 126:15
**substance** 15:5
78:1,8 79:4
80:17
**substantive**
47:17
**suggested** 115:6
116:18
**suggesting** 58:15
**suggestion** 60:15
88:13 120:13
**Suite** 1:22 2:5,11
126:20
**sum** 15:4
**Sumiko** 6:18,21

**summarize**
59:23
**supervise** 19:13
25:17
**supervised**
77:14
**supervising**
36:10,17
**supervision**
36:12
**supervisor** 3:15
17:1,6,10
18:22 19:1,16
20:17 21:6,9
21:10 23:16
24:10,17 25:2
26:21 27:24
28:21 31:15,16
37:5,19 38:4,7
41:14 42:8
43:13 45:1,8
45:12 46:11,17
46:18 55:13
58:9 61:14,20
61:25 62:9,11
62:15 77:13
78:7,15
**supervisors**
19:23 20:7,13
20:15 22:21
23:23 74:9
**supervisors'**
24:2
**supplier** 45:10
**supply** 9:14 12:9
63:12,14 65:16
**support** 21:1
**supporting**
27:20
**sure** 5:22 8:20
11:15 13:18
14:16 17:11,18
20:1,12 21:3
30:7,8 32:21
40:25 56:1,6
56:19 64:11,13
72:3,11,17,24

77:9 88:12
96:25 97:10
108:10 109:16
109:17
**surgeon** 103:20
103:22,23,25
105:17
**surgeons** 104:21
106:20
**surgeries** 108:2
**surgery** 104:25
105:21 106:21
**swear** 4:7
**sworn** 1:17 4:14
125:20 126:15
**system** 27:12,15
30:4 52:25
53:23 54:2

**T**
**tab** 82:5,25
84:19,21 85:15
85:16 89:16
91:15 108:17
**table** 92:17,19
92:24
**take** 8:11 32:19
41:6 42:21
76:10,14 84:5
84:14 92:25
100:3 106:13
107:5 118:19
119:12
**taken** 1:17 90:24
91:7,8,8
106:17,23
107:2,4,21,23
107:25 126:12
**talk** 11:11,13
52:18 119:13
**talked** 23:20
53:17 69:10
91:3 92:8
119:23
**talking** 5:14,25
16:7 17:19
21:9 52:13

55:24 69:24
**TAMARA** 1:5
125:5
**target** 57:14
**targets** 30:3
**Tarrant** 1:23
**tasks** 36:13,16
115:6
**tavern** 51:22
58:22 61:13,19
61:24 65:25
68:20 81:4
97:12
**tax** 45:5
**Taylor** 2:18
**team** 13:11 38:1
69:18 90:25
**teamwork** 9:23
10:6 69:10,15
91:4
**tear** 26:6
**tech** 12:9
**teenager** 73:22
113:8,13
**Telephone** 100:2
**tell** 14:14 20:20
33:25 52:5
54:7,8,16,16
58:8 63:11
80:5 98:21
108:9 114:15
116:3
**telling** 114:21
**tend** 5:17 69:23
**tenure** 20:18
**Terrell** 92:12,13
**testified** 4:14
85:22
**testimony**
125:22
**Texas** 1:20,23
7:8 16:20
125:18 126:18
126:21
**text** 3:16 32:9
33:11 34:21
37:22 39:11

40:8,22 41:7
55:20 58:3
71:8,12,19,23
72:6,15,18,25
73:8,15,19,25
74:2,11,15,18
74:21 75:5,6
76:24 77:20
78:13 79:14,19
79:22,25 80:4
80:7,17,21,22
96:2,3,10,14
**texting** 77:12
**texts** 34:5 39:22
39:23,24 41:2
47:16 51:9
74:25 75:12
80:11
**Thank** 18:5,6
38:21,23 52:19
104:1 111:22
**Thanks** 38:24
**therefor** 126:6
**Therese** 1:19
125:16 126:18
**thing** 25:19,21
36:1 47:19
49:5 69:21
78:20 88:25
91:5 99:4,22
100:11,11
102:15 106:11
108:25 115:12
**things** 4:25
11:23 19:10
22:25 25:20
27:17 28:6
31:25 36:10
43:17 47:1
57:8 119:22
**think** 5:21 7:19
49:18 52:13
56:3 62:6 68:2
78:21 80:20
83:9 88:8
91:20 92:8
94:16 97:14,16

100:12,23,24
102:23 104:17
104:17,18,23
105:5,22
109:19,24
119:10,23
120:6
**third** 72:6
**thought** 88:11
88:15 105:14
**three** 20:7,25
23:22 26:14
52:16,17 67:11
70:24,25 79:6
80:3 85:24
86:18,25 88:13
91:23 108:5
109:19,19
119:25 120:14
120:15,17
**ticket** 117:24
**time** 8:19 10:25
12:6 15:13,24
17:21 19:13,24
21:15 25:5
26:18,18 27:22
34:16 35:22
37:2,4 38:3,3,9
40:20 41:19,21
41:22 42:6
44:4,16,20
45:8,12 46:16
47:11,15 48:11
48:13,15,19
49:17 52:2,20
52:22 57:16,20
59:18 60:22
62:25 64:4,20
65:15 71:20
75:19 76:12
81:18 84:4
85:23 95:12
97:20 98:1,1,2
101:3 102:7
103:6,15 105:3
105:5,20,23
106:17 107:3

109:21 110:1
110:14,24
113:8 115:5
117:25
**timeline** 47:13
109:23
**times** 5:17 15:14
22:25 56:16
60:21 61:7
87:20 105:22
**timewise** 51:19
**tip** 90:14
**title** 43:2,21
63:11 79:10
**titled** 109:12,16
**titles** 64:13
**tizanidine**
103:11,14
106:8,13
**today** 29:18
58:21 101:7
109:7
**told** 90:12
105:16 112:16
**top** 13:18 20:1
21:3 39:21
103:21
**topic** 78:2
**total** 20:8 23:18
34:8 35:2
100:24
**totally** 64:12
95:9
**Totals** 39:21
**touch** 119:4
**town** 51:22
115:23
**Toyota** 110:8,13
**track** 45:2
**traits** 10:12
**transaction** 54:3
**transcript** 5:10
125:21 126:4
**transferred** 8:24
113:20,21
114:20,25
**transitioned**

13:6
**transitions**
20:23
**transportation**
19:12
**travel** 98:9,12
98:23
**treated** 104:19
**Trick** 61:17
**tried** 79:24
**trigger** 54:23
57:4
**truck** 107:12
**true** 10:3 112:19
124:3 125:22
**try** 5:3,13,23,24
**trying** 99:2
**turn** 34:4 100:14
**turns** 102:13
**two** 6:10 7:5 8:1
13:3 15:19,22
16:11 20:14
22:19 23:20
24:2,6 25:15
49:10 52:16
70:25 74:25
75:6 80:3
85:24 86:1,17
86:18,19,25
87:1,22 88:13
88:18 91:23
92:1 99:8
100:6 103:10
104:7 106:1
117:24 119:24
120:13,14,17
121:2
**type** 25:20 27:14
29:5 53:24
**types** 26:15
69:23
**typical** 48:19
50:5 59:7
**typically** 10:11
16:11,12 21:14
21:16 22:7,8
26:8 32:2,2,3,5

35:16 37:23
45:16,25 48:16
48:25 49:22
51:13,17,18
54:18 55:12,20
57:7,9,24 59:5
61:9,10 66:19
74:7 85:2 89:2
96:12,16
118:18
**typo** 52:6,11

_____

**U**

**Uber** 93:15,19
95:6
**UGA** 10:14
11:18
**uh-huh** 5:7,10
14:21 36:3
**Ultra** 86:14 92:2
**Ultras** 86:10,15
91:24
**umbrella** 111:5
**unclear** 5:1
**understand**
28:22 35:13
55:24 56:13
57:9 58:18
99:2 107:25
**understanding**
24:22 35:9
82:24 83:1,2,9
89:12,15 90:11
105:17
**understands**
35:15
**understood** 5:12
57:18 108:10
**unfolds** 53:24
**unfortunately**
40:16 42:17
44:3 74:16
76:7 106:7
**unhappy** 13:8
97:11
**UNITED** 1:1
125:1

**University** 8:24
**unusual** 61:3
**unwinding**
69:25
**update** 108:12
**upset** 97:15
**use** 10:25 11:6
21:8 26:9
28:24 30:22
31:5,8 33:23
34:14 35:11,15
35:19 44:23
74:13 90:9,14
90:22 110:3
121:1
**uses** 91:10
**usual** 38:8 61:3
**usually** 51:19
96:10

_____

**V**

**vacation** 38:3,17
**valid** 90:14
**vehicle** 44:19,23
111:6,11,15
117:21
**vehicles** 110:6
110:20
**verify** 41:1
**versa** 20:16
110:17,18
**vice** 20:16 43:2,6
63:1 110:17,18
**video** 5:9 11:5,5
101:12,15,20
102:5,17 118:1
118:5
**Videographer**
2:18 4:2 32:22
32:25 76:16,19
119:14,17
121:25
**VIDEOTAPED**
1:11,15 125:13
**VS** 1:7 125:7

_____

**W**

**W-A-R-N-E-R**
65:11
**wait** 5:13,23
11:8,10
**waiting** 94:23
**WALDON** 2:10
**walk** 2:14 95:2
**walking** 57:18
92:24
**Walmart** 11:24
**want** 8:21 11:8
18:11 52:8,14
76:13 83:21,23
84:9 119:21
**wanted** 69:18
70:16
**Warner** 65:10
**wasn't** 30:17
32:7 35:18
36:4 41:19
42:6 49:6
54:22 57:12
58:2 60:20
67:3,6 70:18
85:13 88:12
94:18 110:2
112:19 118:25
120:12,15
121:13
**watch** 101:14
**watched** 101:11
101:13
**way** 6:10 22:8
40:2 50:21,24
51:7,16 52:4
54:19 82:16
109:16
**we'll** 4:18 5:23
11:11,13 52:18
**we're** 10:19 16:7
18:2 21:8,9
31:23 32:22
48:10 54:9,21
56:19 57:4,13
57:14,14 58:15
76:16 86:6
97:8 119:10,14

121:24,25
**we've** 66:13 71:7
71:12 76:11
80:22 91:7,8,8
114:25
**wear** 118:7,8
**wearing** 101:16
118:16,20
**Wednesday** 4:3
**week** 15:25 16:3
22:10 32:1
45:18,20 50:8
53:16 54:25
**weekend** 22:6
23:1,2 31:9,15
31:17,21 32:7
33:13 54:21
56:11 57:8
58:16
**weekends** 15:14
15:15 16:1
**weekly** 30:2
37:24 54:19
**weeks** 47:14
**weigh** 60:6,7,9
**Wendy's** 26:2
**went** 25:22 27:3
48:23 49:5
51:21 53:3
65:24 70:18
73:9,16 80:21
103:1 105:15
110:12 118:16
**weren't** 31:21
53:2,2 85:12
88:14 110:24
120:6
**whichever** 17:24
**Whistle** 51:22
51:25 52:3,21
53:11 58:22
60:12,16,25
61:5 62:4
65:25 66:3
67:1,20 68:19
70:2,11,17,19
70:23 71:3

81:4,19,22
85:23 87:19
91:15 92:9,10
92:18 93:3,7
93:10,14 94:14
95:12,14,19
96:20 97:17
99:19 99:6
101:8 108:18
118:16 119:25
120:19 121:12
**whoever's** 38:12
**wife** 7:6 8:1 35:6
95:21 96:9,25
97:8 110:6
**wife's** 6:17
**WiFi** 96:16
**Wild** 6:9,10
**will@call-ellis...**
2:16
**Willie** 2:13 4:12
**Wilson** 63:6
82:22,23,25
85:16 89:15
**wing** 101:1
**wish** 99:1,1
**witness** 1:16 3:5
4:7 7:20 11:15
18:6 38:21
82:22 84:12
91:21 111:22
117:8,11,14
121:8 123:2
125:20,23
**word** 21:8 28:11
**words** 6:10
24:14
**work** 11:22
16:24 19:7
20:6 24:3
27:24 30:4,10
30:23 31:6,9
31:16 32:7
33:11 34:5
35:19 36:7,19
36:20 39:25
41:12 43:19

47:12,17 48:19
51:1,1,7,12,15
51:16 61:5
64:7 70:9
77:17,17 96:10
96:18 103:1,4
105:7 106:24
118:3,7,16,18
121:2
**work-related**
35:12,17 45:3
80:9
**workday** 50:5
50:10 74:3
96:20
**worked** 15:15
20:4,9 23:23
26:4 30:5
64:12
**worker** 81:25
**workers** 30:20
68:20
**workers'** 105:9
**working** 10:1
15:24 20:10
27:5 35:23
105:5 107:1
**workout** 49:8
**workplace** 9:24
10:7
**works** 92:10
**world** 9:17 10:2
10:8
**WORLDWIDE**
126:19
**Worth** 1:23 7:24
8:4 16:19,22
**wouldn't** 16:12
27:21 58:16
68:4 73:19
81:16,17 85:19
90:19 110:24
120:24
**wrap** 11:23
53:19
**wrapping** 53:16
**wreck** 41:10

48:12 110:2
**written** 5:10
52:15
**wrong** 19:6 33:4

**X**

**X** 3:1
**XX** 126:1

**Y**

**y'all** 92:16 114:9
114:9
**Yarbrough**
42:16 77:20
**Yarbrough's**
79:2
**yeah** 5:5 7:21
11:10 15:20
17:11 18:19
20:3,24 28:17
28:24 35:1
36:6 40:12
48:3,3 51:13
53:17 55:2
67:10 73:23
75:24 76:12,13
80:2,2,10
83:18,19,23,25
84:3,6,10 87:6
90:21 91:21
94:22 99:22
104:3 109:17
111:25 115:21
116:10,10
119:13 121:24
**year** 7:9,10,10
7:16,19,20
8:11 9:2,8
15:17 68:7,9
99:3
**years** 13:19
105:1,1,1
109:19,20
114:16
**yellow** 98:8,15
98:22

**Z**

**zag** 5:21
**zigging** 5:21

**0**

**0.192** 112:22

**1**

**1** 3:15 18:3,4
**1-28-22** 3:16
**1-800-745-1101**
126:22
**1,000** 29:17,18
**1:23-CV-0203...**
1:7 125:7
**10** 81:23 114:16
**10:26** 76:17
**10:26-10:47**
76:18
**10:47** 76:20
**100** 1:22 29:18
53:25 64:11
87:11 88:12
91:22,25 97:24
**1040** 2:11
**11** 6:7 33:16
**11:39** 71:13,23
72:7,15,19,25
73:9,16 80:21
119:15
**11:39-11:52**
119:16
**11:51** 74:21 75:1
**11:52** 119:18
**11:54** 1:19 122:1
122:2
**111** 3:19
**119** 3:7 39:23
**11th** 17:7 21:6
39:16 41:8,11
41:15 42:14
47:9 48:7 60:8
71:8 74:18
76:24 81:5
110:7
**12** 21:18,21
**12-hour** 21:14

**121** 3:8
**123** 3:10
**125** 2:5 3:11
**12621** 126:20
**138** 14:9 99:20
99:24 100:14
100:15
**14:37** 75:12,19
**145** 2:14
**14th** 6:6
**16** 88:1
**174.20** 90:13
**178** 39:22
**18** 3:15
**19** 1:13 125:14
**1906** 77:4
**1995** 6:6
**19th** 1:18 4:3

**2**

**2** 3:3,16 38:22
38:25 39:15
40:21 71:6
**2-23-22** 3:17
**2:00** 48:20
**2:37** 75:16,18,23
**20** 13:19 51:20
**2012** 8:15 50:19
**2013** 112:3
117:23 118:21
**2014** 9:3
**2016** 9:9
**2017** 12:2
**2021** 7:3 12:3
13:1 14:7 17:4
**2022** 6:7 7:15
17:4,7 21:6
23:7 33:5,16
39:13,13,17
40:22 41:3,8
41:11,15,25
42:14 48:7
60:8 71:8
74:18 89:13,20
89:25 110:7
**2023** 1:13,19 4:4
82:17 124:19

125:14 126:16
**21** 7:11 15:19
**210** 60:10
**22** 7:13,14 88:1
**223** 126:21
**230** 60:7
**23rd** 39:13
40:22
**24** 16:4
**24-hour** 49:3
**24/7** 15:12
**25th** 126:16
**270** 6:9
**28th** 39:13 40:21
**290** 126:20

**3**

**3** 3:18 80:11
84:11,13,17
86:7 89:16
112:6
**3(a)** 52:15
**3:00** 48:20
**30** 126:3
**30(e)(1)** 125:25
**300** 16:17
**30030** 2:6
**30331** 2:15
**30339** 2:11
**38** 3:16
**3983** 80:11

**4**

**4** 3:6,19 71:7
111:20,21
112:1
**4/30/24** 126:19
**4:00** 52:23 53:10
58:23 81:21
**4:30** 52:23 53:10
58:23 81:21
**402-510-8705**
73:1 78:12
**404-368-2745**
7:7 96:7
**404-378-3635**
2:6

**404-536-5773**
73:10 78:22
**404-593-3731**
74:22 79:7
**404-680-3664**
33:19
**404-798-5027**
72:7 77:19
**404-820-5207**
72:20 78:3
**440** 2:5

---

**5**

**5** 59:25
**5:00** 49:20
**5001** 126:19
**5027** 77:19

---

**6**

**6-24-13** 3:19
**6-9-23** 3:18
**6:00** 21:16,16
48:18 50:10,14
50:16 53:7,7
**6:37** 75:13

---

**7**

**7** 95:13 96:23
**7-19-23** 123:2
**70** 1:22 16:2,3
**706-853-1906**
71:24
**72** 35:7
**75** 2:10
**770-212-1432**
2:15
**770-953-1710**
2:12
**77034** 126:21

---

**8**

**8:50** 1:19 4:3
**80** 35:8
**8104** 7:23
**814-441-3983**
75:25
**84** 3:18

**84-** 75:25
**850-901-8888**
71:14
**8888** 77:1

---

**9**

**9:25** 32:23
**9:25-9:29** 32:24
**9:29** 33:1
**900** 2:10
**9th** 82:17